**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EXPRESSIONS HAIR DESIGN, LINDA
FIACCO, THE BROOKLYN FARMACY &
SODA FOUNTAIN, INC., PETER FREEMAN,
BUNDA STARR CORP., DONNA PABST, FIVE
POINTS ACADEMY, STEVE MILLES,
PATIO.COM LLC, and DAVID ROSS,

No. 13-CIV-3775 (JSR)

        *Plaintiffs*,

      v.

ERIC T. SCHNEIDERMAN, in his official capacity
as Attorney General of the State of New York,

        *Defendant*.

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

DEEPAK GUPTA (*pro hac vice*)
GREGORY A. BECK
BRIAN WOLFMAN
JONATHAN E. TAYLOR
GUPTA BECK PLLC
1625 Massachusetts Avenue, NW, Suite 500
Washington, DC 20036
(202) 470-3826

GARY B. FRIEDMAN
TRACEY KITZMAN
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680 5150

MARK WENDORF
REINHARDT, WENDORF &
BLANCHFIELD
332 Minnesota Street
St. Paul, MN 55101
(651) 287-2100

June 17, 2013

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................ii

Introduction ...........................................................................................................1

Background ............................................................................................................4

    I.    Why Labels Matter: The Communicative Difference Between "Surcharges" and "Discounts" ..........................................................................................5

    II.   How We Got Here: The Credit-Card Industry's Concerted Efforts To Prevent Merchants From Communicating the Costs of Credit As "Surcharges" ..................8

        A.   The industry's early ban on differential pricing and its demise ......................8

        B.   The credit-card industry shifts its strategy to labels ..................................9

        C.   The industry's labeling strategy achieves short-lived success at the federal level ...........................................................................................9

        D.   The credit-card industry lobbies states to enact no-surcharge laws and adopts contractual no-surcharge rules .............................................11

        E.   The Durbin Amendment and the recent political controversy over swipe fees ...............................................................................................13

        F.   Visa and MasterCard drop their no-surcharge rules ...................................14

    III.  The Plaintiffs ...............................................................................................15

Preliminary-Injunction Standard ..........................................................................20

Argument .............................................................................................................21

    I.    The Plaintiffs Are Likely to Prevail on Their First Amendment Claim. ...................21

        A.   New York's no-surcharge law is a content-based speech restriction subject to heightened First Amendment scrutiny. .........................................21

        B.   The no-surcharge law cannot withstand even intermediate scrutiny. ............28

            1.   It is legal for merchants to directly pass along the cost of swipe fees to consumers who pay with credit cards, and labeling that cost as a "surcharge" is not misleading. ...........................................29

            2.   The state has no legitimate interest in obscuring the cost of credit-card transactions from consumers. ...........................................30

            3.   The no-surcharge law does not directly advance any legitimate state interest. ..........................................................................................31

            4.   The no-surcharge law is far more extensive than necessary to serve any legitimate state interest. ........................................................34

    II.  The Plaintiffs Are Likely to Prevail on Their Void-for-Vagueness Claim..................36

        A.   The no-surcharge law fails to provide actual notice of what language a merchant may not use in describing a dual-pricing system. ........................37

        B.   The no-surcharge law fails to provide explicit standards for enforcement. ....................................................................................40

    III.  The Other Preliminary-Injunction Factors Also Favor the Plaintiffs. ........................42

Conclusion ...........................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*
    517 U.S. 484 (1996) .................................................................................24, 28, 32

*Allstate Insurance Co. v. Abbott,*
    495 F.3d 151 (5th Cir. 2007) ..................................................................................24

*American Booksellers Association, Inc. v. Hudnut,*
    771 F.2d 323 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986) ....................................23

*BellSouth Telecommunications, Inc. v. Farris,*
    542 F.3d 499 (6th Cir. 2008) ............................................................................*passim*

*Bloom v. O'Brien,*
    841 F. Supp. 277 (D. Minn. 1993) ....................................................................*passim*

*Bolger v. Youngs Drug Products Corp.,*
    463 U.S. 60 (1983) ..................................................................................................28

*Bronx Household of Faith v. Board of Education,*
    331 F.3d 342 (2d Cir. 2003) ....................................................................................43

*Brown v. Entertainment Merchants Association,*
    131 S. Ct. 2729 (2011) .......................................................................................27, 40

*Capital Leasing of Ohio, Inc. v. Columbus Municipal Airport Authority,*
    13 F. Supp. 2d 640 (S.D. Ohio 1998) ...............................................25, 29, 32, 35

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,*
    447 U.S. 557 (1980) .........................................................................................*passim*

*Chatin v. Coombe,*
    186 F.3d 82 (2d Cir. 1999) ......................................................................................37

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
    598 F.3d 30 (2d Cir. 2010) ......................................................................................20

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993) ................................................................................................35

*Colautti v. Franklin,*
    439 U.S. 379 (1979) ................................................................................................37

*Edenfield v. Fane,*
    507 U.S. 761 (1993) .................................................................................29, 30, 31, 32

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................................43

*First National Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) ................................................................................................24

*Greater New Orleans Broadcasting Association, Inc. v. United States,*
    527 U.S. 173 (1999) ................................................................................................33

*In re R.M.J.*,
  455 U.S. 191 (1982) ...............................................................................29, 36

*International Dairy Foods Association v. Amestoy*,
  92 F.3d 67 (2d Cir. 1996) .....................................................................43

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ..........................................................................39, 42

*Latino Officers Association v. Safir*,
  170 F.3d 167 (2d Cir. 1999) ...............................................................43, 44

*Metropolitan Taxicab Board of Trade v. City of New York*,
  615 F.3d 152 (2d Cir. 2010) ................................................................21

*Motor Vehicle Manufacturers Association of the United States, Inc. v. Abrams*,
  684 F. Supp. 804 (S.D.N.Y. 1988) ..................................................*passim*

*NAACP v. Button*,
  371 U.S. 415 (1963) ............................................................................37

*National Electrical Manufacturers Association v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001) ................................................................36

*New York State Association of Realtors, Inc. v. Shaffer*,
  27 F.3d 834 (2d Cir. 1994) ..................................................................31

*North American Olive Oil Association v. Kangadis Food Inc.*,
  2013 WL 1777774 (S.D.N.Y. Apr. 25, 2013) ....................................21

*Pagan v. Fruchey*,
  492 F.3d 766 (6th Cir. 2007) (en banc) ............................................22

*Papachristou v. City of Jacksonville*,
  405 U.S. 156 (1972) ............................................................................42

*Peel v. Attorney Registration & Disciplinary Commission of Illinois*,
  496 U.S. 91 (1990) ..............................................................................36

*People v. Fulvio*,
  517 N.Y.S.2d 1008 (N.Y. Crim. Ct. 1987) ...................................*passim*

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997) ............................................................................40

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
  487 U.S. 781 (1988) ............................................................................27

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995) ........................................................................24, 33

*Smith v. Goguen*,
  415 U.S. 566 (1974) ............................................................................42

*Sorrell v. IMS Health Inc.*,
  131 S. Ct. 2653 (2011) .....................................................................*passim*

*Thompson v. Western States Medical Center*,
535 U.S. 357 (2002) ...................................................................................26, 32

*United States v. Amirnazmi*,
645 F.3d 564 (3d Cir. 2011) ...................................................................40

*United States. v. Caronia*,
703 F.3d 149 (2d Cir. 2012) ................................................................21, 22

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) ...................................................................................26

*VIP of Berlin, LLC v. Town of Berlin*,
593 F.3d 179 (2d Cir. 2010) ...................................................................37

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976) .................................................................24, 31, 32, 44

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ...................................................................................21

## Federal Legislation

15 U.S.C. § 1666(f)(a) ...................................................................................9

15 U.S.C. § 1666(f)(b) .................................................................................35

15 U.S.C. § 1693o-2 ...................................................................................13

Pub. L. No. 93, § 495, 88 Stat. 1500 (1974) ...................................................9

Pub. L. No. 94–222, 90 Stat. 197 (1976) .......................................................9

Pub. L. No. 97–25, 95 Stat. 144 (1981) .......................................................10

S. Rep. No. 97-23 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 74 ....................................10

156 Cong. Rec. S4839 (June 10, 2010) ...........................................................4

## State Legislation

Cal. Civ. Code § 1748.1(a) ...................................................................................11

Colo. Rev. Stat. § 5-2-212 ...................................................................................11

Conn. Gen. Stat. § 42-133ff ...................................................................................11

Fla. Stat. § 501.0117 ...................................................................................11

Kan. Stat. § 16a-2-403 ...................................................................................11

Mass. Gen. Laws ch. 140D, § 28A(a)(1)-(2) .......................................................11

Me. Rev. Stat. 9-A, § 8-303 ...................................................................................11

Minn. Stat. § 325G.051 ...................................................................................3, 36

N.Y. Crim Proc. Law § 420.05 ...................................................................................33

N.Y. Crim Proc. Law § 520.10(1)(i) ...................................................................................33

N.Y. Gen. Bus. Law § 349 .................................................................................35

N.Y. Gen. Bus. Law § 350 .................................................................................35

N.Y. Gen. Bus. Law § 350-a ..............................................................................35

N.Y. Gen. Bus. Law § 518 ............................................................................ *passim*

N.Y. Pub. Auth. Law § 1045-j(4-a)(b) ...............................................................33

N.Y. Pub. Serv. Law § 92-c(9) ..........................................................................33

Okla. Stat. 14a, § 2-211(A) ...............................................................................11

Tex. Fin. Code § 339.001 ..................................................................................11

Wash. HB 1870, *available at* http://apps.leg.wa.gov/billinfo/ .....................................36

**Articles**

Associated Press, *Consumers Gain Friends in Credit Card Fight,*
    Ocala Star-Banner, Apr. 2, 1984 ..................................................................12

Christopher J. Dodd, *Credit Card Surcharges,*
    New York Times, Mar. 12, 1984.....................................................................10

Gary Dymski, *State freezes illegal oil heat fees,*
    Newsday, Sept. 15, 2009 ............................................................................38

Stephen Engelberg, *Credit Card Surcharge Ban Ends,*
    New York Times, Feb. 27, 1984.....................................................................11

Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence of*
    *Market Manipulation,* 112 Harvard Law Review 1420 (1999) ...................................6

Betsy Horkovich, *The Cash Discount Act: More Than Just a Matter of Semantics?,*
    8 University of Dayton Law Review 137 (1982).................................................26

Daniel Kahneman, Jack L. Knetsch, & Richard H. Thaler, *Anomalies: The Endowment*
    *Effect, Loss Aversion, and Status Quo Bias,* 5 Journal of Economic Perspectives 193 (1991)..........6

Edmund W. Kitch, *The Framing Hypothesis: Is It Supported by Credit Card Issuer Opposition*
    *to a Surcharge on a Cash Price?,* 6 Journal of Law, Economics & Organization 217 (1991) ........8

Carol Krucoff, *When Cash Pays Off,*
    Washington Post, Sept. 22, 1981.............................................................11, 12

Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints,*
    55 UCLA Law Review 1321 (2008) ............................................4, 5, 11, 23, 44

Adam J. Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules,*
    *and the Hidden Costs of Credit,* 3 Berkeley Business Law Journal 265 (2006)............6, 27, 34, 45

Irvin Molotsky, *Extension of Credit Surcharge Ban,*
    New York Times, Feb. 29, 1984.....................................................................10

David Morrison, *7-Eleven Claims Millions of Interchange Signatures,*
    Credit Union Times, Sept. 28, 2009 ...............................................................14

J. Craig Sherman, *Credit Card Surcharge 'Propaganda' Leads to State Legislation*,
Washington Retail Insight, Feb. 1, 2013 .................................................................15

Gerald P. O'Driscoll, Jr., *The American Express Case: Public Good or Monopoly?*,
19 Journal of Law & Economics 163 (1976) ..........................................................8

Wayne T. Price & Amanda Stratford, *Store Owner Takes Petition to Congress*,
Florida Today, Sept. 29, 2009 ...............................................................................14

E. Scott Reckard, Andrea Chang & Marc Lifsher, *Victor in a War Over Credit Card
'Swipe Fees'*, Los Angeles Times, July 17, 2012 ....................................................14

Scott Schuh, Oz Shy, & Joanna Stavins, *Who Gains and Who Loses from Credit
Card Payments?*, Federal Reserve Bank of Boston (2010) ...................................4, 7

Jennifer Schwartz, *Suffolk County, NY Heating Oil Dealers Penalized for Credit Card Surcharges*,
Sept. 17, 2009, http://www.heatingoil.com/blog/
suffolk-county-ny-heating-oil-dealers-penalized-credit-card-surcharges/ ...........38

Jessica Silver-Greenberg, *Visa and MasterCard Settle Claims of Antitrust*,
New York Times, July 14, 2012 ..............................................................................15

Richard Thaler, *Toward a Positive Theory of Consumer Choice*,
1 Journal of Economic Behavior & Organization 39 (1980) ...................................9

Oliver Tree, *The Great Plastic Robbery Continues: Visa, MasterCard Still 'Ripping Off'
US Consumers*, International Business Times, Aug. 3, 2012 .....................................4

Amos Tversky & Daniel Kahneman, *Rational Choice and the Framing of Decisions*,
59 Journal of Business S251 (1986) .........................................................................9

**Other Sources**

American Express, *Merchant Reference Guide – U.S.* (April 2013), *available at*
https://www209.americanexpress.com/merchant/singlevoice/
singlevoiceflash/USEng/pdffiles/MerchantPolicyPDFs/US_%20RefGuide.pdf...............13

2006 N.Y. Attorney General, Formal Opinion No. F2 (Jan. 25, 2006)...................................41, 42

New York Attorney General, Press Release: *Attorney General Cuomo's Investigation
Prompts 14 Suffolk County-Based Home Heating Oil/propane Companies To Agree To
Stop Charging Surcharges For Credit Card Purchases* (Sept. 14, 2009).............................38

New York Insurance Department, Office of General Counsel Opinion (Feb. 25, 2008)........34, 42

New York Insurance Department, Office of General Counsel Opinion (June 19, 2007) ............42

New York State Department of Taxation and Finance, *Pay by Credit Card*,
*available at* http://www.tax.ny.gov/pay/all/pay_by_credit_card.htm.................................33

## INTRODUCTION

Each time a merchant swipes a credit card, the merchant incurs a "swipe fee." These fees are typically passed on to all consumers (whether or not they pay with credit) through higher prices. The plaintiffs are five New York merchants who want to pass on the cost of swipe fees to only those customers who pay with credit cards. They may lawfully do so by charging two prices: a higher price for using a credit card and a lower one for using cash, a check, or a debit card.

But a New York statute enacted at the behest of the credit-card lobby, N.Y. Gen. Bus. Law § 518, seeks to control how merchants may communicate those prices to consumers: It allows merchants to offer "discounts" to those who pay in cash, but makes it a crime to impose equivalent "surcharges" on those who pay with credit. A "surcharge" and a "discount" are two ways of framing the same price information—like calling a glass half full instead of half empty. But consumers react very differently to the two words, perceiving a "surcharge" as a penalty. Because the "surcharge" label is thus far more effective at communicating the cost of credit cards and discouraging their use, the credit-card industry has long insisted that it be suppressed. And the state, in justifying its adoption of the industry's speech code, openly relied on the different effect of the two words, "even if only psychologically," to produce "desired behavior."

New York's no-surcharge law in effect says to merchants: If you employ dual pricing, you may tell your customers only that they are paying *less* for paying without credit (a "discount"). But you may not tell them that they are paying *more* for using credit (a "surcharge")—even though they *are* paying more for using credit. As the only court to analyze the New York no-surcharge law has observed, "precisely the same conduct . . . may be treated either as a criminal offense or as lawfully permissible behavior, depending only upon the *label* the individual affixes to his economic behavior." *People v. Fulvio*, 517 N.Y.S.2d 1008, 1011 (N.Y. Crim. Ct. 1987). "[I]t is not the *act* which is outlawed, but the *word* given that act." *Id.* at 1015.

An example illustrates how the law works. Imagine that a merchant, seeking to cut down on swipe fees, puts up a sign offering a "discount" to anyone who pays with cash. A customer buys $100 worth of goods with a credit card. He pays the full $100, not the lower amount he would have paid had he used cash (say, $97). Is the merchant violating New York's no-surcharge law? No. She offers different prices for cash and credit, and describes the difference as a cash "discount"—both of which New York permits.

But suppose the merchant finds this framing ineffective at signaling the added cost of credit. So she chooses instead to label all items in her store with the lower cash price. She then describes the price difference as a "surcharge" for using credit and prominently advertises the surcharge so all her customers are made aware of it. The same customer buys the same goods, again with credit, and pays the same $100 ($97, plus a $3 surcharge). Has the merchant violated the law? Yes. Because she has labeled the price difference a "surcharge" rather than a "discount," she may now be arrested and prosecuted by the state.

Now suppose that the merchant decides to clearly advertise two prices for every item—a "cash price" and a "credit price." The same customer makes the same purchase. Is the merchant still violating the law? The state has taken the position that she could be—if she or one of her employees makes the mistake of *truthfully* describing the price difference in a conversation with a customer as $3 "more" for credit rather than $3 "less" for cash. *Id.* As these hypotheticals show, liability under New York's law turns on the language used to describe identical conduct—and nothing else. A merchant who uses the wrong words faces up to one year in state prison.

Because the "purpose and practical effect" of the no-surcharge law is to outlaw a disfavored way of truthfully describing lawful conduct, it is a content-based speech restriction—subject to "heightened scrutiny" and "presumptively invalid." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011). The law cannot withstand scrutiny. New York can put forth no legitimate

interest in suppressing merchants' efforts to convey the true cost of credit-card transactions to consumers, much less evidence that the law advances a legitimate interest. *See BellSouth v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008) (striking down a state law prohibiting a surcharge on phone bills to cover the cost of a tax, even though companies could lawfully pass that cost on to their customers); *Motor Vehicle Mfrs. Ass'n v. Abrams*, 684 F. Supp. 804, 805 (S.D.N.Y. 1988) (Sand, J.) (striking down a New York statute prohibiting a surcharge for lemon-law compliance costs, even though companies could lawfully pass along those costs to consumers). And the law is far more extensive than necessary to address any danger of undisclosed surcharges, which are independently prohibited by false advertising law and which, in any event, could be easily addressed by a simple disclosure requirement. *See*, *e.g.*, Minn. Stat. § 325G.051 (expressly allowing merchants to "impose a surcharge" for credit-card use and requiring that both surcharges and discounts be "conspicuously" disclosed).

The law is also unconstitutionally vague. It does not define "surcharge" or "discount," let alone the line between the two. Yet that line marks the difference between what is criminal and what is not. The law is so vague that one of the plaintiff merchants (Expressions Hair Design) must operate in constant fear of inadvertently describing its dual-pricing policy in a criminal way, while the other merchants (Brooklyn Farmacy & Soda Fountain, Brite Buy Wine & Spirits, Five Points Academy, and Patio.com) have been chilled from engaging in dual pricing altogether.

Because the New York no-surcharge law violates the First Amendment and is unconstitutionally vague—and because the plaintiffs are irreparably harmed each day that the law remains in effect—they are entitled to a preliminary injunction to prevent the state from enforcing the law against them while this case is pending.[1]

---

[1] The complaint raises a third claim—that the no-surcharge law is preempted by the Sherman Act—but the plaintiffs are not seeking a preliminary injunction on that claim.

## BACKGROUND

Americans pay some of the highest swipe fees in the world—as much as eight times the fees paid by Europeans, according to estimates by the Merchants Payments Coalition.[2] The typical swipe fee in the United States is between 2% and 3% of the purchase amount, while fees in some cases are even higher. Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1330, 1355 (2008). These fees add up. In processing more than two trillion dollars in credit-card transactions every year, banks and credit-card networks receive well over $50 billion in swipe fees. 156 Cong. Rec. S4839 (2010).

The main reason swipe fees are so high is that they have been kept hidden from consumers—the very people who decide which payment method to use and thus determine whether a fee will be incurred in the first place. "What most consumers do not know is that their decision to pay by credit card involves merchant fees, retail price increases, a nontrivial transfer of income from cash to card payers, and consequently a transfer from low-income to high-income consumers." Scott Schuh, Oz Shy, & Joanna Stavins, *Who Gains and Who Loses from Credit Card Payments?*, Federal Reserve Bank of Boston, at 1 (2010). Although merchants are allowed to charge consumers more for using credit, merchants cannot effectively communicate that added cost because the credit-card companies have succeeded in insisting that any price difference be labeled as a "discount" for cash rather than a "surcharge" for credit.[3]

New York's no-surcharge law makes it a crime, punishable by a $500 fine and up to one year in prison, for any "seller in any sales transaction [to] impose a surcharge on a holder who

---

[2] *See* Oliver Tree, *The Great Plastic Robbery Continues: Visa, MasterCard Still 'Ripping Off' US Consumers*, Int'l Bus. Times, Aug. 3, 2012, available at http://www.ibtimes.com/great-plastic-robbery-continues-visa-mastercard-still-ripping-us-consumers-738772.

[3] Unless otherwise specified, this memorandum uses "cash" as shorthand for ordinary means of payment other than credit cards—namely, cash, personal checks, and debit cards.

elects to use a credit card in lieu of payment by cash, check, or similar means." N.Y. Gen. Bus. Law § 518. The law does not, however, outlaw dual pricing. As the state itself has recognized, the law "'prohibits a vendor from charging a surcharge for credit card usage, but would not interfere with that same vendor establishing the higher price for credit card sales and then allowing a comparable discount for cash purchases.'" *Fulvio*, 517 N.Y.S.2d at 1011 (ellipsis omitted) (quoting state's memorandum). In other words, "'[c]ash discounts are allowed, credit card surcharges are impermissible.'" *Id.* at 1014. The state has applied that distinction to cover speech uttered by employees, prosecuting a gas-station owner because the station's cashier truthfully told a customer that using a credit card would cost five cents "extra." *Id.* at 1010.

Until January 2013, the credit-card companies imposed parallel speech restrictions in their contracts with merchants. But after federal antitrust litigation caused the two dominant credit-card companies (Visa and MasterCard) to change their contracts to remove their no-surcharge rules, New York's no-surcharge law assumed added importance. It is now the only thing keeping the plaintiffs from saying what they would like: that they impose a "surcharge" for using credit because credit costs more.

## I.   Why Labels Matter: The Communicative Difference Between "Surcharges" and "Discounts"

A "surcharge" for paying with credit and a "discount" for paying without credit "are different frames for presenting the same price information—a price difference between two things." Levitin, *Priceless?*, 55 UCLA L. Rev. at 1351. They are equivalent in every way except one: the *label* that the merchant uses to communicate that price difference.

But labels matter. "[T]he frame within which information is presented can significantly alter one's perception of that information, especially when one can perceive the information as a gain or a loss," as with the price difference between using cash and using credit. Jon D. Hanson

& Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence Of Market Manipulation*, 112 Harv. L. Rev. 1420, 1441 (1999). This difference in perception occurs because of a well-established cognitive phenomenon called "loss aversion," which refers to people's tendency to let "changes that make things worse (losses) loom larger than improvements or gains" of an equivalent amount. Daniel Kahneman, Jack L. Knetsch, & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persp. 193, 199 (1991). Put more simply, "people have stronger reactions to losses and penalties than to gains." Adam J. Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 Berkeley Bus. L.J. 265, 280 (2006).

"Consumers react very differently to surcharges and discounts," even though they present the same pricing information. *Id.* Consumers are more likely to respond to surcharges (which are perceived as *losses* for using credit) than to discounts (which are perceived as *gains* for not using credit). *Id.* Research shows just how wide this gap is. In one study, 74% of consumers had a negative or strongly negative reaction to credit surcharges, while fewer than half had a similar reaction to mathematically equivalent cash discounts. *Id.* at 280-81. That difference—the difference in how the same pricing information is understood by consumers—influences their behavior, making "surcharges" a much more effective way to communicate the costs of credit to consumers.

The effectiveness of surcharges is why the plaintiffs in this case seek to impose them: Surcharges inform consumers of the costs of credit, letting consumers decide for themselves whether the benefits of credit outweigh its costs. That exchange of information creates meaningful competition, which in turn drives down costs—as price-transparency reforms in Europe and Australia have shown. *Id.* at 312-313. If swipe fees are too high, consumers will use a different payment method, and banks and credit-card companies will have to lower their fees to

attract more business. Indeed, in Australia, where regulators in 2003 allowed complete transparency of price information and merchants have responded with surcharges, swipe fees have greatly declined. *Id.*

But when the government criminalizes framing the added cost of credit as a "surcharge," as New York has done, merchants lose their most effective means of informing consumers of the high costs of credit. Moreover, because the dividing line between what constitutes a "surcharge" and what constitutes a "discount" is so blurry, many merchants (like many of the plaintiffs in this case) do not even attempt to offer dual pricing, even though the law allows it, to avoid accidentally subjecting themselves to criminal punishment. And many other merchants falsely believe that they may not offer any dual pricing at all. The upshot, then, is that merchants end up passing on swipe fees to *all* consumers by raising the prices of goods and services across the board. This means that consumers are unaware of how much they pay for credit and have no incentive to reduce their credit-card use because they will pay the same price regardless. As a result, swipe fees have soared. *See* Pabst Decl. ¶ 2; Milles Decl. ¶ 3; Ross Decl. ¶ 5.

Swipe fees thus function as an invisible tax, channeling vast amounts of money from consumers to some of the nation's largest banks and credit-card companies. Because cash and credit purchasers both pay this tax, swipe fees are also highly regressive. In a "reverse Robin Hood" effect—criticized by prominent economists and consumer advocates from Joseph Stiglitz to Elizabeth Warren—low-income cash purchasers subsidize the cost of credit cards, while enjoying none of their benefits or convenience. Schuh, Shy, & Stavins, *Who Gains and Who Loses from Credit Card Payments?*, at 21 ("The average cash-paying household transfers $149 . . . annually to card users," each of whom on average "receives a subsidy of $1,333 . . . annually from cash users."). According to Federal Reserve economists, "[b]y far, the bulk of [this subsidy] is enjoyed by high-income credit card buyers," who receive an average of $2,188 every year, paid

7

disproportionately by poor households. *Id.* The result is a regime in which food-stamp recipients are subsidizing frequent-flier miles.

## II.   How We Got Here: The Credit-Card Industry's Concerted Efforts to Prevent Merchants from Communicating the Costs of Credit as "Surcharges"

The invisibility of swipe fees is no accident. It is the product of concerted efforts by the credit-card industry over many decades to ensure that merchants cannot communicate to consumers the added price they pay for using credit. Over the years, the industry has succeeded, both through contractual provisions and legislation, to silence merchants' attempts to call consumers' attention to the true costs of credit.

### A.   The Industry's Early Ban on Differential Pricing and Its Demise

In the early days of credit cards, any attempt at differential pricing between credit and non-credit transactions was strictly forbidden by rules imposed on merchants in their contracts with credit-card companies. *See* Edmund W. Kitch, *The Framing Hypothesis: Is It Supported by Credit Card Issuer Opposition to a Surcharge on a Cash Price?*, 6 J.L. Econ. & Org. 217, 219-20 (1991). That changed in 1974 after two important developments. *First*, Consumers Union sued American Express on the ground that its contractual ban on differential pricing was an illegal restraint on trade. *Linda Blitz & Consumers Union of United States, Inc. v. Am. Express Co.*, Civ. No. 74-314 (D.D.C. filed Feb. 30, 1974). Rather than face the prospect that federal courts would mandate full price transparency, American Express almost immediately settled the suit by agreeing to allow merchants to provide consumers with differential price information. *See* Kitch, *The Framing Hypothesis*, 6 J.L. Econ. & Org. at 225; Gerald P. O'Driscoll, Jr., *The American Express Case: Public Good or Monopoly?*, 19 J.L. & Econ. 163 (1976).

*Second*, Congress then enacted legislation protecting the right of merchants to have dual-pricing systems. Congress amended the Truth in Lending Act to provide that "a card issuer may

not, by contract, or otherwise, prohibit any such seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Pub. L. No. 93, § 495, 88 Stat. 1500 (1974) (codified at 15 U.S.C. § 1666f(a)).

**B.     The Credit-Card Industry Shifts Its Strategy to Labels**

The 1974 amendment was initially considered a victory for consumer advocates. But the credit-card industry, seizing on Congress's use of the word "discount," soon shifted its focus to the way merchants could *label* and *describe* credit pricing to consumers. Aware that how information is presented to consumers can have a huge impact on their behavior—and that many merchants would avoid dual pricing altogether if "surcharges" were outlawed—the credit-card lobby "insist[ed] that any price difference between cash and credit purchases should be labeled a cash discount rather than a credit card surcharge." Amos Tversky & Daniel Kahneman, *Rational Choice and the Framing of Decisions*, 59 J. Bus. S251, S261 (1986); *see also* Richard Thaler, *Toward a Positive Theory of Consumer Choice*, 1 J. Econ. Behavior & Org. 39, 45 (1980) ("[T]he credit card lobby turned its attention to form rather than substance. Specifically, it preferred that any difference between cash and credit card customers take the form of a cash discount rather than a credit card surcharge.").

**C.     The Industry's Labeling Strategy Achieves Short-Lived Success at the Federal Level**

In 1976, after two years of lobbying Congress to impose its preferred speech code, the credit-card industry succeeded in getting Congress to enact a temporary ban on "surcharges," despite the authorization for "discounts." *See* Pub. L. No. 94–222, 90 Stat. 197 ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means."). This set the stage for a series of battles over

renewal of the ban, culminating in an intense political debate in the mid-1980s that pitted both the Reagan Administration and consumer groups against the credit-card industry.

The Chairman of the Federal Trade Commission, writing in opposition to extending the law in 1981, recognized that the "surcharge" label drives home the true additional cost of a credit transaction to the consumer. S. Rep. No. 97-23, at 10-12. Although "a discount and a surcharge are equivalent concepts," he remarked, "one is hidden in the cash price and the other is not," meaning that a ban on "surcharges" prohibited merchants from disclosing to their customers the true cost of credit. *Id.* at 10. Despite opposition, Congress gave in to industry pressure and renewed the ban for three years. Pub. L. No. 97–25, 95 Stat. 144 (1981).

In 1984, when the ban was again set to expire, Senator William Proxmire of Wisconsin cut to the chase: "Not one single consumer group supports the proposal to continue the ban on surcharges," he observed. "The nation's giant credit card companies want to perpetuate the myth that credit is free." Irvin Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984, at D12 (quoting Proxmire).

The Senate Banking Committee observed that "while discounts for cash and surcharges on credit cards may be mathematically the same, their practical effect and the impact they may have on consumers is very different." S. Rep. No. 97-23, at 3. The surcharge ban thus effectively established a speech code, requiring merchants to label their prices in the way that best hid the costs of credit. Further, the vague distinction between "discounts" and "surcharges," and the risk of inadvertently describing a dual-pricing system in an unlawful way, led merchants to steer clear of those systems. In an editorial in *The New York Times*, Senator Christopher Dodd of Connecticut noted that "many merchants are not sure what the difference between a discount and a surcharge is and thus do not offer different cash and credit prices for fear they will violate the ban on surcharges." Sen. Christopher J. Dodd, *Credit Card Surcharges*, N.Y. Times, Mar. 12, 1984, at

A16. *See also* Carol Krucoff, *When Cash Pays Off*, Wash. Post, Sept. 22, 1981 (describing consumer activist who argued that merchants have not offered cash discounts because "the regulations have been so complicated. Smaller business people, who are most likely to offer them, may have been intimidated by the fear it could be viewed as an illegal surcharge."); Stephen Engelberg, *Credit Card Surcharge Ban Ends*, N.Y. Times, Feb. 27, 1984, at D1 ("A House aide said that one explanation for the relative unpopularity of cash discounts is that retailers, aware that surcharges on credit purchases are illegal, have erroneously assumed that discounts are not permitted.").

The credit-card industry, conscious of the threat that surcharges would pose to its business model, responded by unleashing a massive lobbying campaign to oppose ending the ban. *Id.* One senior vice president of Shearson/American Express remarked in 1984 that his company had been opposing ending the ban for eight years. He observed that consumers do not write angry letters to credit-card companies about cash discounts, but they do complain about surcharges, which "could potentially hurt the image of" credit cards. *Id.* The industry's efforts failed, and the ban lapsed in 1984. Levitin, *Priceless?*, 55 UCLA L. Rev. at 1381.

### D.   The Credit-Card Industry Lobbies States to Enact No-Surcharge Laws and Adopts Contractual No-Surcharge Rules

After the controversial federal ban expired, the credit-card industry briefly turned to the states, convincing ten states (including New York) to enact no-surcharge laws of their own.[4] New York's law took effect in June 1984, just after expiration of the federal ban. N.Y. Gen. Bus. Law § 518. American Express and Visa went to great lengths to create the illusion of grassroots support for these laws by consumers, even going so far as to create and bankroll a fake consumer

---

[4] In addition to New York, those states are California, Colorado, Connecticut, Florida, Kansas, Maine, Massachusetts, Oklahoma, and Texas. *See* Cal. Civ. Code § 1748.1(a); Colo. Rev. Stat. § 5-2-212; Conn. Gen. Stat. § 42-133ff; Fla. Stat. § 501.0117; Kan. Stat. Ann. § 16a-2-403; Me. Rev. Stat. 9-A, § 8-303; Mass. Gen. Laws ch. 140D, § 28A(a)(1)-(2); Okla. Stat. 14a, § 2-211(A); Tex. Fin. Code § 339.001.

group called "Consumers Against Penalty Surcharges"—an early instance of the phenomenon now known as "astroturfing."[5] But the real consumer groups (including Consumers Union and Consumer Federation of America) opposed state no-surcharge laws because they inhibit merchants' ability to make the costs of credit transparent, thereby masking an enormous "invisible subsidy" from low-income cash consumers to higher-income credit consumers. Gupta Decl., Ex. A.

The New York law's legislative history does not hide the fact that it was intended to influence consumers' perceptions of credit cards by controlling the labels that merchants could use to describe mathematically equivalent transactions. A memorandum justifying the state's support for the law openly declared: "Surcharges, *even if only psychologically*, impose penalties on purchasers and may actually dampen retail sales. A cash discount, on the other hand, operates as an incentive and *encourages desired behavior*." Gupta Decl., Ex. B at 10 (Mem. from Consumer Protection Board to Governor's Counsel) (emphasis added); *see also* Krucoff, *When Cash Pays Off*, Wash. Post. (quoting an American Express spokesman emphasizing the "big psychological … difference between offering a customer a discount and adding on a surcharge").

Around the same time that New York's no-surcharge law was enacted, the major credit-card companies changed their contracts with merchants to include no-surcharge rules. No-surcharge laws in New York and other states thus function as a legislative extension of the restrictions that credit-card issuers imposed more overtly by contract. For instance, American Express's contracts with merchants include an elaborate speech code. The contracts provide that merchants may not "indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card"; "try to dissuade Cardmembers from using the Card"; "criticize . . . the

---

[5] *See* Associated Press, *Consumers Gain Friends in Credit Card Fight*, Ocala Star-Banner, Apr. 2, 1984 (describing "consumer coalition bankrolled by American Express and Visa").

Card or any of our services or programs"; or "try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check)."[6]

### E.  The Durbin Amendment and the Recent Political Controversy Over Swipe Fees

From the mid-1980s until the 2000s the issue of swipe fees remained largely in the shadows. Even in the majority of states without no-surcharge laws, contractual no-surcharge rules ensured that consumers were rarely informed of the true cost of credit-card use. Developments in the late 2000s, however, caused swipe fees to reemerge as a volatile political issue.

The global financial crisis of 2007-2008 and the ensuing push for financial-regulation reform resulted in renewed focus on swipe fees. Senator Dick Durbin of Illinois proposed an amendment to the Senate version of the Dodd-Frank Wall Street Reform and Consumer Protection Act that aimed to reduce the fees associated with transactions by both debit and credit cards. Although proposed legislation to regulate *credit-card* swipe fees was defeated, the Durbin Amendment was enacted into law and establishes a procedure by which the Federal Reserve Board sets the maximum swipe fees for *debit-card* transactions. 15 U.S.C. § 1693o-2(a). It also protects merchants' rights to offer consumers incentives for using other payment methods: "A payment card network shall not . . . by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards." *Id.* § 1693o-2(b)(2).

The fight over the Durbin Amendment shone a spotlight on the amount of revenue that banks generate from transaction fees, generated a lobbying frenzy by the credit-card industry,

---

[6] American Express, *Merchant Reference Guide – U.S.*, at 14 (April 2013), https://www209.americanexpress.com/merchant/singlevoice/singlevoiceflash/USEng/pdffiles/MerchantPolicyPDFs/US_%20RefGuide.pdf.

and touched off a contentious political debate. Many merchants conveyed their opposition to swipe fees directly to their customers—and voters—at the checkout counter. Franchisees of the national convenience store chain 7-Eleven, for example, put up signs asking customers to "STOP UNFAIR CREDIT CARD FEES" and gathered a total of 1.6 million signatures on a petition to support legislation on credit-card fees. 7-Eleven franchisees saw the petition drive as an opportunity to educate their customers. "People don't know about these fees and they are shocked," explained one franchisee. Wayne T. Price & Amanda Stratford, *Store Owner Takes Petition to Congress*, Fla. Today, Sept. 29, 2009. 7-Eleven claimed that the petition represented the largest quantity of signatures ever presented to Congress—trumping even the 1.3 million signatures presented to Congress regarding healthcare reform. David Morrison, *7-Eleven Claims Millions of Interchange Signatures*, Credit Union Times, Sept. 28, 2009.

### F.    Visa and MasterCard Drop Their No-Surcharge Rules

In May 2005, a pet-relocation company called Animal Land sued Visa, seeking a declaration that its no-surcharge rule violated antitrust laws by preventing Animal Land and other merchants from assessing a discrete, denominated charge on customers using credit cards. *Animal Land, Inc. v. Visa USA, Inc.*, No. 05-CV-1210 (N.D. Ga.). In the ensuing months, numerous U.S. merchants and trade associations brought claims against the dominant credit-card networks, alleging that they engaged in illegal price fixing and impermissibly banned merchants from encouraging customers to use less expensive payment methods. The lead plaintiff in the ultimately consolidated class action was Mitch Goldstone, the owner of a small photo-processing business. E. Scott Reckard, Andrea Chang & Marc Lifsher, *Victor in a War Over Credit Card 'Swipe Fees'*, L.A. Times, July 17, 2012. Troubled by consumers' ignorance about swipe fees and merchants' passive acceptance of them, Goldstone became an activist against the credit-card

issuers, challenging their business practices in media interviews and blog postings in addition to his role as lead plaintiff in the lawsuit. *Id.*

Under the terms of a settlement with the merchant class, Visa and MasterCard in January 2013 dropped their contractual prohibitions against merchants imposing surcharges on credit-card transactions. Jessica Silver-Greenberg, *Visa and MasterCard Settle Claims of Antitrust*, N.Y. Times, July 14, 2012, at B1. As a result, state no-surcharge laws—previously largely irrelevant because of contractual no-surcharge rules—have now gained added importance. And as they did in the 1980s, credit-card companies are once again seeking to discourage dual pricing by pushing state legislation that dictates the labels that merchants can use for such systems. *See* Craig J. Sherman, *Credit Card Surcharge 'Propaganda' Leads to State Legislation*, Washington Retail Insight, Feb. 1, 2013, http://www.nrf.com/modules.php?name=Newsletter&op=details&sp_id=571.

## III. The Plaintiffs

### A. Expressions Hair Design

Expressions Hair Design is a hair salon in Vestal, New York. Fiacco Decl. ¶ 1. Linda Fiacco is one of its three co-owners. *Id.* For a small business like Expressions, "swipe fees make an enormous difference." *Id.* ¶ 3. Expressions has found that most of its customers "are not aware of the high cost of credit-card swipe fees or the ways in which they burden small businesses." *Id.* ¶ 4. But when they learn of the fees, "customers are generally sympathetic." *Id.* Expressions therefore seeks to do what it can to ensure that its customers learn of the cost of using credit cards and use that information when deciding how to pay for a haircut or other salon services. *Id.* ¶ 5. Ultimately, Expressions "want[s] credit card companies to reduce their swipe fees." *Id.*

Until 2012, Expressions posted a sign at its front counter informing all customers that, "due to the high swipe fees charged by the credit-card industry," it would charge them 3% more for using a credit card. *Id.* ¶ 6. But Expressions was forced to take down the sign and stop

15

informing customers of that policy when a customer (who is also a lawyer) informed the salon's owners that New York law makes it a crime to impose a "surcharge" on customers for paying with a credit card (even though merchants are allowed to provide an equivalent "discount" for paying with something other than a credit card). *Id.* Because of New York's law, the salon's current policy is to tell customers that it has two different prices for haircuts and other services—a lower price for customers paying in cash and a higher price for customers paying with a credit card. *Id.* ¶ 7. Expressions tries "to be as careful as [it] can to avoid characterizing that price difference as a 'surcharge' or an 'extra' charge for paying with a credit card, even though it is obvious that customers *do* effectively pay more for using a credit card whenever a store offers a 'discount' for using cash." *Id.*

By engaging in dual pricing, Expressions increases its prices to account for the costs of credit (which New York permits) and does so only for those responsible for those costs (which New York also permits). But Expressions cannot communicate its price difference in the way that it would like—by calling the difference a "surcharge" for credit—because New York bars Expressions from doing so. Instead, Expressions is forced to describe the lower price as the "cash price" and the higher one as the "credit price," which Expressions believes is far less effective at conveying the costs of credit to its customers (and thus at reducing the amount Expressions pays in swipe fees) than having a "regular price" with a "surcharge" for credit. Indeed, Expressions "know[s] from experience that customers who are presented with an extra charge for using a credit card are much more likely to respond by using a cheaper payment method." *Id.* ¶ 8.

Expressions is also concerned that even this less effective way of labeling its pricing could violate the no-surcharge law. *Id.* ¶ 9. If even one staff member inadvertently refers to the difference as a "surcharge" for credit, or says that credit is "extra" or "more," Expressions is afraid that its truthful speech could subject the business to criminal sanctions. Expressions must

16

therefore be exceedingly vigilant in instructing its staff and in monitoring what they say. Even then, Expressions is unsure what constitutes a "surcharge" and what constitutes a "discount" and does not know how to truthfully respond to customer inquiries without running afoul of the law. *Id.* ¶ 9.

### B.   Brooklyn Farmacy & Soda Fountain

The Brooklyn Farmacy & Soda Fountain, Inc., is an ice-cream parlor and soda fountain in Brooklyn. Freeman Decl. ¶¶ 1 & 2. Peter Freeman is co-owner and is responsible for its day-to-day management. *Id.* ¶ 1. Brooklyn Farmacy pays an average of 2% to 3% per credit transaction in swipe fees and has paid thousands of dollars in fees since starting the business in 2010. *Id.* ¶ 3. Because Brooklyn Farmacy considers the rising costs of credit to be "an important political and economic issue," it would like to "inform [its] customers about the costs that the credit card companies impose on merchants in a manner that will cause them to pay attention." *Id.* ¶ 7. It has determined that the best way to do this would be to "charge more for credit card transactions and [to] label that price difference as a 'surcharge' rather than a 'discount.'" *Id.*

Brooklyn Farmacy does not offer cash discounts because it believes that "[l]abeling the difference as a 'discount' . . . would not be nearly as effective as calling it 'a surcharge.'" *Id.* ¶ 8. Discounts "would make [the] advertised prices look higher than they are, without making it transparent that the higher price would be due solely to credit card transaction costs—precisely the information [Brooklyn Farmacy] wish[es] to convey to [its] customers." *Id.* Just as important, Brooklyn Farmacy is concerned about the difficulty of "monitoring how [its] waitstaff would express such a 'discount'" because the distinction between "tell[ing] customers that they will pay *less* if they don't use credit cards" and telling "customers that they are effectively paying *more* by using a credit card" is "difficult to understand." *Id.* ¶ 9. Freeman is "not willing to take the risk that [he] might be prosecuted by the state simply for conveying truthful information to [his]

customers about the higher cost of using a credit card." *Id.* As a result, Brooklyn Farmacy is forced to include that additional cost "in the prices that [it] charge[s] all consumers," regardless of whether they pay with a credit card. *Id.* ¶ 7.

### C.    Brite Buy Wines & Spirits

Bunda Starr Corp. owns Brite Buy Wines & Spirits, a liquor store in lower Manhattan. Pabst Decl. ¶¶ 1 & 2. Donna Pabst is President of Bunda Starr and is responsible for Brite Buy's day-to-day management. *Id.* ¶ 1. Brite Buy has accepted credit cards since the mid-1980s, when the New York State Liquor Authority first allowed liquor to be purchased with credit. *Id.* ¶ 2. Swipe fees "have consistently risen over the years" and now "represent an enormous expense for Brite Buy"—tens of thousands of dollars annually. *Id.*

To cut down on swipe fees, Brite Buy would like to charge its customers two different prices depending on whether they pay with cash or credit and to call the difference between them a "surcharge" for using credit, which the company believes "is the most effective way" to convey the true costs of credit. *Id.* ¶¶ 4 & 5. Because of the New York no-surcharge law, Brite Buy instead refrains from dual pricing of *any* kind because the company could not effectively communicate the price difference to its customers and because "training and monitoring" its employees to constantly adhere to a certain "verbal formulation" would be "next to impossible," making it far "too risky for Brite Buy to try to implement a discounting regime even if such a regime would be effective (which it would not)." *Id.* ¶¶ 5 & 6. Brite Buy thus has to "include the high costs of credit acceptance in its prices," without customers being aware that they are paying more to have the option of using credit. *Id.* ¶ 5.

### D.    Five Points Academy

Five Points Academy is a martial arts and fitness studio in lower Manhattan. Milles Decl. ¶ 1. Steve Milles is its vice president and is responsible for its day-to-day management. *Id.* Five

Points pays on average between 2.4% and 3.3% per credit transaction in swipe fees. *Id.* ¶ 3. Over the years, an increasing percentage of Five Points' members have paid their dues and other expenses by credit card, and the company paid more than $50,000 in swipe fees in 2012. *Id.*

Five Points does not currently have a dual-pricing system, so it "must include the costs of accepting credit cards in the prices that [it] charge[s] to all [its] members." *Id.* ¶ 4. Five Points does not offer cash discounts because it understands that "[p]eople react very differently to a surcharge than to a discount." *Id.* ¶ 6. Whereas "a surcharge will cause many members to switch payment forms" by informing them of the costs of credit through a discrete charge, "a discount will not provide anywhere near the same motivation to switch." *Id.* In addition, Five Points does not offer discounts because it is concerned about the "substantial difficulties in monitoring how [its] employees would express any such discount consistent with New York law." *Id.* ¶ 7. Neither Milles nor his "partners are convinced that [they] understand" the distinction between "surcharges" and "discounts," and they "certainly do not have any confidence that [their] employees could or would observe that distinction in practice." *Id.*

### E.    Patio.com

Patio.com LLC is an outdoor furniture and billiards company. Ross Decl. ¶ 2. It has stores in Mount Kisco, Scarsdale, South Hampton, and Westbury, New York, as well as online and in six other states. *Id.* David Ross is the company's founder and president and is responsible for its day-to-day management. *Id.* ¶¶ 1 & 3. Patio.com generally pays between 2% and 3% per credit transaction in swipe fees. *Id.* ¶ 4. Over time, "credit cards have become an increasingly popular form of payment at [the company's] storefront locations," to the point where "about 80% of [its] storefront sales are on credit cards." *Id.* As the percentage of customers paying with credit has increased, swipe fees have become "a significant operating expense for Patio.com." *Id.* ¶ 5. In 2012 alone, the company paid more than $200,000 in fees. *Id.*

Although Patio.com has at times discouraged credit use "through verbal steering" and by "communicat[ing] the high costs associated with accepting credit cards," those "attempts have had very limited positive results." *Id.* ¶ 8. Patio.com would like "to better inform [its] customers about the financial impact of [swipe] fees" by "add[ing] a line item to the receipt that illustrates the payment processing costs that Patio.com incurs when customers pay with credit cards." *Id.* ¶ 7. But because it is "afraid that such a line item would . . . be considered a 'surcharge' under the New York no-surcharge statute," Patio.com does not communicate the costs of credit in that way. *Id.*

Patio.com refrains from having dual pricing at all for two reasons. First, it does not "believe that labeling [the price] difference as a 'discount'"—as the no-surcharge law permits—"is as effective as calling it a 'surcharge.'" *Id.* ¶ 9. And second, Patio.com is "concerned about the difficulty in controlling the language [its] employees would use to express a discount," fearing that it would accidentally subject itself to criminal liability because an employee made "the mistake of telling customers that they are paying more for using credit cards." *Id.* ¶ 10. Thus, Patio.com "must include the costs of accepting credit cards in the prices that [it] charge[s] to all customers," meaning that "customers who pay with cash, check or debit cards pay more for their purchases than they otherwise would if" Patio.com passed on "the costs of credit card acceptance directly to those customers who actually use credit cards." *Id.* ¶ 6.

## PRELIMINARY-INJUNCTION STANDARD

Plaintiffs seeking to enjoin enforcement of a statute must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks omitted);

*N. A. Olive Oil Ass'n v. Kangadis Food Inc.*, 2013 WL 1777774, at *2 (S.D.N.Y. Apr. 25, 2013) (Rakoff, J.). In addition, courts consider whether "the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

## I.   THE PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR FIRST AMENDMENT CLAIM.

### A.   New York's No-Surcharge Law Is A Content-Based Speech Restriction Subject To Heightened First Amendment Scrutiny.

The First Amendment protects the people from attempts by the state to censor speech "on account of its content." *United States. v. Caronia*, 703 F.3d 149, 162-63 (2d Cir. 2012). Whenever the government creates restrictions that turn on the content of a speaker's words, the Supreme Court has recently made clear, the First Amendment "requires heightened scrutiny." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011). Content-based speech restrictions are "presumptively invalid," and the presumption is so strong that normally "it is all but dispositive to conclude that a law is content-based." *Id.* at 2667 (internal quotation marks omitted). "Commercial speech is no exception." *Id.* at 2664. Statutes that carry criminal penalties "warrant even more careful scrutiny." *Caronia*, 703 F.3d at 163.

**1.** Both the "purpose and practical effect" of New York's no-surcharge law show that it is a content- and speaker-based restriction on speech. *Sorrell*, 131 S. Ct. at 2663. It does not regulate what merchants may *do*; they are allowed to charge different prices depending on whether a customer pays with cash or credit. What the law regulates—all that it regulates—is what merchants may *say*: characterizing the price difference as a cash "discount" is favored; characterizing it as a credit "surcharge" is a crime. The law thus prohibits a certain class of speakers (merchants) from communicating a certain disfavored message (identifying the added

cost of credit as a surcharge) and does so to discourage consumers from acting on that message (by deciding not to use a credit card to make a purchase). Because liability under New York's no-surcharge law turns on whether merchants use certain words to describe otherwise identical conduct, it is a content-based restriction. *See id.* at 2667. Indeed, any law "that requires reference to the content of speech to determine its applicability is inherently content-based." *Pagan v. Fruchey*, 492 F.3d 766, 779 (6th Cir. 2007) (en banc).

The state has enforced the no-surcharge law based on its interpretation that price differences described as "[c]ash discounts are allowed," but those described as "credit card surcharges are impermissible." *Fulvio*, 517 N.Y.S.2d at 1014 (quoting state's memorandum); *see id.* at 1011 (quoting state's explanation that the law "prohibits a vendor from charging a surcharge for credit card usage, but . . . would not interfere with that same vendor establishing the higher price for credit card sales and then allowing a comparable discount for cash purchases"). The state prosecuted a gas station owner who clearly advertised a credit price and a cash price for gas because his cashier made the mistake of truthfully informing a customer that it cost "five cents 'extra'" to pay with a credit card rather than saying that it was a "nickel less" to use cash. *Id.* at 1010, 1014. That is, "the government clearly prosecuted [the merchant] for his words—for his speech." *Caronia*, 703 F.3d at 161.

In that case—the only one to confront the meaning of New York's no-surcharge law—the court observed that "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior, depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *Fulvio*, 517 N.Y.S.2d at 1011 (emphasis in original). The court explained:

> [W]hat General Business Law § 518 *permits* is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what General Business Law § 518 *prohibits* is a price differential, in

that so long as that differential is characterized as an additional charge for payment by use of a credit card, it is legally impermissible. . . . General Business Law § 518 creates a distinction without a difference; **it is not the *act* which is outlawed, but the *word* given that act.**

*Id.* at 1015 (bold added; italics in original).

That interpretation accords with the legislative history. The memorandum introducing the bill explained that, under the law, a "merchant would be able to offer a discount for cash if they so desire." Gupta Decl. Ex. B at 5-6. And the law's sponsor, too, recognized that the law did not change merchants' ability to use dual-pricing systems, so long as the cost of credit was concealed in the "regular" price and the cash price was depicted as a "discount." *Id.* at 8 (Letter from Ralph Goldstein, Member of N.Y. State Assembly) ("It is important to note that this bill does nothing to prevent a seller from offering a discount to consumers who pay by cash or check.").

Indeed, the state itself justified the no-surcharge law based on the different psychological effects that those words would have on consumers' understanding and behavior, including their willingness to make retail purchases with credit cards: "Surcharges, *even if only psychologically*, impose penalties on purchasers and may actually dampen retail sales," explained the state consumer agency's memorandum expressing support for the bill. "A cash discount, on the other hand, operates as an incentive and *encourages desired behavior*." *Id.* at 10 (emphasis added).

But a behavioral effect that "depend[s] on mental intermediation" just "demonstrates the power" of speech. *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 329 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986). In the context of credit cards, the effect is well recognized: "Because of the framing effect, surcharges are far more effective than discounts at signaling to consumers the relative costs of a payment system." Levitin, *Priceless?*, 55 UCLA L. Rev. at 1352. States, however, may not pass laws that seek to "diminish the effectiveness" of communication because

the state has determined that certain speech is too powerful. *Sorrell*, 131 S. Ct. at 2663. A law that "has the effect of preventing" merchants "from communicating with [consumers] in an effective and informative manner," thereby hamstringing their "ability to influence [consumer] decisions," is one that "impose[s] a specific, content-based burden on protected speech." *Id.* at 2663-64, 2670.

The state's justification—that speech that "encourages desired behavior" (making purchases with credit cards) should be favored and speech that discourages it disfavored—is particularly antithetical to the First Amendment. Courts must "be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion). That is so whether the regulation "relates to advertising . . . the price" of a product, *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 752 (1976), or even to "information on beer labels," *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481-82 (1995). "Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects." *Sorrell*, 131 S. Ct. at 2670. But here, those effects are adverse only to *the credit-card industry*, so the state is not even looking out for the consumer's own good. Rather, the state is "giv[ing] one side"—the credit-card industry—"an advantage" by muzzling merchants who want to discourage credit-card use. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785 (1978). "Attempting to control the outcome of . . . consumer decisions" by restricting truthful speech is just what the First Amendment prohibits the state from doing. *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 167 (5th Cir. 2007).

**2.** This case fits neatly into a line of cases involving challenges to laws and other provisions prohibiting merchants from disclosing costs that have been lawfully passed on to consumers. In each of these cases, the courts found that the measures violated the First

Amendment because they failed to directly advance—and were more extensive than necessary to serve—a legitimate government interest. Within this line of cases, courts have struck down:

- A Kentucky law prohibiting phone companies from identifying a surcharge on customers' phone bills as reflecting a tax, even though the phone companies could lawfully pass the cost of the tax on to their customers. *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008).

- A New York law prohibiting car companies from identifying a surcharge on sales of new cars as reflecting the increased cost associated with compliance with the state's "Lemon Law," even though it remained legal for the companies to actually pass the compliance costs on to their customers by raising prices. *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. Abrams*, 684 F. Supp. 804, 805 (S.D.N.Y. 1988) (Sand, J.).

- A contract between a municipal airport authority and a rental-car company under which "a number of specific words" could "not be used to describe" a charge for the company's cost of leasing space at the airport, even though it was permissible for the company to pass along that cost to its customers. *Capital Leasing of Ohio, Inc. v. Columbus Mun. Airport Auth.*, 13 F. Supp. 2d 640, 647, 664 (S.D. Ohio 1998).

- A Minnesota law that expressly authorized healthcare providers to pass along a new tax along to consumers, but prohibited providers from listing that increased cost as a surcharge on the consumers' bill. *Bloom v. O'Brien*, 841 F. Supp. 277, 278 (D. Minn. 1993).

New York's no-surcharge law functions like the provisions struck down in these cases. It does not prohibit the merchants' underlying conduct—passing a cost on to consumers—but prohibits merchants from *communicating* that fact in the most effective way possible: by identifying the cost as a discrete additional charge.

The New York law, moreover, effectively blocks merchants from communicating the cost of credit to credit-card customers "in the forum most likely to capture [their] attention"—the receipt. *BellSouth*, 542 F.3d at 505; *see also Abrams*, 684 F. Supp. at 806-07. Communicating the cost of credit on the receipts of only those customers who pay in cash (which is what conveying the cost as a "discount" would do) is ineffective because those customers are *already* using cash. Customers who use credit, however—the target audience for the merchants' message—are kept "in the dark" because their receipts say nothing about how much of their purchase was the result of their decision to pay with a credit card. *BellSouth*, 542 F.3d at 505; *see* Betsy Horkovich, *The Cash Discount Act: More Than Just a Matter of Semantics?*, 8 U. Dayton L. Rev. 137, 154 (1982) ("If the merchant offers [a] discount [as opposed to a surcharge], the credit customer may not fully appreciate the consequential impact on his true cost of credit or may not be able to make an informed choice."). It is therefore no answer to say that merchants "may express [their] views in some other forum or by some other means. Here, the speech is prohibited in the most logical and relevant place for it to occur." *Abrams*, 684 F. Supp. at 807. The no-surcharge law's "prohibition on the use of a particular method of communication"—conveying the cost of credit as a surcharge on signs and "as a line item" on customer "receipt[s]," Ross Decl. ¶ 7—triggers First Amendment scrutiny "even if other, but less satisfactory, methods of communication exist." *Abrams*, 684 F. Supp. at 807.

**3.** This leaves the question of what form of "heightened" First Amendment scrutiny applies to New York's no-surcharge law. *See Sorrell*, 131 S. Ct. at 2667. At a minimum, the law is subject to scrutiny under "a special commercial speech inquiry" that imposes upon the state a "burden to justify its content-based law as consistent with the First Amendment." *Id.* (citing *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)). Commercial speech is speech that "does *no more* than propose a commercial transaction," *United States v. United Foods, Inc.*, 533 U.S.

26

405, 409 (2001), or is "related *solely* to the economic interests of the speaker." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (emphasis added). But New York's no-surcharge law does not regulate *only* commercial speech. And where, as here, a content- or speaker-based law sweeps up both commercial and non-commercial speech, the law is subject to strict scrutiny, *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988), which means that it will be struck down "unless it is justified by a compelling government interest and is narrowly drawn to serve that interest," *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011).

"[W]hat is going on here is more than just a debate about how best to sell toothpaste." *BellSouth*, 542 F.3d at 505. Prominently advertising a price on a sign outside a store or at the point of sale no doubt proposes a commercial transaction. But listing the price difference as a surcharge on the receipt does more than propose a commercial transaction: it explains to customers why they paid what they did, *after* the transaction is completed. *Id.*; *see also Bloom*, 841 F. Supp. at 281. They can then decide whether the price they paid to use a credit card is a fair one, or whether their elected officials should take action to regulate the market, as Congress did with debit fees in the Durbin Amendment. This is why Brooklyn Farmacy considers the rising costs of credit to be "an important political and economic issue," and why it would like to communicate with its customers about swipe fees "in a manner that will cause them to pay attention." Freeman Decl. ¶ 7. And it is why Expressions considers swipe fees "a matter of significant political controversy," and would like to "do [its] part to educate people about swipe fees," so "they will act on that information—both as consumers and as citizens." Fiacco Decl. ¶ 5. On the other side of the debate, "the credit card industry might well be the most powerful lobby" in the United States, and "spend[s] a tremendous amount" on speech designed to "reinforc[e] the perception that plastic is a more convenient payment system than cash, but cost-equivalent." Levitin, *Antitrust Super Bowl*, 3 Berkeley Bus. L.J. at 317, 330. The plaintiffs seek to counter that

speech in the most effective way, and in the most effective forum. The no-surcharge law is thus "a hybrid . . . that implicates commercial *and* political speech." *BellSouth*, 542 F.3d at 505; *see Bloom*, 841 F. Supp. at 281 ("[T]he common sense distinction between commercial and political speech breaks down in this case.").

### B. The No-Surcharge Law Cannot Withstand Even Intermediate Scrutiny.

Here, the Court need not "pin down where the political nature of these speech restrictions ends and the commercial nature of the restrictions begins," *BellSouth*, 542 F.3d at 505, because "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied," *Sorrell*, 131 S. Ct. at 2667. "Either way," the no-surcharge law must be struck down because it "facilitates keeping consumers (and voters) in the dark" about the cost of credit cards "and its impact on their wallets." *BellSouth*, 542 F.3d at 505.

Commercial speech is traditionally subject to intermediate scrutiny under the *Central Hudson* test, which asks four questions: (1) whether the speech "concern[s] lawful activity and [is] not . . . misleading"; (2) "whether the asserted governmental interest" justifying the regulation "is substantial"; (3) "whether the regulation directly advances the governmental interest asserted"; and (4) whether the challenged law "is not more extensive than is necessary to serve that interest." 447 U.S. at 566. Courts "must review the [state's law] with 'special care,' mindful that speech prohibitions of this type rarely survive constitutional review." *44 Liquormart*, 517 U.S. at 504 (plurality opinion) (citation omitted). "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983). The Supreme Court has stressed that the state's burden is a "heavy" one, *44 Liquormart*, 517 U.S. at 516, requiring actual evidence, not just speculation and conjecture, that

each one of the *Central Hudson* factors is satisfied. *See Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). The state cannot satisfy that burden here.

> **1.      It is legal for merchants to directly pass along the cost of swipe fees to consumers who pay with credit cards, and labeling that cost as a "surcharge" is not misleading.**

Dual pricing based on whether consumers pay with cash or credit is legal. New York does not prohibit merchants from "raising prices to account for" swipe fees. *BellSouth*, 542 F.3d at 506. And it permits them to charge different prices for cash versus credit, so long as those prices are described using the right words. Because the underlying economic conduct is authorized, "speech about the reasons for these price increases does not advance an illegal transaction." *Id.*; *see also Abrams*, 684 F. Supp. at 806 (because it is "entirely lawful" for an automobile manufacturer to pass along "the costs of compliance with the Lemon Law," a clearly marked Lemon-Law surcharge "relates to lawful activity").

Nor is it "inherently misleading" for the merchant to label the difference between the cash price and the credit price a "surcharge." *In re R.M.J.*, 455 U.S. 191, 203 (1982); *see BellSouth*, 542 F.3d at 506 ("[T]ruthfully telling customers why a company has raised prices simply by listing a new tax on a bill . . . is not the kind of false, inherently misleading speech that the First Amendment does not protect."); *Abrams*, 684 F. Supp. at 807 ("The assumption that all statements as to compliance charges imposed are necessarily deceptive cannot be accepted without some evidence."). Indeed, New York's no-surcharge law targets speech that is *less* likely to mislead consumers than the speech targeted by the laws invalidated in other surcharge cases, where the fees or taxes were imposed on the gross revenues of the merchant or service provider. *See BellSouth*, 542 F.3d at 506-07; *Capital Leasing of Ohio*, 13 F. Supp. 2d at 649; *Bloom*, 841 F. Supp. at 281. In those cases, there was at least some argument that itemizing the surcharge on the consumer's bill might mislead some consumers into believing that the taxes had been

imposed on the individual transaction with the consumer, rather than being the result of the company's business decision to pass along the costs of a tax on its revenue to consumers. Here, by contrast, credit-card issuers actually *do* impose charges on each credit transaction between a merchant and a consumer. The merchants in this case simply want to tell consumers of this fact by truthfully describing the price difference as a "surcharge" on each credit transaction. The interest in preventing consumers from being "misled" that the courts recognized but rejected in the other surcharge cases, therefore, plays no role here.

### 2. The state has no legitimate interest in obscuring the cost of credit-card transactions from consumers.

Because New York has no legitimate interest in keeping consumers in the dark about the cost of credit, the state cannot satisfy the second *Central Hudson* prong. Unlike rational basis review, the *Central Hudson* standard does not allow courts to "supplant the precise interests put forward by the State with other suppositions," or to "turn away if it appears that the stated interests are not the actual interests served by the restriction." *Edenfeld*, 507 U.S. at 768. The Court's analysis, therefore, must be confined to interests actually offered by the state.

On its face, the no-surcharge law articulates *no* state interest, and the legislative history fails to make up for this deficiency. The memorandum introducing the bill indicates that it was meant to prevent a situation where "two price scales would exist for the merchant who would advertise a certain price and, at the time of the sale, raise or lower the price according to the method of payment," subjecting consumers to "dubious marketing practices and variable purchase prices." Gupta Decl., Ex. B at 5. But "two price scales" are permitted—the law regulates only how they are labeled—and the legislative history does not explain how "variable purchase prices" might be harmful or what is "dubious" about truthfully communicating the higher cost of credit.

To justify regulation of commercial speech, the state must have more than hypothetical concerns. Rather, it must "ensure that its fear of consumer confusion is real" before taking the radical step of enacting a speech ban. *BellSouth*, 542 F.3d at 509. The state's failure to "provide direct and concrete evidence that the evil that the restriction purportedly aims to eliminate does, in fact, exist will doom the . . . regulation." *NY State Ass'n of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 842 (2d Cir. 1994). Here, New York has offered nothing.

### 3. The no-surcharge law does not directly advance any legitimate state interest.

The case for the no-surcharge law fares no better under the third *Central Hudson* prong, which requires the state to show that the statute directly advances the state's asserted interest— that is, that the government's means and ends align. *Edenfield*, 507 U.S. at 771. Despite the legislature's purported concern about "two price scales," the law does not prohibit merchants from charging a higher price for credit transactions as long as they follow the state's preferred labeling system. The law's only effect is to require that merchants *describe* these two price scales as a "discount" for paying in cash, rather than a "surcharge" for paying by credit. The state's interest in protecting consumers is not advanced by preferring one description over another. If anything, the law *contributes* to consumer confusion because it prohibits merchants from communicating the cost of credit to the very consumers who ultimately pay that cost.

Indeed, the state's asserted purpose for the no-surcharge law is directly at odds with the interests that the commercial-speech doctrine is designed to protect. The Supreme Court extended First Amendment protection to commercial speech because it recognized a "public interest" in the "free flow of commercial information" to foster "intelligent and well informed" consumer economic decisions, specifically with respect to price information. *Va. Bd. of Pharmacy*, 425 U.S. at 765. Consistent with this rationale, courts have been suspicious of laws that shield

truthful, non-misleading information from people out of a paternalistic fear that "the public will respond 'irrationally' to the truth," *44 Liquormart*, 517 U.S. at 503 (plurality opinion), or "would make bad decisions if given truthful information," *Thompson*, 535 U.S. at 374. It is for "the speaker and the audience, not the government, [to] assess the value of the information provided." *Edenfield*, 507 U.S. at 767.

New York's no-surcharge law, however, does not even have paternalism on its side. Rather than protecting consumers from information the state considers harmful, the law protects the credit-card industry—at the *expense of* consumers—by keeping people in the dark about the high costs of credit. Far from directly advancing a "substantial governmental interest" under the commercial-speech framework, the no-surcharge law undermines the basic reason why commercial speech is afforded constitutional protection. Again, the law is even less defensible than the laws invalidated in the other surcharge cases. Those cases involved taxes that had been passed along to the consumer and that the consumer *could not help but pay* as part of the ultimate cost of the service. *BellSouth*, 542 F.3d at 506; *Bloom*, 841 F. Supp. at 278; *Capital Leasing of Ohio*, 13 F. Supp. 2d at 647; *Abrams*, 684 F. Supp. at 805. Although there was value in informing consumers that the cost had been passed along, this information had a less direct impact on a consumer's ability to make "intelligent and well informed" economic decisions than New York's law. *Va. Bd. of Pharmacy*, 425 U.S. at 765. Here, because Expressions employs a dual-pricing system, a consumer *actually could* reduce the final price paid by making future purchases in cash. Yet the no-surcharge law prohibits Expressions from telling consumers that they will incur an added cost for using credit. Only a perverse misreading of the commercial-speech doctrine would sustain a law on the basis that it advances a state interest in keeping consumers ignorant about the additional, avoidable costs they incur by using credit.

The no-surcharge law, moreover, is riddled with "exemptions and inconsistencies [that] bring into question the purpose of the labeling ban." *Rubin*, 514 U.S. at 489. To begin with, New York tellingly exempts *itself* from the no-surcharge law. New York authorizes its courts to impose a "reasonable administrative fee" on individuals who elect to pay their court-imposed fines or fees "by credit card or similar device." N.Y. Crim Proc. Law § 420.05. Under New York law, "any person posting bail by credit card or similar device . . . may be required to pay a reasonable administrative fee." *Id.* § 520.10(1)(i). New York allows the Water Board to "accept credit cards as a means of payment of fees, rates, rent or other charges," and to impose "a reasonable administrative service fee not to exceed the costs incurred by the water board in connection with such credit card transaction." N.Y. Pub. Auth. Law § 1045-j(4-a)(b). New York also allows telecommunications providers to collect "a premises or location surcharge" for calls originating in the state and charged to a credit card. N.Y. Pub. Serv. Law § 92-c(9). And the state lets its Department of Taxation and Finance charge a "convenience fee" to taxpayers who elect to pay their taxes by credit card. N.Y. State Dep't of Taxation and Finance, Pay by Credit Card, *available at* http://www.tax.ny.gov/pay/all/pay_by_credit_card.htm (noting that the "credit card service providers listed below will charge a convenience fee to taxpayers to cover their cost of providing this service," that "the convenience fee is in addition to the tax you owe," and that "the tax payment and convenience fee will appear as two different charges on your credit card").

These self-serving exemptions defeat any interest that the state might claim in preventing consumer confusion. In *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, the Supreme Court concluded that where a speech restriction prohibited broadcasters from airing advertisements for privately-operated casinos—but exempted government-run, non-profit, and tribal casinos—the regulatory scheme was "so pierced by exemptions and inconsistencies" as to defeat any asserted government interest in reducing gambling. 527 U.S. 173, 190 (1999). Here,

33

as there, the state can "present[] no convincing reason for pegging its speech ban to the identity" of the entity imposing the credit-card surcharge, allowing certain favored entities to use the "surcharge" label while banning its use by others. *Id.* at 191. If the state contends that surcharges threaten to produce consumer confusion, it can "offer[] no reason" why retail customers "are any more likely to be confused" by explicit surcharges imposed by merchants than by surcharges imposed by the state and certain favored utilities under vague labels like "administrative fees." *BellSouth*, 542 F.3d at 507; *see* Levitin, *Antitrust Super Bowl*, 3 Berkeley Bus. L.J. at 285 n.92 ("These exceptions make less sense than the surcharge prohibition, unless one sees them as an explicit acknowledgement that when the government plays the role of a merchant, it too does not want to be stuck with any of the transaction costs of credit.").

The New York State Insurance Department has created another loophole in the law. According to the Department, where a "seller" uses a third-party payment processor to execute a credit-card transaction, the seller may pass along the credit-card swipe fees to the consumer as an added charge without violating the no-surcharge law. Gupta Decl., Ex. C (N.Y. Ins. Dept. Opinion, Feb. 25, 2008). This means that merchants can get around the no-surcharge law simply by outsourcing the processing of credit-card transactions to a third party. Like the state's exemptions for itself and certain favored utilities, this large loophole undermines any claim that the no-surcharge law advances a legitimate state interest.

### 4. The no-surcharge law is far more extensive than necessary to serve any legitimate state interest.

Not only does the no-surcharge law fail to directly advance any legitimate interest in preventing consumer confusion, but it is also far more extensive than necessary to achieve the state's purported goals, failing the final prong of the *Central Hudson* test. "[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is

certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993). In the other surcharge cases, the courts found that the "total prohibition on itemizing the tax on a statement" was "substantially excessive and therefore not proportional to the state's interest" in preventing consumer confusion. *Bloom*, 841 F. Supp. at 282-83. Here, as in those cases, "the prohibition against the use of words which could be used to present the information about the surcharge in an accurate and non-misleading manner [is] broader than necessary to prevent the description from being potentially misleading." *Capital Leasing of Ohio*, 13 F. Supp. 2d at 669.

The plaintiffs accept that merchants should not impose an undisclosed surcharge on a credit transaction—a surcharge that consumers do not learn about until after their cards have been charged. But it is equally clear that the state did not need to enact a new law to prevent that sort of blatantly deceptive conduct. Consumer protection and false-advertising laws independently prohibit such bait-and-switch tactics. *See* N.Y. Gen. Bus. Law § 349 (deceptive acts and practices); *id.* § 350 & 350-a (false advertising); 15 U.S.C. § 1666f(b) (requiring price difference to be "disclosed clearly and conspicuously"). Because the state could address any legitimate concern about consumer confusion or deception simply by enforcing already existing laws, the no-surcharge law is not necessary.[7]

Even if those laws were not already on the books, the no-surcharge law would sweep far too broadly. The state pointedly "does not limit itself to a prohibition on false or misleading

---

[7] In addition, the recent national settlement agreement under which Visa and MasterCard rescinded their contractual no-surcharge bans requires merchants to "provide clear disclosure to the merchant's customers at the point of store entry"; additional "clear disclosure … at the point of interaction or sale with the customer" of (a) the amount of the surcharge, (b) a statement that the surcharge is being imposed by the merchant, and (c) a statement that the surcharge is not greater than the applicable swipe fees; and "clear disclosure of the dollar amount of the surcharge on the transaction receipt provided by the merchant to the customer." Settlement Agreement, ¶ 42(c), *available at* https://www.paymentcardsettlement.com.

statements as to the charges imposed." *Abrams*, 684 F. Supp. at 807. "States may not place an absolute prohibition" on information that is merely "potentially misleading . . . if the information also may be presented in a way that is not deceptive." *R.M.J.*, 455 U.S. at 203. If the state really were concerned about consumers being misled by undisclosed surcharges, it could solve that problem by requiring clear disclosure of dual pricing. For example, Minnesota allows merchants to "impose a surcharge on a purchaser who elects to use a credit card," provided that the merchant "informs the purchaser of the surcharge both orally at the time of sale and by a sign conspicuously posted on the seller's premises." Minn. Stat. § 325G.051(1)(a). If the same price difference is labeled as a cash "discount," it must likewise be "conspicuously" disclosed. *Id.* § 325G.051(1)(c). Similarly, Washington's state legislature recently rejected a proposed no-surcharge law like New York's and is now considering legislation that would allow merchants to impose a surcharge provided that they "clearly and conspicuously disclose the surcharge." Wash. HB 1870, *available at* http://apps.leg.wa.gov/billinfo/. A similar disclosure requirement would accomplish the state's purported objective without "offend[ing] the core First Amendment values of promoting efficient exchange of information." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-14 (2d Cir. 2001). The state may not, however, ban an entire category of speech because *some* of the targeted speech has the potential to mislead. *Peel v. Attorney Registration & Disciplinary Comm'n of Ill.*, 496 U.S. 91, 109 (1990).

## II.   THE PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR VOID-FOR-VAGUENESS CLAIM.

Given the lack of any legitimate state interest in prohibiting merchants from describing dual pricing as a "surcharge," the law would violate the Constitution even if it were limited to restricting that single word. But the law has been enforced much more broadly, to restrict any speech that impermissibly depicts the cost of credit as an added cost above the "regular" price.

36

Application of the law thus turns on a "subtle semantic distinction" between slightly different ways of describing otherwise indistinguishable economic conduct. *Fulvio*, 517 N.Y.S.2d at 1014. As a result, the law both fails to "give[] the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and does not "provide[] explicit standards for those who apply it." *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999). The law's vagueness violates the plaintiffs' right to due process.

### A. The No-Surcharge Law Fails to Provide Actual Notice of What Language a Merchant May Not Use in Describing a Dual-Pricing System.

The no-surcharge law has two elements that subject it to "the strictest [vagueness test] of all." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (internal quotation marks omitted). *First*, the law carries criminal penalties of up to a year in prison and a $500 fine. *Id.*; N.Y. Gen. Bus. Law § 518. Because those penalties come in the "absence of a scienter requirement," the law sets up "a trap for those who act in good faith." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). Nor is it possible to cure this problem by reading a *mens rea* requirement into the law. All that separates an illegal "surcharge" from a permissible cash "discount" are the words themselves, so an implied intent requirement would mean that merchants would violate the law merely by *thinking* about the difference between the cash price and the credit price as a "surcharge." Transforming a word ban into a thought ban is no way to address the law's constitutional infirmities.

*Second*, because prosecution under the law turns on the words merchants use in connection with otherwise valid dual-pricing systems, the no-surcharge law threatens to destroy the "breathing space" that First Amendment freedoms need to survive. *NAACP v. Button*, 371 U.S. 415, 433 (1963). The plaintiffs' declarations show how much New York's labeling restriction chills speech. For instance, although Expressions discloses both the cash price and the credit price

37

for a haircut, it worries about inadvertently violating the no-surcharge law when describing this system to customers. Fiacco Decl. ¶ 9. *Fulvio* shows these fears to be well-founded: Three words mistakenly spoken by a gas-station cashier transformed a lawful pricing system into a criminal surcharge. The station's owner posted a sign that clearly displayed both a cash price and a credit price for gas and instructed his employees to tell customers only that he offered a discount for cash. 517 N.Y.S.2d at 1010, 1013. Yet he was prosecuted because his cashier told a customer that using a credit card was "five cents 'extra'" instead of a "nickel less." *Id.* More recent prosecutions, too, have turned on the wording of merchants' pricing.[8]

When liability turns on semantics, it can be difficult to find the line between what is legal and what is not. What, for example, is the legal difference between the following clearly disclosed price tags?

| Store A | Store B |
|---|---|
| Cash Price (With Discount): $97<br><br>Credit Price: $100<br><br>We offer a 3% cash discount. | Cash Price: $100<br><br>Credit Price (With Surcharge): $103<br><br>We impose a 3% credit surcharge. |

Or between these two signs, both placed prominently at the store entrance and point of sale?

| Store A | Store B |
|---|---|
| We offer a 3% cash discount on all items. | We impose a 3% credit surcharge on all items. |

---

[8] *See, e.g.*, Gupta Decl., Ex. D (Press Release: *Attorney General Cuomo's Investigation Prompts 14 Suffolk County-Based Home Heating Oil/propane Companies To Agree To Stop Charging Surcharges For Credit Card Purchases* (September 14, 2009)); Gary Dymski, *State freezes illegal oil heat fees*, Newsday, Sept. 15, 2009 (explaining that, in response to threatened prosecution, heating-oil companies agreed to offer "discounts" rather than "surcharges," and quoting an industry representative: "It's semantics."); Jennifer Schwartz, *Suffolk County, NY Heating Oil Dealers Penalized for Credit Card Surcharges*, Sept. 17, 2009, http://www.heatingoil.com/blog/suffolk-county-ny-heating-oil-dealers-penalized-credit-card-surcharges/ ("[T]he companies have simply changed the wording of their pricing policies, not the actual price customers pay.").

"If a customer asks us whether we charge more for paying with a credit card," one of Expressions' owners wonders, "should we ignore or dodge the question? Are we required to answer falsely? Or should we say something like the following? 'State law does not allow us to tell you that you are paying more for using a credit card, but we can tell you that you are paying less for not using a credit card.'" Fiacco Decl. ¶ 9. Or what if a consumer asks *why* Expressions imposes an "added cost" (or "surcharge") for credit? Can Expressions answer honestly, or does the law require that Expressions contest the customer's characterization, insisting that the price difference represents a cash "discount" rather than an "added cost" for credit? Would Expressions' otherwise lawful dual pricing become criminal if the store posted a sign (like those reproduced below) protesting swipe fees, and added a line stating that "unfair swipe fees are the reason we charge a 'credit price' that is 3% more than the 'cash price'"? *See id.* ¶ 6 (until Expressions learned of the no-surcharge law, it told customers it would charge more for credit "due to the high swipe fees charged by the credit-card industry").





That none of these questions can be answered with certainty is an indication of the no-surcharge law's failure to provide "actual notice" of what is prohibited. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). The law just bans the imposition of a "surcharge," without ever defining the term. Although the law clearly prohibits a merchant from employing a dual-pricing system

and labeling the added cost for credit transactions a "surcharge," beyond that its meaning is nebulous. As soon as a customer asks about Expressions' properly labeled pricing system Expressions finds itself entangled in a semantic briar patch. It "is intolerable" that a merchant "careful enough or sophisticated enough to always characterize the lower . . . prices as a 'discount for cash' may enter his automobile at the end of his business day and drive home a free man; however, if the same individual, or his colleague operating the station down the street, *or his employee* is careless enough to describe the higher price in terms which amount to the 'credit price' having been derived from *adding* a charge to the lower price, he faces the prospect of criminal conviction and possible imprisonment." *Fulvio*, 517 N.Y.S.2d at 1015 (emphasis in original). And the law's inscrutability arouses especially grave concerns because it "sweep[s] within [its] coverage the everyday acts of average citizens"—merchants and employees, carrying out transactions in corner shops and other businesses throughout the state—rather than only "govern[ing] the activities of relatively sophisticated individuals who are deliberately engaged in" some highly technical field. *United States v. Amirnazmi*, 645 F.3d 564, 589 n.34 (3d Cir. 2011) (internal quotation marks omitted).

As a result of the law's uncertainty, the plaintiffs have been forced to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Entm't Merchs. Ass'n*, 131 S. Ct. at 2743 (ellipsis and internal quotation marks omitted). Expressions, unsure of the law's boundaries, goes out of its way to avoid truthfully informing its customers that they are paying more for using credit. Fiacco Decl. ¶¶ 7 & 9. For Brooklyn Farmacy, Brite Buy, Five Points Academy, and Patio.com the no-surcharge law produces a still more extreme "chilling effect." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997). Fear of slipping across the thin and largely indiscernible semantic line separating a lawful pricing system from a criminal one has prompted these plaintiffs to avoid dual pricing entirely, even though they would

otherwise prefer it. Freeman Decl. ¶ 7; Pabst Decl. ¶ 6; Milles Decl. ¶ 8; Ross Decl. ¶ 9. This chilling effect also injures consumers, who are deprived of the option of patronizing a merchant with a dual-pricing system.

### B.   The No-Surcharge Law Fails to Provide Explicit Standards for Enforcement.

Those charged with enforcing the no-surcharge law are no better able to pin down its meaning than those charged with compliance. As the judge in *Fulvio* noted when defense counsel accidentally referred to the gas station's otherwise lawful pricing system as a "surcharge" policy, even "counsel learned in the law can confuse the two sides of the coin . . . ('cash discounts are allowed, credit card surcharges are impermissible')." 517 N.Y.S.2d at 1014. And even legislators who have enacted no-surcharge laws seem to have struggled to understand the distinction. During consideration of a similar no-surcharge law in Connecticut, one participant remarked: "[C]onceptually, I would like somebody to someday explain to me the difference between a surcharge and discount." Gupta Decl., Ex. E (Conn. Joint Standing Committee Hearings, Banks, Pt. 1, 1986 Sess., pp. 48-49).

New York's regulators themselves have vacillated among conflicting interpretations of the no-surcharge law. In 2006, responding to an inquiry from the Insurance Department, the New York Attorney General opined that the law barred an insurance company from imposing a surcharge on policyholders who pay by credit card. The Attorney General observed that "[t]he term 'sales transaction' is not defined in the statute, and there are no reported decisions that address the types of transactions that fall within the ambit of the statute," yet concluded that it was "intended to apply broadly." Gupta Decl., Ex. F (2006 N.Y. Op. Att'y Gen. No. F2 (Jan. 25, 2006)). Based on that interpretation, the Insurance Department issued an opinion concluding that insurance companies "may not charge … an additional fee to cover credit card" expenses.

41

Gupta Decl., Ex. G (N.Y. Ins. Dept. Opinion, June 19, 2007). In an about-face a little more than a year and half later, however, the Insurance Department opined that the insurer's proposed credit-card fee policy would *not* violate the no-surcharge law. Gupta Decl., Ex. C (N.Y. Ins. Dept. Opinion, Feb. 25, 2008). Acknowledging the conflict between its two opinions, the Insurance Department explained that its earlier conclusion was based on "a misapprehension" of the payment system. *Id.* Because the system involved a "third party" that charged for the "separate and distinct service" of sending an electronic payment *to* the insurer, the Department concluded that the law did not apply. *Id.*

A law whose meaning is so vague as to allow such divergent interpretations invites "arbitrary and discriminatory enforcement." *Kolender*, 461 U.S. at 357. The lack of explicit standards for enforcement is especially problematic because the law is "intended to apply broadly" to all sales transactions, regardless of type. Gupta Decl., Ex. F (2006 N.Y. Op. Att'y Gen. No. F2). The void-for-vagueness doctrine prohibits the "almost unfettered discretion" given to law enforcement by a law that is susceptible to such a wide range of interpretation and to application in so many contexts. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 168 (1972). The no-surcharge law does not involve an "area of human conduct where . . . legislatures simply cannot establish standards with great precision. . . . Certainly nothing prevents a legislature from defining with substantial specificity what constitutes" a forbidden surcharge. *Smith v. Goguen*, 415 U.S. 566, 581 (1974). Because the no-surcharge law fails to do so, while chilling free speech rights with the threat of criminal prosecution, it is void for vagueness.

## III.   THE OTHER PRELIMINARY-INJUNCTION FACTORS ALSO FAVOR THE PLAINTIFFS.

Absent a preliminary injunction, the plaintiffs will suffer irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed.").

Because liability under New York's no-surcharge law turns on the words merchants use to describe lawful activity, the law constitutes "the direct penalization, as opposed to incidental inhibition, of First Amendment rights." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 88 (2d Cir. 1996) (finding irreparable injury where a statute required the labeling of dairy products treated with growth hormone). The harm to the plaintiffs is not just "theoretical." *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999). Rather, they offer sworn statements that but for the no-surcharge law they would actually engage in certain speech. This "chilling effect" is particularly acute here because the plaintiffs are "subject to criminal sanctions" if they "itemiz[e] the passed on costs" of credit as surcharges. *Bloom*, 841 F. Supp. 2d at 279. The no-surcharge law has forced Expressions to take down a sign informing all customers that credit-card purchases cost 3% more than cash purchases "due to the high swipe fees charged by the credit-card industry." Fiacco Decl. ¶ 6. Expressions must now "be as careful as [it] can to avoid characterizing [the] price difference as a 'surcharge' or an 'extra' charge for paying with a credit card." *Id.* Absent the no-surcharge law, Expressions would communicate the difference as a "surcharge." *Id.* at ¶ 8. As for the other plaintiffs, they are chilled from conveying the costs of credit to their customers as either credit "surcharges" *or* cash "discounts" because of the law's prohibition on speech and because of its vagueness. Brooklyn Farmacy, for instance, does not offer discounts because they "would make [the] advertised prices look higher than they are, without making it transparent that the high price would be due solely to credit-card transaction costs." Freeman Decl. ¶ 8. The company is also unsure that it could consistently describe such discounts legally, *id.* ¶ 9, so it

refrains from dual pricing altogether. This case, then, does not rely on some "conjectural chill." *Safir*, 170 F.3d at 171. The infringement is direct, and the harm real.

Preventing that harm has special urgency here because, just a few months ago, under a national class-action settlement, the dominant credit-card networks and their bank members dropped the speech bans in their contracts with merchants. As a result, New York's no-surcharge law now stands as the sole remaining barrier preventing the plaintiffs from disclosing the costs of credit to their customers in the most effective way possible—as evidenced by the aggressive efforts of credit-card industry lobbyists in recent months to enact similar no-surcharge laws in other states. The First Amendment guards against this effort to use the power of the state to enforce a private party's speech code.

The balance of the harms and the public interest likewise cut in the plaintiffs' favor. "The potential harm to the plaintiffs is the loss of their First Amendment freedom of speech or the imposition of criminal sanctions if they violate the law." *Bloom*, 841 F. Supp. 2d at 280. Whatever interest the state may have, it "does not outweigh the very real loss of free expression." *Id.* And the state has no interest in the enforcement of an unconstitutional law, particularly one that functions only to mask the costs of credit. Nor does the public. To the contrary, "[t]he public has an interest in full and accurate information," and consumers "have a right to know the basis of the charges they are paying." *Id.* at 283. A consumer's interest in this information is often "as keen, if not keener by far, than his interest in the day's most urgent political debate." *Va. Bd. of Pharmacy*, 425 U.S. at 763. And this interest extends to society more broadly because it is essential to ensuring market efficiency and keeping prices down. The no-surcharge law undermines these goals. By inhibiting the free flow of truthful, non-misleading communication, the law "encourage[s] more credit card transactions at a higher price." Levitin, *Priceless?*, 55 UCLA L. Rev. at 1321. It thus has "substantial negative social and economic welfare effects," including the

44

"inequitable subsidization of credit consumers by non-credit consumers" and the "unnecessary subsidization of the entire credit card industry." Levitin, *Antitrust Super Bowl*, 3 Berkeley Bus. L.J. at 265. In short, the only harm that might come from a preliminary injunction is to the credit-card industry—not to the state or the public. That harm does not come close to trumping the plaintiffs' constitutional rights, or the public's interest in receiving truthful and effective communications about the price they pay for credit.

## CONCLUSION

This Court should declare that N.Y. Gen. Bus. Law § 518 violates the plaintiffs' free-speech rights under the First Amendment and is unconstitutionally vague, and should enjoin the New York Attorney General from enforcing the statute against them.

Respectfully submitted,

*/s / Deepak Gupta*
DEEPAK GUPTA (*pro hac vice*)
GREGORY A. BECK
BRIAN WOLFMAN
JONATHAN E. TAYLOR
GUPTA BECK PLLC
1625 Massachusetts Avenue, NW, Suite 500
Washington, DC 20036
(202) 470-3826

GARY B. FRIEDMAN
TRACEY KITZMAN
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

MARK WENDORF
REINHARDT, WENDORF & BLANCHFIELD
332 Minnesota Street
St. Paul, MN 55101
(651) 287-2100

June 17, 2013                              *Counsel for Plaintiffs*