UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EXPRESSIONS HAIR DESIGN, LINDA FIACCO, THE BROOKLYN FARMACY & SODA FOUNTAIN, INC., PETER FREEMAN, BUNDA STARR CORP., DONNA PABST, FIVE POINTS ACADEMY, STEVE MILLES, PATIO.COM LLC, and DAVID ROSS, | No. 13-cv-3775 (JSR) |

Plaintiffs,

– v. –

ERIC T. SCHNEIDERMAN, in his official capacity as Attorney General of the State of New York,

Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF
ATTORNEY GENERAL SCHNEIDERMAN'S MOTION TO DISMISS
AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
Garrett Coyle
Assistant Attorney General
*of Counsel*
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-6696

**Dated:  July 12, 2013**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ...................................................................................4

    1.    Congress Enacts a Temporary Statute Prohibiting Credit Card
        Surcharges But Allowing Cash Discounts .................................................4

    2.    When the Federal Surcharge Ban Sunsets, New York Acts To
        Continue Those Consumer Protections at the State Level by
        Enacting an Identical Credit Card Surcharge Ban Codified at
        General Business Law § 518 ......................................................................6

    3.    Visa and MasterCard Impose No-Surcharge Rules in Their
        Merchant Contracts, Which They Later Drop As Part of a
        Large Federal Antitrust Class Action Settlement .....................................8

    4.    The Plaintiffs Now Sue the Attorney General, Seeking to Enjoin
        Him From Enforcing General Business Law § 518 Against Them .........8

STANDARD OF REVIEW ..................................................................................10

ARGUMENT .......................................................................................................11

    POINT I:    THE PLAINTIFFS CANNOT SHOW ARTICLE III CAUSATION OR
                REDRESSABILITY BECAUSE THE ATTORNEY GENERAL LACKS
                PLENARY AUTHORITY TO CRIMINALLY PROSECUTE
                § 518 VIOLATIONS, AND THE PLAINTIFFS' ATTEMPT TO ENJOIN
                THE ATTORNEY GENERAL FROM BRINGING A CIVIL
                ENFORCEMENT ACTION IS NOT RIPE ...............................................11

        A.    Only District Attorneys, Not the Attorney General, Have
            Plenary Authority To Criminally Prosecute Violations of
            General Business Law § 518 .........................................................12

        B.    The Plaintiffs Thus Cannot Show That Their Injury Is
            "Fairly Traceable" To the Attorney General or That Their
            Requested Relief Would Likely "Redress" That Injury ..................14

i

C. The Plaintiffs' Pre-enforcement Challenge Seeking To Enjoin the Attorney General From Bringing a <u>Civil</u> Enforcement Action Is Not Ripe Because Postponing Review Would Cause No Hardship to the Plaintiffs ...........................................................................17

POINT II: THE PLAINTIFFS ALSO LACK THE "IMMINENT" INJURY NECESSARY FOR ARTICLE III STANDING BECAUSE THEY CANNOT SHOW A CREDIBLE FEAR OF ENFORCEMENT .....................................19

A. General Business Law § 518 Is an Anti-Deception Statute — Not a Statute Regulating Merely How a Seller "Labels" Its Dual Pricing Scheme, As the Plaintiffs Claim.................................................20

B. Four of the Plaintiffs Cannot Show a Credible Fear That General Business Law § 518, Properly Interpreted, Will Be Enforced Against Them.................................................................30

C. The Challenge of the Fifth Plaintiff, Patio.com, Is Not Ripe Because It Is Not Clear From the Limited Details Before the Court Whether Its Proposed Conduct Would Violate General Business Law § 518.............................................................................33

POINT III: ON THE MERITS, THE PLAINTIFFS' PRE-ENFORCEMENT CHALLENGE TO GENERAL BUSINESS LAW § 518 FAILS AS A MATTER OF LAW....................36

A. The Plaintiffs' First Amendment Claim Fails Because General Business Law § 518 Regulates Conduct — "Impos[ing] a Surcharge" — Not Speech........................................................36

B. The Plaintiffs' Void-For-Vagueness Claim Fails Once Their Untenable Interpretation of § 518 Is Discarded.................................................40

C. The Plaintiffs' Antitrust Preemption Claim Fails As a Matter of Law Because § 518 Is Pro-Competitive .....................................................41

POINT IV: EVEN IF THE PLAINTIFFS' CLAIMS DID NOT FAIL ON THE MERITS, THEIR PRELIMINARY INJUNCTION MOTION SHOULD STILL BE DENIED ...........43

A. Absent a Preliminary Injunction, the Plaintiffs Are Unlikely To Suffer Irreparable Harm ...........................................................................44

B. The Balance of Equities Tips in Favor of the Attorney General, Not the Plaintiffs, and the Plaintiffs' Requested Injunction Is Not in the Public Interest .................................................................................46

CONCLUSION.................................................................................................................47

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Air Transport International LLC v. Aerolease Financial Group*,
 993 F. Supp. 118 (D. Conn. 1998) ................................................................. 44

*American Savings Bank, FSB v. UBS Financial Services*,
 347 F.3d 436 (2d Cir. 2003) ........................................................................... 18

*Arnett v. Kennedy*,
 416 U.S. 134 (1974) ........................................................................................ 40

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ........................................................................................ 11

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) ........................................................................................ 11

*BellSouth Telecommunications, Inc. v. Farris*,
 542 F.3d 499 (6th Cir. 2008) ......................................................................... 36

*Bloom v. O'Brien*,
 841 F. Supp. 277 (D. Minn. 1993) ................................................................. 36

*Bronx Household of Faith v. Board of Education*,
 492 F.3d 89 (2d Cir. 2007) ............................................................................. 11

*California Bankers Association v. Shultz*,
 416 U.S. 21 (1974) .......................................................................................... 10

*Capital Leasing of Ohio, Inc. v. Columbus Municipal Airport Authority*,
 13 F. Supp. 2d 640 (S.D. Ohio 1998) ............................................................ 36

*Central Hudson Gas & Electric Corp. v. Public Service Commission*,
 447 U.S. 557 (1980) ........................................................................................ 38

*Citibank, N.A. v. Citytrust*,
 756 F.2d 273 (2d Cir. 1985) ........................................................................... 45

*Clearing House Association, L.L.C. v. Cuomo*,
 510 F.3d 105 (2d Cir. 2007) ........................................................................... 17

*Della Pietra v. State*,
 71 N.Y.2d 792 (1988) ..................................................................................... 13

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*,
 485 U.S. 568 (1988) ........................................................................................ 29

*FCC v. Fox TV Stations, Inc.*,
 132 S.Ct. 2307 (2012) ..................................................................................... 40

*Fisher v. State*,
 10 N.Y.2d 60 (1961) ....................................................................................... 16

iv

*Friends of the Earth, Inc. v. Laidlaw Environmental. Services (TOC), Inc.,*
    528 U.S. 167 (2000) ............................................................................................ 10

*Gade v. National Solid Wastes Management Association,*
    505 U.S. 88 (1992) .............................................................................................. 42

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ............................................................................................ 41

*Hakim v. Chertoff,*
    447 F. Supp. 2d 325 (S.D.N.Y. 2006) ............................................................ 10, 20

*Hooper v. California,*
    155 U.S. 648 (1895) ............................................................................................ 29

*Jaimes v. Toledo Metropolitan Housing Authority,*
    758 F.2d 1086 (6th Cir. 1985) ............................................................................ 15

*Laird v. Tatum,*
    408 U.S. 1 (1972) ................................................................................................ 20

*Latino Officers Association v. Safir,*
    170 F.3d 167 (2d Cir. 1999) ................................................................................ 45

*Lewis v. United States,*
    523 U.S. 155 (1998) ............................................................................................ 24

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................... 10, 12

*Mahon v. Ticor Title Insurance Co.,*
    683 F.3d 59 (2d Cir. 2012) .................................................................................. 16

*Marchi v. Board of Cooperative Education Services,*
    173 F.3d 469 (2d Cir. 1999) ........................................................ 20, 30, 34, 35

*Maryland v. King,*
    133 S.Ct. 1 (2012) .............................................................................................. 46

*Mendez v. Heller,*
    530 F.2d 457 (2d Cir. 1976) ................................................................................ 13

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    559 U.S. 229 (2010) ............................................................................................ 39

*Motor Vehicle Manufacturers Association of the United States, Inc. v. Abrams,*
    684 F. Supp. 804 (S.D.N.Y. 1988) ...................................................................... 36

*New York Civil Liberties Union v. Grandeau,*
    528 F.3d 122 (2d Cir. 2008) ...................................................................... 10, 19, 33

*Ohralik v. Ohio State Bar Association,*
    436 U.S. 447 (1978) ............................................................................................ 24

*People v. Cuttita,*
    7 N.Y.3d 500 (2006) ............................................................................................ 13

v

*People v. Fulvio*,
  514 N.Y.S.2d 594 (N.Y. Crim. Ct.1987) ............................................ 14, 26–28, 41

*People v. Fulvio*,
  517 N.Y.S.2d 1008 (N.Y. Crim. Ct. 1987) ......................................... 14, 27–28, 32

*People v. Gilmour*,
  98 N.Y.2d 126 (2002) ........................................................................... 12

*Picard v. Kohn*,
  907 F. Supp. 2d 392 (S.D.N.Y. 2012) ................................................... 11

*Planned Parenthood of Idaho, Inc. v. Wasden*,
  376 F.3d 908 (9th Cir. 2004) ................................................................ 14

*Poe v. Ullman*,
  367 U.S. 497 (1961) ............................................................................... 10

*Port Washington Teachers' Association v. Board of Education*,
  478 F.3d 494 (2d Cir. 2007) .................................................................. 20

*Raines v. Byrd*,
  521 U.S. 811 (1997) ............................................................................... 11

*Renne v. Geary*,
  501 U.S. 312 (1991) ............................................................................... 18

*Rewis v. United States*,
  401 U.S. 808 (1971) ............................................................................... 29

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ............................................................................... 42

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ............................................................................. 36–38

*Savage v. Gorski*,
  850 F.2d 64 (2d Cir. 1988) ................................................................ 44–45

*Simmonds v. INS*,
  326 F.3d 351 (2d Cir. 2003) .................................................................. 33

*Southern Pacific Transport Co. v. Redden*,
  651 F.2d 613 (9th Cir. 1980) ................................................................ 15

*St. Martin's Press, Inc. v. Carey*,
  605 F.2d 41 (2d Cir. 1979) ................................................................... 34

*Texaco, Inc. v. Hughes*,
  572 F. Supp. 1 (D. Md. 1982) ............................................................... 43

*Toilet Goods Association v. Gardner*,
  387 U.S. 158 (1967) ............................................................................... 17

*Turner Broadcasting System v. FCC*,
  512 U.S. 622 (1994) ............................................................................... 24

vi

*United States v. Mack*,
   655 F.3d 843 (8th Cir. 1981) ................................................................... 32

*United States Civil Service Commission v. National Association of Letter Carriers*,
   413 U.S. 548 (1973) ............................................................................... 40

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) .......................................................................... 11, 44–45

*Wisconsin Right to Life, Inc. v. Schober*,
   366 F.3d 485 (7th Cir. 2004) ....................................................... 15, 31–33

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*,
   471 U.S. 626 (1985) ............................................................................ 38–39

## Constitutions, Statutes, and Rules

15 U.S.C. § 1610 ........................................................................................ 43

15 U.S.C. § 1666 ......................................................................................... 4

15 U.S.C. § 1666f ........................................................................................ 4

15 U.S.C. § 1691 ......................................................................................... 4

Pub. L. No. 90-321, 82 Stat. 146 ................................................................. 4

Pub. L. No. 94-222, 90 Stat. 197 ................................................... 4, 5, 6, 22

Pub. L. No. 97-25, 95 Stat. 144 .................................................. 5, 6, 22, 43

43 Fed. Reg. 2898 ....................................................................................... 5

Fed. R. Civ. P. 12 ................................................................................. 1, 10

Fed. R. Civ. P. 65 ...................................................................................... 15

N.Y. County Law § 700 ............................................................................ 14

N.Y. Exec. Law § 63 ................................................................................. 13

N.Y. Exec. Law § 71 ................................................................................. 13

N.Y. Gen. Bus. Law § 347 ........................................................................ 13

N.Y. Gen. Bus. Law § 358 ........................................................................ 13

N.Y. Gen. Bus. Law § 513 ................................................... 7, 13, 17, 18

N.Y. Gen. Bus. Law § 518 ................................................................. passim

## Other Authorities

Black's Law Dictionary (9th ed. 2009)........................................................ 22

Reserve Bank of Australia,
   *Review of Card Surcharging: A Consultation Document* (2011) .......................................... 26

Robb Mandelbaum,
   *Visa and MasterCard Settle Lawsuit, but Merchants Aren't Celebrating*,
   N.Y. Times, Aug. 8, 2012 ..................................................................................................... 8

Webster's Third New International Dictionary (unabridged ed. 1981) .................................. 22, 26

13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper,
   *Federal Practice and Procedure* § 3531.5 (3d ed. 2008) ...................................................... 14

Defendant Eric T. Schneiderman, Attorney General of the State of New York, respectfully submits this memorandum of law in support of his motion to dismiss the complaint under Federal Rule of Civil Procedure 12 and in opposition to the plaintiffs' motion for a preliminary injunction.

## PRELIMINARY STATEMENT

The plaintiffs in this action — five retailers and their owners — seek to enjoin the New York attorney general from enforcing a state statute that protects consumers from hidden fees at checkout if they pay by credit card. That statute, New York General Business Law § 518, provides that: "*No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means.*" The plaintiffs claim that § 518, which criminalizes "surcharges" imposed on consumers who pay with a credit card but allows "discounts" for consumers who use cash — economically identical conduct, the plaintiffs say — makes liability turn solely on the *word* a seller uses to characterize its dual pricing scheme. The specter of a criminal prosecution under § 518, they claim, deters them from using the label "surcharge," a label that is allegedly more effective at encouraging consumers to switch to cash, thus supposedly insulating credit card companies from competition. As a result, the plaintiffs claim that § 518 violates the First Amendment, is unconstitutionally vague, and is preempted by federal antitrust law.

As explained in more detail below, General Business Law § 518 is a reasonable, constitutional way for New York to prevent retailers from luring consumers with deceptive price information. But for two key reasons, the Court need not reach that issue here because the plaintiffs lack Article III standing to bring this action:

***First***, the plaintiffs' claims are based on a supposed fear that the attorney general might criminally prosecute them under General Business Law § 518.  But New York law authorizes county district attorneys — *not* the attorney general — to criminally prosecute § 518 violations.  As a result, the plaintiffs' supposed fear of a criminal § 518 prosecution is not "fairly traceable" to the attorney general.  Nor would their requested injunction "likely redress" that supposed fear, because it could not bind their respective district attorneys, whom the plaintiffs have chosen not to sue here.  And while the attorney general can bring *civil* § 518 enforcement actions, the plaintiffs' request to enjoin the attorney general from enforcing § 518 against them civilly is not ripe because postponing judicial review unless and until such an action would cause them no hardship.  In short, the plaintiffs have sued the wrong official.

***Second***, the plaintiffs' supposed fear that the attorney general might prosecute them under § 518 merely for using the label "surcharge" is based on an untenable interpretation of the statute.  Liability under § 518 does not turn solely on the "label" that a seller uses to describe its dual pricing scheme.  Rather, a seller violates § 518 only if it charges consumers more for using a credit card *without displaying that credit card price at least as prominently as the cash price* — an interpretation of the statute that accords with its plain meaning, the identically worded federal statute on which it was based, the legislative history, the statute's policy objectives, the case law, established canons of construction, and the attorney general's consistent view for more than 25 years.  Properly interpreted, § 518 protects, for example, the diner with no cash in his wallet from being lured into a restaurant by the menu's low posted prices, only to receive the unpleasant surprise when the check comes that the restaurant's credit card prices are 5% higher — prices that, had they been displayed prominently, the diner could and would have avoided, either by stopping at an ATM or patronizing another restaurant.

2

When § 518 is properly understood as a protection against consumer deception, four of the plaintiffs can have no credible fear that the statute will be enforced against them because they propose to display their credit card prices prominently.  With no credible fear of enforcement, they lack the "imminent" injury necessary for Article III standing.  And the fifth plaintiff's challenge is unripe because it is not clear, given the limited facts before the Court, whether its proposed conduct would violate § 518.

Rejecting the plaintiffs' illogical interpretation of General Business Law § 518 also reveals a ***third*** reason why their complaint should be dismissed and their preliminary injunction denied: namely, that their claims fail on the merits as a matter of law when § 518 is given its proper interpretation as a consumer safeguard against misleading pricing schemes.  Properly interpreted as an anti-deception statute, § 518 regulates *conduct* — barring sellers from "impos[ing] a surcharge" on credit card users — not *speech*, and thus it does not implicate the First Amendment.  To the extent § 518 has any incidental effect on speech, that effect is limited to misleading commercial speech not protected by the First Amendment.  Properly interpreted as an anti-deception statute, § 518 also gives sellers fair notice of what conduct is prohibited, so the plaintiffs' void-for-vagueness challenge fails.  And properly interpreted as an anti-deception statute, § 518 is *pro*-competitive, giving consumers accurate pricing information at an early point in the transaction when they can feasibly decide whether to switch to another merchant or to cash.  Section 518 thus does not interfere with the purposes of, and is not preempted by, the federal antitrust laws.

***Finally***, even if their claims were likely to succeed on the merits, the plaintiffs would still not be entitled to a preliminary injunction because absent an injunction they are not likely to suffer irreparable harm.  Their claimed injury, at bottom, is monetary — swipe fees that they

incur and cannot effectively recover — and monetary injuries are reparable.  The remaining

preliminary injunction factors, too, weigh against the plaintiffs' requested injunction.


## STATEMENT OF FACTS

**1.      Congress Enacts a Temporary Statute Prohibiting Credit Card Surcharges But Allowing Cash Discounts**

The rapid growth of consumer credit in the 1960s and 1970s brought new and more

complex credit instruments to many American homes for the first time.  Before comprehensive

regulation of the consumer credit industry, abusive practices and consumer deception were

commonplace.  A groundswell of public support to safeguard consumers and promote

competition spurred Congress to enact a series of statutes requiring full disclosure of the terms of

consumer credit finance charges.  *See, e.g.*, Consumer Credit Protection Act, Pub. L. No. 90-321,

§ 102, 82 Stat. 146, 146 (1968); Fair Credit Billing Act, 15 U.S.C. §§ 1666 *et seq.* (1974); Equal

Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.* (1974).

Congress passed a provision in one such statute, the Truth in Lending Act, in 1976 that

stated:

> No seller in any sales transaction may impose a surcharge on a
> cardholder who elects to use a credit card in lieu of payment by cash,
> check, or similar means.

Act of Feb. 27, 1976, Pub. L. No. 94-222, 90 Stat. 197.  Congress codified that credit card

surcharge ban right next to another provision of the Truth in Lending Act that stated:

> [T]he card issuer may not, by contract or otherwise, prohibit any . . .
> seller from offering a discount to a cardholder to induce the
> cardholder to pay by cash, check, or similar means rather than use a
> credit card.

15 U.S.C. § 1666f(a).

4

Understanding that any cash discount could be seen as a credit card surcharge, Congress reconciled these two apparently conflicting provisions by defining "surcharge" and "discount" in relation to the "regular price" as follows:

> The term "surcharge" . . . means any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means.
>
> The term "discount" . . . means a reduction made from the regular price. The term "discount" . . . shall not mean a surcharge.
>
> The term "regular price" means the tag or posted price charged for the property or service if a single price is tagged or posted, or the price charged for the property or service when payment is made by use of . . . a credit card if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment is made by use of . . . a credit card and the other when payment is made by use of cash, check, or similar means.

Act of Feb. 27, 1976, Pub. L. No. 94-222, 90 Stat. 197 (defining "surcharge" and "discount");

Act of July 27, 1981, Pub. L. No. 97-25, 95 Stat. 144 (defining "regular price").

Taken together, these provisions mean that:

- When a seller posts a single price, that price must be the price for credit card users. The seller may not, under the surcharge ban, impose an unposted fee on top of that single posted price for credit card users. But the seller may, under the cash discount haven, reduce that single posted price for cash users.

- A seller may post two prices — a lower price for cash users and a higher price for credit card users — without violating the surcharge ban.

The touchstone of this regulatory scheme was disclosure, as the Federal Reserve Board's interpretations of these statutes indicate. *See, e.g.*, Official Staff Interpretations, 43 Fed. Reg. 2898, 3899 (Jan. 30, 1978) (views on surcharge ban's application to gas stations).

5

Congress set the surcharge ban to sunset in three years.  Act of Feb. 27, 1976, Pub. L. No. 94-222, 90 Stat. 197.  Congress then extended the ban for another three years.  Act of July 27, 1981, Pub. L. No. 97-25, 95 Stat. 144.

**2.    When the Federal Surcharge Ban Sunsets, New York Acts To Continue Those Consumer Protections at the State Level by Enacting an Identical Credit Card Surcharge Ban Codified at General Business Law § 518**

The federal credit card surcharge ban expired in 1984.  The New York Legislature, with the support of the State Consumer Protection Board, quickly acted to continue the consumer protections in the lapsed federal ban at the state level.  *See* Gupta Decl. Ex. B at 5–6 (bill memoranda) (noting "[t]he expiration of a Federal ban on surcharges on credit card purchases" and explaining that if the ban were not restored, "the consumer would be subject to dubious marketing practices and variable purchase prices"), ECF No. 17-2; *id.* at 10.  The statute, which passed the Assembly by a vote of 147-0 and the Senate by a vote of 52-7, states:

> No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means.

N.Y. Gen. Bus. Law § 518 (effective June 5, 1984); *see also* Gupta Decl. Ex. B at 4 (Assembly vote tally); *id.* at 3 (Senate vote tally).

In addition to the identical wording, the legislative history further indicates that § 518 was understood to take the same meaning as the lapsed federal surcharge ban — including the cash discount haven.  *See* Gupta Decl. Ex. B at 13 (memorandum from Department of Commerce first assistant counsel to governor's counsel) ("This bill was proposed to maintain the status quo while extension of the Federal surcharge ban, which expired in February, is debated by Congress."); *id.* at 8 (letter from Assemblyman Goldstein to governor's counsel) ("A 'surcharge' here [in the proposed bill] is understood to mean any means of increasing the regular

6

price to a cardholder which is not imposed upon customers paying by cash, check or a similar

means.  This is identical to the definition contained in [the lapsed federal statute]. . . . It is

important to note that this bill does nothing to prevent a seller from offering a discount to

consumers who pay by cash or check.  This was always permitted under [the federal statute] and

continues to be allowed under the proposed bill.").[1]

Section 518 makes violations of the surcharge ban a "misdemeanor punishable by a fine

not to exceed five hundred dollars or a term of imprisonment up to one year, or both."  N.Y. Gen.

Bus. Law § 518.

By codifying the surcharge ban in article 29-A of the General Business Law, the

Legislature authorized the attorney general to bring civil enforcement actions to enjoin

continuing violations of the surcharge ban.  *See* N.Y. Gen. Bus. Law § 513 ("Injunctive relief.

Whenever the attorney general has reason to believe that any violation of this article is a

continuous practice, he may apply to the supreme court in any county wherein any such violation

occurred for the purpose of restraining and enjoining the continuance of such violations.").

---

[1]      *See also* Gupta Decl. Ex. B at 5–6 (bill memoranda) ("A merchant would be able to offer
a discount for cash if they so desire.  The only procedure that would be prohibited is a
surcharge for credit in keeping with the provisions of the Federal ban that recently
expired."); *id.* at 10 (memorandum from State Consumer Protection Board associate
counsel to governor's counsel) ("Credit card surcharges were illegal until very recently
when the federal prohibition on their use expired. . . . Merchants, however, may continue
to offer discounts to those customers purchasing in cash. . . . One of the most important
efforts of the consumer movement has been to insure that customers can depend on
advertised claims and prices.  Allowing credit card surcharges may defeat this effort
however, by permitting unannounced price increases at the point of sale."); *id.* at 7 (letter
from Senator Lack to governor's counsel) ("Until February 28, of this year, there was in
place by Federal law, a restriction on merchants and other commercial vendors from
imposing any surcharge on consumers who paid for goods or services by way of a credit
card, in lieu of payments by cash, check or similar direct remittance.  This Federal
legislation has lapsed . . . .  The consumers of New York State must not be required to
forego this essential protection in the market place . . . .").

3.  **Visa and MasterCard Impose No-Surcharge Rules in Their Merchant Contracts, Which They Later Drop As Part of a Large Federal Antitrust Class Action Settlement**

Visa and MasterCard simultaneously began to include rules in their contracts with merchants prohibiting merchants from imposing surcharges on consumers who paid with their Visa and MasterCard cards, respectively.  Compl. ¶ 43, ECF No. 1.  Those rules allowed merchants to give a discount to customers who pay with cash.  *See* Robb Mandelbaum, *Visa and MasterCard Settle Lawsuit, but Merchants Aren't Celebrating*, N.Y. Times, Aug. 8, 2012.

Visa and MasterCard agreed beginning in January 2013 to remove those no-surcharge rules from their merchant contracts as part of a nationwide antitrust class action settlement.  *Id.*; Compl. ¶ 48.

4.  **The Plaintiffs Now Sue the Attorney General, Seeking to Enjoin Him From Enforcing General Business Law § 518 Against Them**

Several months after Visa and MasterCard dropped their contractual no-surcharge rules, the plaintiffs — five New York businesses and their owners — filed this action against the New York attorney general challenging General Business Law § 518.  Compl. ¶¶ 2, 6–7, 9–10, 12–15, 17.

One of the plaintiffs — Expressions Hair Design — uses a dual pricing scheme, charging a lower price for customers paying with cash, check, or debit card and a higher price for customers paying with a credit card.  Compl. ¶ 3.  Expressions claims that it would like to describe the difference between the two prices as a credit card "surcharge," but does not do so out of a professed fear that it would violate General Business Law § 518.  Compl. ¶¶ 3–4.

Three of the plaintiffs — The Brooklyn Farmacy & Soda Fountain, Inc., Brite Buy Wine & Spirits, and Five Points Academy — charge customers the same price regardless of whether they use a credit card or cash, check, or debit card.  Compl. ¶¶ 8, 11, 13.  They claim they would

8

like to use a dual pricing scheme and would like to label the difference between the prices as a credit card "surcharge." Compl. ¶¶ 8, 11, 13. But they do not use dual pricing, even by characterizing it as a "cash discount," out of a professed fear that an employee's mistaken use of the word "surcharge" could violate General Business Law § 518. Compl. ¶¶ 8, 11, 13.

The fifth plaintiff — Patio.com LLC — also does not use a dual pricing scheme. Compl. ¶ 16. Patio.com claims that it would like to implement a dual pricing scheme by adding a "line item" on customer receipts indicating the additional credit card cost. Compl. ¶ 16; Ross Decl. ¶ 7, ECF No. 16. But Patio.com does not use dual pricing, even by characterizing it as a "cash discount," out of a professed fear that an employee's mistaken use of the word "surcharge" could violate General Business Law § 518. Ross Decl. ¶ 10.

The complaint asserts three claims:

1. The plaintiffs claim that General Business Law § 518 violates the First Amendment because (they say) it regulates the "label" that they may use to characterize their dual pricing scheme — prohibiting the "credit card surcharge" label but permitting the "cash discount" label — even though the two are economically equivalent; Compl. ¶¶ 49–50.

2. The plaintiffs claim that General Business Law § 518 is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause because (they say) it makes liability under the statute turn on the unclear difference between two ways of describing the same conduct. Compl. ¶ 51.

3. The plaintiffs claim that General Business Law § 518 is preempted by the Sherman Act because (they say) it prevents sellers from effectively communicating the costs of using a credit card to consumers, thus insulating credit card companies from competition. Compl. ¶ 52.

The complaint seeks an injunction prohibiting the attorney general from enforcing § 518 against them and a declaratory judgment that § 518 is unconstitutional and preempted. Compl., prayer for relief.

9

The plaintiffs have also moved for a preliminary injunction prohibiting the attorney general "and his agents, including any other person acting in the name of the State of New York," from enforcing § 518 against them.  Notice of Mot. for Prelim. Inj., ECF No. 11.

## STANDARD OF REVIEW

Rule 12(b)(1) requires the Court to dismiss an action for lack of Article III standing if, "assum[ing] as true all allegations made in [the] complaint," the complaint fails to allege plausible facts establishing the three elements comprising "the irreducible constitutional minimum of standing": "'(1) [the plaintiff] has suffered an injury in fact that is . . . actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *Hakim v. Chertoff*, 447 F. Supp. 2d 325, 326 n.2, 237–28 (S.D.N.Y. 2006) (Rakoff, J.) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing these elements [of Article III standing].").

Pre-enforcement challenges like this one are disfavored because they often rest on speculation and risk yielding advisory opinions — often on constitutional issues — if enforcement would not have occurred or would have occurred on a different factual record.  *See, e.g.*, *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 56 (1974); *Poe v. Ullman*, 367 U.S. 497, 508 (1961).  Accordingly, a pre-enforcement challenge will be dismissed as unripe when the issues are not "'fit[] . . . for judicial decision'" and "'withholding court consideration'" would not cause the plaintiff substantial "'hardship.'"  *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122,

10

131–32 (2d Cir. 2008) (citation omitted).  These standing and ripeness inquiries are especially

rigorous when reaching the merits would mean deciding the constitutionality of a legislative or

executive act.  *Raines v. Byrd*, 521 U.S. 811, 819–820 (1997); *Bronx Household of Faith v. Bd.*

*of Educ.*, 492 F.3d 89, 114 (2d Cir. 2007).

Rule 12(b)(6) requires the Court to grant a motion to dismiss for failure to state a claim if,

disregarding "mere conclusory statements" and "formulaic recitation[s] of the elements of a

cause of action," " the complaint lacks "'sufficient factual matter, accepted as true, to state a

claim to relief that is plausible on its face.'"  *Picard v. Kohn*, 907 F. Supp. 2d 392, 399–400

(S.D.N.Y. 2012) (Rakoff, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and

*Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

Finally, the Court will deny a motion for a preliminary injunction if the plaintiff fails to

establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).


**ARGUMENT**

**POINT I**

**THE PLAINTIFFS CANNOT SHOW ARTICLE III CAUSATION OR
REDRESSABILITY BECAUSE THE ATTORNEY GENERAL LACKS PLENARY
AUTHORITY TO <u>CRIMINALLY</u> PROSECUTE § 518 VIOLATIONS, AND THE
PLAINTIFFS' ATTEMPT TO ENJOIN THE ATTORNEY GENERAL FROM
BRINGING A <u>CIVIL</u> ENFORCEMENT ACTION IS NOT RIPE**

The plaintiffs say they brought this action because they fear the attorney general might

prosecute them under General Business Law § 518.  The power to criminally prosecute

violations of § 518, however, does not belong to the attorney general, but rather to district

11

attorneys — none of whom the plaintiffs have chosen to sue here.  As a result, the plaintiffs lack two essential elements of Article III standing.  Their alleged injury is not "'fairly . . . trac[eable]'" to the attorney general because the attorney general lacks plenary authority to criminally prosecute them under § 518.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted; omission and alteration in original).  And their requested injunction against the attorney general would not "'likely' . . . 'redress[]'" that injury because the nonparty district attorneys would remain free to criminally prosecute them under § 518.  *See id.* at 561 (citation omitted).

And while it is true that the attorney general can bring civil enforcement actions under § 518, the plaintiffs' request to enjoin the attorney general from enforcing § 518 against them civilly is unripe because postponing judicial review unless and until such an action would cause them no hardship.

**A.** **Only District Attorneys, Not the Attorney General, Have Plenary Authority To <u>Criminally</u> Prosecute Violations of General Business Law § 518**

The attorney general has only the authority granted to him by statute.  *See People v. Gilmour*, 98 N.Y.2d 126, 131 (2002) ("'[T]he Attorney-General has no . . . general authority [to conduct prosecutions] and is without any prosecutorial power except when specifically authorized by statute.'") (citations and footnote omitted; emphasis deleted; second and third alterations in original).

With certain exceptions,[2] New York law does not empower the attorney general to prosecute crimes.  *See Della Pietra v. State*, 71 N.Y.2d 792, 796–97 (1988) ("With few exceptions, the Legislature has delegated the responsibility for prosecuting persons accused of crime solely to the District Attorney, the public officer entrusted with the general prosecutorial authority for all crimes occurring in the county where elected.  The Attorney-General, by contrast, is given no general prosecutorial authority and, except where specifically permitted by statute, has no power to prosecute criminal actions.") (citations omitted); *People v. Cuttita*, 7 N.Y.3d 500, 507 (2006) ("[T]he Attorney General's historical authority to instigate criminal proceedings has over time been transferred to county district attorneys.  As a result, the Attorney General now has no power to prosecute crimes unless specifically permitted by law.").

No state statute gives plenary authority to the attorney general to criminally prosecute violations of General Business Law § 518.[3]  Rather, the attorney general's authority is limited to bringing civil enforcement actions.  *See* N.Y. Gen. Bus. Law § 513 ("Injunctive relief.  Whenever the attorney general has reason to believe that any violation of this article is a continuous practice, he may apply to the supreme court in any county wherein any such violation occurred for the purpose of restraining and enjoining the continuance of such violations.").

---

[2]      *See, e.g.*, N.Y. Gen. Bus. Law § 347 (antitrust violations); N.Y. Gen. Bus. Law § 358 (securities fraud violations); N.Y. Exec. Law § 63(2) (when required by governor); N.Y. Exec. Law § 63(3) (when requested by agency charged with executing criminal statute in question); N.Y. Exec. Law § 63(10) (anti-discrimination laws); N.Y. Exec. Law § 63(13) (perjury committed in course of attorney general's investigation).

[3]      It is true that the attorney general has a duty to defend the constitutionality of challenged state statutes, N.Y. Exec. Law § 71, and to defend actions in which the state is 'interested,' N.Y. Exec. Law § 63(1).  But in those cases "the Attorney General does so, not as an adverse party, but as a representative of the State's interest in asserting the validity of its statutes."  *Mendez v. Heller*, 530 F.2d 457, 460 (2d Cir. 1976).

The authority to criminally prosecute violations of General Business Law § 518, like other crimes, belongs to county district attorneys. *See* N.Y. County Law § 700(a) ("[I]t shall be the duty of every district attorney to conduct all prosecutions for crimes and offenses cognizable by the courts of the county for which he or she shall have been elected or appointed . . . ."); *Della Pietra*, 71 N.Y.2d at 796–97; *see also People v. Fulvio*, 514 N.Y.S.2d 594, 594 (N.Y. Crim. Ct.1987) (criminal prosecution for violation of Gen. Bus. Law § 518 brought by district attorney); *People v. Fulvio*, 517 N.Y.S.2d 1008, 1008 (N.Y. Crim. Ct. 1987) (same).

**B.**   **The Plaintiffs Thus Cannot Show That Their Injury Is "Fairly Traceable" To the Attorney General or That Their Requested Relief Would Likely "Redress" That Injury**

The upshot of this divided prosecutorial authority is that the plaintiffs cannot establish Article III causation or redressability. *See* 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3531.5 & nn.75–76 (3d ed. 2008) ("A common variety of the public-official defendant cases [in which courts have found no Article III causation or redressability] involves actions brought by mistake or miscalculation against an official who lacks authority to enforce a challenged statute or to accord desired relief.") (citing cases); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) ("State attorneys general are not invariably proper defendants in challenges to state criminal laws. Where an attorney general cannot direct, in a binding fashion, the prosecutorial activities of the officers who actually enforce the law or bring his own prosecution, he may not be a proper defendant.").

The plaintiffs' claimed injury — i.e., the supposed threat that they will be criminally prosecuted for violating an allegedly unconstitutional statute, and that supposed threat's supposed chilling effect on their pricing schemes — is not "fairly traceable" to the attorney

14

general because the attorney general cannot criminally prosecute them.  *See, e.g.*, *S. Pac. Transp. Co. v. Redden*, 651 F.2d 613, 614–15 (9th Cir. 1980) (citation omitted) (no Article III causation in action to enjoin state attorney general from enforcing allegedly unconstitutional criminal statute because state law did not provide that he "could prosecute a violation of the challenged act or compel the [nonparty] district attorneys to prosecute or refrain from doing so").

And their requested injunction against the attorney general would not redress their claimed injury because they could still be criminally prosecuted by their respective district attorneys — who, as nonparties to this action, would not be bound by the plaintiffs' requested injunction or declaratory judgment.[4]  *See, e.g.*, *id.* at 615 ("The attorney general's advice that the statute was unconstitutional would not insulate the plaintiffs from prosecution if this advice were rejected by the district attorneys."); *Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086, 1093, 1097–98 (6th Cir. 1985) (no Article III redressability in action for injunction to require housing authority to build low-rent housing in suburbs because "[t]o build in the suburbs, [the housing authority] must obtain cooperation agreements from the various [nonparty] local governments"). As a result, this action, if litigated to judgment, would yield only one thing: an advisory opinion.

---

[4]     *See, e.g.*, Fed. R. Civ. P. 65(d)(2) ("Contents and Scope of Every Injunction and Restraining Order. . . . Persons Bound.  The order binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."); *Wisc. Right to Life, Inc. v. Schober*, 366 F.3d 485, 490 (7th Cir. 2004) ("[A] district court's declaration that the statute is unconstitutional does not automatically stop state officials from trying to enforce the statute.").

For the same reason, Rule 65(d)(2) bars the plaintiffs' request for an injunction against "any other person acting in the name of the State of New York."  Notice of Mot. for Prelim. Inj., ECF No. 11.

That conclusion is not changed by the fact that the plaintiffs seek a preliminary injunction against the attorney general "and his agents," Notice of Mot. for Prelim. Inj., ECF No. 11, because district attorneys are not "agents" of the attorney general.  *See Fisher v. State*, 10 N.Y.2d 60, 61–62 (1961) (affirming dismissal of respondeat superior action against state for district attorney's alleged misconduct; "Until early in the 19th century the prosecution of crime in this State was a duty of the Attorney-General, somewhat like the English system, and at that time the State was divided into districts in each of which there was a prosecutor, hence the name 'District Attorney.' . . . However, all that ended when the 1846 Constitution directed that the District Attorney should be chosen by the electors of the respective counties.") (citations omitted).

Nor could the plaintiffs fix these flaws by amending their complaint to add their respective district attorneys as defendants.  Even if they were to do so, their injury would still not be "fairly traceable" to the attorney general, and an injunction against the attorney general would not redress that injury.  *See Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62–63 (2d Cir. 2012) ("[The plaintiff's] proposed interpretation of Article III — that it permits suits against non-injurious defendants as long as one of the defendants in the suit injured the plaintiff — is unprecedented.  No decision that we can discern has ever adopted such a broad interpretation of constitutional standing.").

In sum, because the attorney general cannot criminally prosecute General Business Law § 518 violations, the plaintiffs have sued the wrong public official.  The Court should dismiss their complaint for lack of Article III standing and deny their motion for a preliminary injunction.

**C.    The Plaintiffs' Pre-enforcement Challenge Seeking to Enjoin the Attorney General From Bringing a <u>Civil</u> Enforcement Action Is Not Ripe Because Postponing Review Would Cause No Hardship to the Plaintiffs**

It is true that the attorney general has the authority to bring <u>civil</u> enforcement actions for violations of General Business Law § 518.  *See* N.Y. Gen. Bus. Law § 513 ("Injunctive relief. Whenever the attorney general has reason to believe that any violation of this article is a continuous practice, he may apply to the supreme court in any county wherein any such violation occurred for the purpose of restraining and enjoining the continuance of such violations.").  But the plaintiffs' pre-enforcement challenge seeking to enjoin the attorney general from bringing a civil enforcement action is not ripe because postponing review would cause no hardship to the plaintiffs.

An action to enjoin enforcement of an allegedly unconstitutional statute will be dismissed as unripe when the plaintiff will suffer minimal or no hardship from postponing review — even when the issues are purely legal and thus fit for judicial decision — because deciding the constitutional question could turn out to be unnecessary.  *Clearing House Ass'n, L.L.C. v. Cuomo*, 510 F.3d 105, 124 (2d Cir. 2007) (holding that pre-enforcement challenge was unripe because deferring review would not cause hardship to plaintiff; even though the questions presented were "purely legal ones which would not be significantly clarified by further factual development," the plaintiff was not "faced with the dilemma . . . where to test the validity of an allegedly unconstitutional state regulation, [it] would have . . . to find an agent or employee to disobey the regulation at the risk of a fine or imprisonment. . . . Should the Attorney General ultimately decide to pursue an action to enforce the . . . statute, [the plaintiff] could assert its objection immediately before a court, without subjecting itself to any punitive consequences."), *aff'd in part and rev'd in part on other grounds*, 557 U.S. 519 (2009); *Toilet Goods Ass'n v.*

17

*Gardner*, 387 U.S. 158, 164–65 (1967) (holding that pre-enforcement challenge to regulation

requiring manufacturers to allow inspections was unripe because "no irremediable adverse

consequences flow from requiring a later challenge to this regulation by a manufacturer who

refuses to allow this type of inspection[;] a refusal to admit an inspector here would at most lead

only to a suspension of certification services to the particular party, a determination that can then

be promptly challenged through an administrative procedure, which in turn is reviewable by a

court") (citation and footnotes omitted); *Renne v. Geary*, 501 U.S. 312, 322–23 (1991) (holding

that pre-enforcement challenge was unripe because challenged statute "carries no criminal

penalties, and may only be enforced by injunction," and thus "deferring adjudication will [not]

impose a substantial hardship on these [plaintiffs]"); *see also Am. Sav. Bank, FSB v. UBS Fin.*

*Servs.*, 347 F.3d 436, 440 (2d Cir. 2003) (holding motion to enforce subpoenas was unripe

because deferring review until movant had exhausted administrative remedial process, which

could afford movant full relief sought, would cause no hardship to movant).

      Here, deferring review until (and unless) the attorney general brings a civil enforcement

action will cause <u>no</u> hardship to the plaintiffs.  In a civil enforcement action to enforce § 518, the

attorney general is not authorized to seek fines or other penalties; rather, the sole remedy

available is an injunction against further violations of General Business Law § 518.  *See* N.Y.

Gen. Bus. Law § 513.  Violations of an injunction entered after a civil enforcement action could,

of course, subject the plaintiffs to contempt sanctions, but they would first have had the

opportunity to raise their constitutional and preemption arguments in the civil enforcement action

without subjecting themselves to any punitive consequences.  This is not a situation, therefore,

where postponing review would subject the plaintiffs to a "direct and immediate dilemma"

between unnecessarily altering their conduct to avoid an enforcement action, on the one hand,

18

and on the other, continuing their conduct, thereby risking criminal or civil penalties in a later

enforcement action.  *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131–32 (2d Cir.

2008).[5]

With no hardship from postponing review, the plaintiffs' pre-enforcement challenge to

enjoin the attorney general from bringing a civil enforcement action against them is not ripe.

Their complaint should therefore be dismissed and their motion for a preliminary injunction

denied.

## POINT II

### THE PLAINTIFFS ALSO LACK THE "IMMINENT" INJURY NECESSARY FOR ARTICLE III STANDING BECAUSE THEY CANNOT SHOW A CREDIBLE FEAR OF ENFORCEMENT

Even if the attorney general could criminally prosecute violations of General Business

Law § 518 — and, as explained above, he cannot — the plaintiffs would still lack an "imminent"

injury because their supposed fear of criminal liability is based on an untenable interpretation of

the statute.  Liability under § 518 does not, as the plaintiffs contend, turn solely on the "label"

that a seller uses to describe its dual pricing scheme.  Rather, a seller violates § 518 only if it

charges consumers more for using a credit card without displaying that credit card price at least

as prominently as the cash price — an interpretation of the statute that accords with its plain

meaning, the meaning of the federal precursor on which it is based, the legislative history, the

statute's policy objectives, the case law, established canons of construction, and the attorney

general's consistent view for more than 25 years.

---

[5]      In addition, the plaintiffs' pre-enforcement challenge seeking to enjoin the attorney general from bringing a civil enforcement action is unripe for a second reason: the issues presented are not fit for judicial review, as explained below.  *See infra* pp. 33–35.

Under that interpretation, four of the five plaintiffs cannot show the "imminent" injury necessary for Article III standing because their proposed conduct would not violate the statute, and thus the attorney general would not likely bring an enforcement action against them. And the fifth plaintiff's challenge is unripe because it is not clear, given the limited facts before the Court, whether its proposed conduct would violate the statute.

**A.      General Business Law § 518 Is an Anti-Deception Statute — Not a Statute Regulating Merely How a Seller "Labels" Its Dual Pricing Scheme, As the Plaintiffs Claim**

To establish an "imminent" injury sufficient to satisfy Article III's case-or-controversy requirement, plaintiffs bringing a pre-enforcement challenge to a statute must show "'an actual and well-founded fear that [it] will be enforced against [them].'" *Port Wash. Teachers' Ass'n v. Bd. of Educ.*, 478 F.3d 494, 500 (2d Cir. 2007) (citation omitted; alterations in original); *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 479 (2d Cir. 1999) (even in First Amendment context, "some credible fear of enforcement must exist."). A plaintiff's subjective fear that the statute will be enforced against her is insufficient. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . ."); *Hakim v. Chertoff*, 447 F. Supp. 2d 325, 328 (S.D.N.Y. 2006) (Rakoff, J.) ("'It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.'") (citation omitted).

Here, the plaintiffs' claimed fear that General Business Law § 518 will be enforced against them is rooted in a flawed premise: that liability under the statute turns solely on the "label" that they use to implement a dual pricing scheme. *See* Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. ("PI Br.") at 1–2, 4–5, 15–20, 21–23, ECF No. 18. According to the plaintiffs, the statute "allows merchants to offer 'discounts' to those who pay in cash, but makes

20

it a crime to impose equivalent 'surcharges' on those who pay with credit," even though "[a] 'surcharge' and a 'discount' are two ways of framing the same price information."  PI Br. at 1. The plaintiffs' view, in short, is that "liability under [the statute] turns on the language used to describe identical conduct — and nothing else."[6]  PI Br. at 2.

But the plaintiffs' interpretation of § 518 is not the most reasonable interpretation, and — more importantly for Article III injury purposes — it is not the attorney general's interpretation. Rather, § 518 is an anti-fraud statute prohibiting sellers from charging credit card users an additional hidden fee not displayed as prominently as the cash price.  Under that more reasonable interpretation, the plaintiffs cannot show a "credible fear" that the statute will be enforced against them.

Section 518 states:  "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means."  Its wording is identical to the now-lapsed federal credit card surcharge ban on which it was modeled.  The federal ban's distinction between cash discounts and credit card surcharges was substantive, not semantic.  The first step was to determine the seller's "regular price"[7]:  If the

---

[6]     The amici base their views about the effects of General Business Law § 518 on this same untenable interpretation.  *See* Mem. of Law of *Amici Curiae* Large Retailers at 2 (arguing "why merchants should not be foreclosed from using the 'surcharge' label in New York"), ECF No. 23; Mem. of Law of *Amici Curiae* Consumer Protection Organizations at 1 ("By requiring merchants to label any price difference as a cash 'discount' rather than a credit 'surcharge,' New York's no-surcharge law prohibits them from effectively communicating the cost of credit to their customers . . . ."), ECF No. 25.  Thus, their views do nothing to "illuminate the statute's effect on consumers, and . . . on [large retailers'] negotiations with credit card companies over swipe fees."  Order at 2, ECF No. 22.

[7]     "The term 'regular price' means the tag or posted price charged for the property or service if a single price is tagged or posted, or the price charged for the property or service when payment is made by use of . . . a credit card if either (1) no price is tagged or posted, or (2) two prices are tagged or posted, one of which is charged when payment

21

seller posted only one price, that posted price was the regular price.  If the seller posted two prices, the credit card price was the regular price.  A seller imposed an impermissible "surcharge" only if it "increase[ed] th[at] regular price to a cardholder" but not to "customers paying by cash, check, or similar means."[8]  The only way a seller could violate the federal surcharge ban, therefore, is if it charged credit card holders a higher price without having "posted" that price.  Liability under the federal ban did not turn on the words the seller used to characterize its own dual pricing scheme.

Even without considering the federal precursor, the plain meaning of § 518 supports the attorney general's interpretation, not the plaintiffs' interpretation.  The dictionary definition of the word "surcharge" is "a charge in excess of the usual or normal amount: an additional tax, cost, or impost."  Webster's Third New International Dictionary 2299 (unabridged ed. 1981); *see also* Black's Law Dictionary 1579 (9th ed. 2009) ("an additional tax, charge, or cost, usu. one that is excessive").  Using that definition, a seller violates § 518 only when it charges its "usual" or "normal" price — that is, its posted, or most prominently displayed, price — to consumers paying with cash, check, or similar means, and then an "additional" charge over and above that normal price to consumers paying with a credit card.  In other words, as long as the seller displays the cash price and credit card price with equal prominence, it does not violate § 518, since the cash price cannot be said to be the sole "usual" or "normal" price.  But a seller does violate § 518 if, for example, it conceals the additional charge for using a credit card until after

---

is made by use of . . . a credit card and the other when payment is made by use of cash, check, or similar means."  Act of July 27, 1981, Pub. L. No. 97-25, 95 Stat. 144.

[8]     "The term 'surcharge' . . . means any means of increasing the regular price to a cardholder which is not imposed upon customers paying by cash, check, or similar means."  Act of Feb. 27, 1976, Pub. L. No. 94-222, 90 Stat. 197.

consumers have commenced a purchase. In that case, the seller's "normal" price is the more prominently displayed cash price, and § 518 forbids the seller from imposing an additional fee on credit card users.

The attorney general's interpretation draws support from the legislative history of General Business Law § 518. A principal impetus for § 518's ban on credit card surcharges was the fear that consumers could be hit with hidden credit card fees not announced until the point of sale. *See* Gupta Decl. Ex. B at 10 (memorandum from State Consumer Protection Board associate counsel to governor's counsel) ("One of the most important efforts of the consumer movement has been to insure that customers can depend on advertised claims and prices. Allowing credit card surcharges may defeat this effort however, by permitting unannounced price increases at the point of sale.") (emphasis added).

But like the federal statute on which it was modeled, the bill that became General Business Law § 518 was uniformly understood to allow cash discounts. *See* Gupta Decl. Ex. B at 5–6 (bill memoranda) ("A merchant would be able to offer a discount for cash if they so desire."); *id.* at 8 (letter from Assemblyman Goldstein to governor's counsel) ("[T]his bill does nothing to prevent a seller from offering a discount to consumers who pay by cash or check. This was always permitted under truth-in-lending and continues to be allowed under the proposed bill."); *id.* at 10 (observing that sellers "may continue to offer discounts to those customers purchasing in cash").

Section 518 was understood to reconcile these two seemingly inconsistent goals — barring credit card surcharges but allowing cash discounts — not through a formalistic focus on the "label" sellers attach to their pricing schemes, as the plaintiffs claim, but rather through an understanding of the word "surcharge" as being a charge over and above the seller's "regular

23

price."  *See id.* at 8 ("A 'surcharge' here is understood to mean any means of <u>increasing the</u> <u>regular price</u> to a cardholder which is not imposed on customers paying by cash, check or a similar means.") (emphasis added).

The attorney general's interpretation of § 518 makes eminently more sense than the plaintiffs' interpretation in light of the statute's objectives.  *See Lewis v. United States*, 523 U.S. 155, 160 (1998) (rejecting proposed literal interpretation of statutory language "since a literal reading . . . would dramatically separate the statute from its intended purpose").  The State of New York has a paramount interest in protecting consumers against fraud, deception, and excessive complexity in economic transactions.  *See, e.g.*, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 (1978) ("[T]he State has a legitimate and indeed 'compelling' interest in preventing those aspects of solicitation that involve fraud . . . .").  The State also has a strong interest in facilitating dual pricing so as not to insulate credit card companies from competition. *See, e.g.*, *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994) ("[T]he Government's interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment.").  The plaintiffs' interpretation of § 518 would not serve the State's anti-deception interest, as liability under their interpretation would turn solely on the label that a seller used to describe its dual pricing scheme — not whether that scheme was adequately disclosed to consumers.  And the plaintiffs' interpretation would frustrate the State's interest in promoting competition, as a seller could not lawfully implement a dual pricing scheme under their interpretation if (for example) a cashier inadvertently described the scheme as a credit card "surcharge."

By contrast, under the attorney general's interpretation, the statute is well-tailored to both purposes. Sellers are liable under the statute only when they fail to disclose the credit card price with equal prominence as the cash price, thus protecting credit card users from an unpleasant surprise at the point of sale.[9] It is not hard to imagine how a low advertised price could induce a driver with no cash in her wallet to pull off the highway into a gas station, or a shopper with no cash in his wallet to stand in a long line at a retail store — only to learn at the pump or register about a credit card surcharge that, had it been displayed prominently, they would have refused to pay.

And sellers are free to impose dual pricing schemes under the statute, regardless of the label they use to characterize it. Moreover, requiring sellers to prominently disclose the credit card price <u>exposes</u> credit card companies to competition by allowing consumers to make an informed decision whether the higher credit card price is worth paying at an early moment in the transaction when they can feasibly switch to cash — by, for example, stopping at an ATM or choosing a competitor with a lower credit card fee.

In addition, the attorney general's interpretation of § 518 protects credit card users against gouging. If sellers could hide credit card fees until the point of sale, they could more easily impose a credit card fee much higher than the swipe fee that they in turn incur, pocketing the difference. Consumers with no cash on hand would face an unwelcome dilemma between

---

[9]     A cash discount, even if not prominently displayed, does not implicate the State's anti-fraud interest to the same extent as a credit card surcharge. If a seller's most prominently advertised price applies to credit cards, a credit card user who commences a purchase at that price cannot fairly claim that she was defrauded, even if she later learns that she could have saved money by using cash. *See* Compl. ¶ 26 ("In one study, 74% of consumers had a negative or strongly negative reaction to credit surcharges, while fewer than half had a negative or strongly negative reaction to cash discounts."). Thus, it makes sense that § 518 does not prohibit cash discounts.

paying the excessive fee or aborting the transaction, even though, had they known about the fee

from the outset, they could have avoided it.[10]  *See* Gupta Decl. Ex. B at 8 (letter from

Assemblyman Goldstein to governor's counsel) (warning that "to allow imposition of a

surcharge . . . will only result in a windfall for some retailers with no concomittant [*sic*] benefit

for consumers").  The experience of other jurisdictions that have done away with no-surcharge

laws shows that this fear is not imaginary.[11]

      The attorney general's interpretation of § 518 also accords with the case law interpreting

the statute; the plaintiffs' interpretation does not.  The court in *People v. Fulvio*, 514 N.Y.S.2d

594 (N.Y. Crim. Ct. 1987) ("*Fulvio I*"), read the statute as the attorney general does, holding that

the "everyday, commonsense meaning" of the word "surcharge" was "'a charge in excess of the

usual . . . amount.'"  514 N.Y.S.2d at 596 & n.* (quoting Webster's Third International New

---

[10]    It is true that § 518 prohibits all credit card surcharges, not just excessive ones.  But that bright-line rule makes sense in light of the administrative difficulty of determining the actual swipe fees that sellers incur, which vary significantly based on the type of card. *See* Compl. ¶ 7 ("Brooklyn Farmacy pays an average of 2% to 3% per credit transaction in swipe fees . . . ."); *id.* ¶ 13 ("[Five Points] pays on average between 2.4% and 3.3% per credit transaction in swipe fees."); *id.* ¶ 15 (Patio.com pays on average between 2% and 3% per credit transaction in swipe fees.").

    It is also true that even under the attorney general's interpretation, § 518 allows sellers to give a cash discount much larger than the swipe fee they save when consumers use cash. But market forces provide a more robust check on this conduct:  To implement such a pricing scheme, a seller's prominently advertised (credit card) price would have to be high enough so that even after the large cash discount, the transaction would still be profitable.  But a high advertised price tends to drive away consumers, thus discouraging sellers from implementing that kind of scheme.

[11]    *See, e.g.*, Reserve Bank of Australia, Review of Card Surcharging: A Consultation Document 2 (2011) (after Australia eliminated no-surcharge rules in 2003, average surcharges have steadily risen and now exceed average swipe fee by approximately 1% of transaction value), *available at* http://www.rba.gov.au/publications/consultations/201106-review-card-surcharging/pdf/201106-review-card-surcharging.pdf.

Dictionary) (omission in original).  Accordingly, the court rejected Eugene Fulvio's void-for-vagueness challenge because the statute was "sufficiently clear" to "g[i]ve the defendant fair warning as to what conduct was prohibited."[12]  *Id.* at 596–97.  That "everyday, commonsense" reading of the statute covered the conduct alleged in the complaint — that Mr. Fulvio "attempted to impose a five cents per gallon charge over the cash price when the complainant attempted to use his credit card to purchase gasoline."  *Id.* at 596.  However, the court intimated that it would be a valid defense at trial if Mr. Fulvio could show that "the charge for gasoline in excess of the cash price was a cash discount and not a surcharge."  *Id.* at 596–97.

Later in the same criminal case, the court held that a broader interpretation of § 518 adopted by the district attorney at trial[13] — the same interpretation that the plaintiffs advance here, where liability turns solely on the "label" that a defendant uses to describe its dual pricing scheme — was unconstitutionally vague.  *See People v. Fulvio*, 517 N.Y.S.2d 1008, 1011–15 (N.Y. Crim. Ct. 1987) ("*Fulvio II*") (observing that district attorney's interpretation of § 518 was that "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the label the individual affixes to his economic behavior, without substantive difference").  The evidence at trial showed that "the

---

[12]    The plaintiffs' interpretation of § 518, which they claim renders the statute unconstitutionally vague, is inconsistent with *Fulvio I*, which held that the statute was not unconstitutionally vague as applied to Mr. Fulvio's conduct as alleged in the complaint. The plaintiffs do not attempt to reconcile their interpretation with that holding.

[13]    The plaintiffs conflate the attorney general and the district attorney when they claim to fear that the <u>attorney general</u> will attempt to enforce § 518 against them using the same broad interpretation he supposedly advanced in *Fulvio II*.  *See* PI Br. at 22–23.  The district attorney prosecuted *Fulvio*.  *See Fulvio II*, 517 N.Y.S.2d at 1008 ("COUNSEL: Mario Merola, District Attorney (Eric A. Seiff of counsel), for plaintiff.").  The attorney general was not involved in *Fulvio* since he cannot criminally prosecute § 518 violations. The views that the plaintiffs attribute to the attorney general are not and have never been his — thus undermining the credibility of their alleged fear of enforcement.

signs in [Mr. Fulvio's] station clearly stated the 'cash price' and the 'credit price' for his gasoline." *See id.* at 1009–10. If § 518 were interpreted to cover that conduct, the *Fulvio II* court concluded, the defendant would not have fair notice of what the statute prohibited because "the innocent and the criminal conduct [would be] based upon the same factual configuration[,] creat[ing] a distinction without a difference; it is not the <u>act</u> which [would be] outlawed, but the <u>word</u> given that act." *Id.* at 1015. Accordingly, the *Fulvio II* court dismissed the § 518 charge.[14] *Id.*

The State did not appeal *Fulvio II*, and since then, the attorney general has enforced the statute in accordance with *Fulvio I* and *Fulvio II*. The plaintiffs cite no reported decisions, settlements, or threatened enforcement actions to the contrary.[15] *Cf.* Gupta Decl. Ex. D (announcing attorney general's settlement with home heating oil companies; "'This already massive expense [of home heating in winter] should not be compounded by <u>hidden costs and charges</u> that place an even greater burden on New York homeowners. Today's agreement will provide welcome relief to thousands of Long Islanders who suffered from these companies' <u>misleading and deceptive business practices</u>.'") (emphasis added).

Finally, the attorney general's interpretation of General Business Law § 518 better accords with established canons of statutory interpretation than the plaintiffs' interpretation. The

---

[14]   The key change that explains the seemingly inconsistent outcomes in *Fulvio I* and *Fulvio II* (which did not purport to overrule *Fulvio I*) was the additional evidence that emerged between the complaint (based solely on the testimony of the complaining witness, who claimed that he did not observe the credit card price until he had already begun pumping gas) and at trial (which showed that "the signs in [Mr. Fulvio's] station clearly stated the 'cash price' and the 'credit price' for his gasoline"). *See Fulvio II*, 517 N.Y.S.2d at 1009–10 (so explaining).

[15]   Indeed, the plaintiffs do not even cite any instances of a <u>district attorney</u> advancing their interpretation of § 518 in a criminal prosecution since *Fulvio* was decided in 1987.

plaintiffs' interpretation of § 518 would flout the canon of constitutional avoidance, allegedly rendering the statute an unconstitutional restriction on speech in violation of the First Amendment and unconstitutionally vague under the Fourteenth Amendment. *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of [the legislature]."); *Hooper v. California*, 155 U.S. 648, 657 (1895) ("The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.").  The attorney general's interpretation — which poses no constitutional problems, as explained more fully below, *see infra* at 36–41 — would not.

Likewise, the plaintiffs' interpretation of § 518 would violate the rule of lenity, criminalizing (for example) a cashier's mistaken characterization of a seller's dual pricing scheme as a "credit card surcharge."  *See Rewis v. United States*, 401 U.S. 808, 812 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). The attorney general's interpretation, by contrast, would not, criminalizing only those dual pricing schemes in which the credit card price is not displayed with equal prominence as the cash price.

In sum, the plaintiffs' interpretation of General Business Law § 518 cannot be correct. Liability under the statute does not turn solely on the "label" that a seller uses to describe its dual

pricing scheme.[16]  Rather, a seller violates § 518 only if its credit card price is not displayed at least as prominently as its cash price.

**B.**      **Four of the Plaintiffs Cannot Show a Credible Fear That General Business Law § 518, Properly Interpreted, Will Be Enforced Against Them**

Under that proper interpretation of General Business Law § 518, four of the plaintiffs — Expressions Hair Design, Brooklyn Farmacy & Soda Fountain, Brite Buy Wines & Spirits, and Five Points Academy — cannot establish a "credible fear" that the statute will be enforced against them. *Marchi*, 173 F.3d at 479.  They therefore have no justiciable "case or controversy" over which this Court has jurisdiction under Article III.

None of these four plaintiffs claim to want to implement a dual pricing scheme displaying the credit card price less prominently than the cash price.  Expressions says it currently uses a dual pricing scheme but is careful to call it a "cash discount" rather than a "credit card surcharge."  *See* Fiacco Decl. ¶¶ 6–7.  Brooklyn Farmacy, Brite Buy, and Five Points all say they want to implement a dual pricing scheme but do not do so out of fear that they might be prosecuted under § 518 if they described that scheme as a "credit card surcharge."  *See* Freeman Decl. ¶¶ 7–9; Pabst Decl. ¶¶ 4–6; Milles Decl. ¶¶ 5–8.  As explained above, however, liability under § 518 does not turn solely on the "label" that a seller uses to describe its dual pricing scheme.  Rather, it turns on whether the seller displays its credit card price at least as prominently as its cash price.  But all four plaintiffs say they want to display their credit card price prominently, so as to discourage customers from using credit cards and thereby avoid

---

[16]      The label that a seller uses to describe its dual pricing scheme could, of course, constitute <u>evidence</u> that the seller is violating § 518.  The seller's label sheds light on which price is the seller's "regular" (i.e., most prominently displayed) price and thus whether the seller is charging credit card users an additional fee on top of that regular price.  But the label alone is not dispositive.

swipe fees.  *See* Fiacco Decl. ¶¶ 5, 8 ("We [at Expressions] want to do what we can to ensure that our customers are aware of the high cost of using credit cards, and that they take that information into account in deciding how to pay for a haircut or other services. . . . We would like to clearly and transparently impose a surcharge on customers who pay for their haircuts with credit cards . . . ."); Freeman Decl. ¶¶ 5, 7–8 ("We [at Brooklyn Farmacy] want to do what we can to inform our customers about the high [swipe] fees and encourage them to use cash instead of credit . . . .  [S]urcharging credit card usage would allow Brooklyn Farmacy to effectively inform our customers about the costs that the credit card companies impose on merchants in a manner that will cause them to pay attention."); Pabst Decl. ¶ 5 ("We [at Brite Buy] want to inform our customers that they would be paying *more* when they use a credit card . . . ."); Milles Decl. ¶ 6 ("Five Points firmly believes that a surcharge will cause many members to switch payment forms and that a discount won't provide anywhere near the same motivation to switch . . . .").  Those four plaintiffs thus cannot establish a "credible fear of enforcement."

The Seventh Circuit has held that plaintiffs in the same position as Expressions, Brooklyn Farmacy, Brite Buy, and Five Points lack an injury sufficient for Article III standing.  In *Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485 (7th Cir. 2004), the plaintiff organizations sought to enjoin the Wisconsin state elections board from enforcing an allegedly unconstitutional campaign finance statute against them.  *Id.* at 488.  Previously, however, a district court had declared the statute unconstitutional in a case involving different plaintiffs and had enjoined the board from enforcing it against those plaintiffs — a decision the board did not appeal.  *Id.* at 487–88.  The Seventh Circuit acknowledged the "theoretical" possibility that the board could seek to enforce the statute against the new plaintiffs, since as non-parties to the prior case they were not covered by the district court's injunction and since the district court's declaration did

31

not bar the board from prosecuting violations of the statute.  *Id.* at 489–90.  Nevertheless, the

Seventh Circuit held that the new plaintiffs had "fail[ed] to tie this theoretical harm to an actual

and imminent threat of enforcement," both because the board had implicitly conceded that the

statute was unconstitutional by declining to appeal the prior district court declaration, and

because the plaintiffs could not show that the board had ever tried to enforce the statute in the

allegedly unconstitutional manner they sought to challenge.  *Id.* at 490.  As a result, the Seventh

Circuit held, the plaintiffs' injury "simply is conjectural, not actual or imminent."  *Id.*; *see also*

*United States v. Mack*, 655 F.3d 843, 846–47 (8th Cir. 1981) (no justiciable case or controversy

where agency agreed that statute would be unconstitutional if applied in manner challenged and

had adopted policy statement against applying statute in that manner).

      Here, likewise, Expressions, Brooklyn Farmacy, Brite Buy, and Five Points cannot show

"an actual and imminent threat of enforcement."  *See id.* at 490.  Here — as in *Wiconsin Right to*

*Life* — the attorney general did not seek to appeal *Fulvio II*[17] and has nothing to suggest that he

intends to enforce § 518 on the untenable interpretation that the district attorney adopted there

(and that the plaintiffs challenge here).  *See Fulvio II*, 517 N.Y.S.2d at 1011–15.  And here — as

in *Wisconsin Right to Life* — these four plaintiffs cannot identify any instances since *Fulvio II*

where the attorney general sought to enforce § 518 in the allegedly unconstitutional manner they

challenge.  Even if — as in *Wisconsin Right to Life* — the attorney general here could

"theoretical[ly]" seek to enforce General Business Law § 518 against these four plaintiffs under

their illogical interpretation of the statute, they cannot "tie th[at] theoretical harm to an actual and

---

[17]    Even though the district attorney prosecuted *Fulvio* — not the attorney general — the
attorney general could have intervened in the case to defend the constitutionality of § 518
against Mr. Fulvio's constitutional challenge.  *See supra* p. 13 n.3.

imminent threat of enforcement." *See Wisc. Right to Life*, 366 F.3d at 490.  Thus — as in

*Wisconsin Right to Life* — their injury is "conjectural, not actual or imminent."  *See id.*

    As a result, because Expressions, Brooklyn Farmacy, Brite Buy, and Five Points have no

"credible fear" that § 518 will be enforced against them, this Court should dismiss their

complaint for lack of jurisdiction and deny their motion for a preliminary injunction.

**C.    The Challenge of the Fifth Plaintiff, Patio.com, Is Not Ripe Because It Is Not Clear
        From the Limited Details Before the Court Whether Its Proposed Conduct Would
        Violate General Business Law § 518**

    In contrast to the other four plaintiffs, the fifth plaintiff in this case, Patio.com, says that it

would like to impose a dual pricing scheme that might violate General Business Law § 518, even

under the proper interpretation explained above.  Nevertheless, Patio.com's challenge is not ripe

because, on the limited factual record presently before the Court, the constitutional issues raised

are not sufficiently well defined for judicial decision and indeed may turn out to be unnecessary

to decide.

    The issues presented in a pre-enforcement challenge are not "fit for judicial decision"

when they would "'benefit from . . . further factual development and when the court would be in

[a] better position to adjudicate the issues in the future than it is now.'"  *N.Y. Civil Liberties

Union v. Grandeau*, 528 F.3d 122, 132 (2d Cir. 2008) (quoting *Simmonds v. INS*, 326 F.3d 351,

359 (2d Cir. 2003)); *see also id.* at 130–31 (explaining that "fitness for judicial decision" element

of ripeness inquiry serves to "'prevent . . . the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements over administrative

policies'") (citation omitted).  A pre-enforcement challenge is not ripe when the challenged law's

applicability to the plaintiff's proposed conduct — as well as the constitutionality *vel non* of that

applicability — is "highly fact-specific and, as of yet, hypothetical," because "[s]uch an open-

33

ended and indefinite challenge is not well suited to judicial decision." *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999) ("[I]t is easy to imagine a variety of circumstances that would fall within the challenged hypothetical application of the directive, some of which may be regulated constitutionally and others of which may not. . . . [A] court entertaining [the plaintiff's] challenge would be forced to guess at how [the school board] might apply the directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical."); *see also St. Martin's Press, Inc. v. Carey*, 605 F.2d 41, 44 & n.2 (2d Cir. 1979) (holding that pre-enforcement constitutional challenge to state statute was not Article III case or controversy in part because it was not clear whether statute covered plaintiff's conduct).

Here, it is not clear from the limited details before the Court whether Patio.com's proposed dual pricing scheme would violate General Business Law § 518. *See generally* Ross Decl. ¶¶ 7–9. Patio.com says: "In order to better inform our customers about the financial impact of merchant discount fees, Patio.com would like to add a line item to the receipt that illustrates the payment processing costs that Patio.com incurs when customers pay with credit cards. Such a line item would inform customers that they are paying more for using a credit card . . . ."[18] Ross Decl. ¶ 7. If a line item on the customer's receipt were the sole place where

---

[18]     Five Points says that it would like to add "a designated line item on our member invoices that informs members about the costs that credit card acceptance impose [*sic*] on Five Points" and that "show[s] our members how much Five Points is paying in processing costs when they use a credit card." Milles Decl. ¶ 8. As described, that proposed line item — which would merely inform consumers of the swipe fees that Five Points incurs, without passing those fees on to credit card users — would not violate § 518, since Five Points would not be "imposing" any additional charge on a credit card user. If, however, Five Points wanted to charge credit card users an additional fee, then its proposed line item would be subject to the same ripeness problems as Patio.com's proposed line item described above.

34

Patio.com disclosed this proposed additional credit card charge, that conduct would likely violate General Business Law § 518:  If Patio.com's credit card price were not even visible to consumers until after they completed a purchase, the credit card price would not be displayed with equal prominence as the cash, check, and debit price.  But if Patio.com also displayed its credit card price in prominent locations visible to consumers earlier in the shopping process (as suggested by Patio.com's professed desire to create a "meaningful incentive to many customers to switch to paying with a debit card, cash, or check," *see* Ross Decl. ¶ 8), that conduct might not violate General Business Law § 518.[19]

Patio.com's pre-enforcement challenge thus would require the Court to predict, on this meager factual record, how the unspecified details of Patio.com's proposed pricing scheme would materialize, whether that hypothetical pricing scheme would violate General Business Law § 518, and whether the attorney general would in his discretion seek to enforce § 518 against that hypothetical pricing scheme.  Because its proposed conduct is so "highly fact-specific and, as of yet, hypothetical," Patio.com's pre-enforcement challenge is "not well suited to judicial decision."  *See Marchi*, 173 F.3d at 478.

In addition to the issues being ill-suited to judicial decision, Patio.com's pre-enforcement challenge is also not ripe because, as explained above, Patio.com would suffer no hardship if judicial review were postponed unless and until the attorney general brought a subsequent civil enforcement action against it.  *See supra* pp. 17–19.

---

[19]     This action therefore does not present the question of whether § 518 would allow a pricing scheme in which the seller prominently displays both the cash price and the additional (or marginal) credit card charge (expressed either as a dollar figure or a percentage of the cash price) without prominently displaying the total credit card price as a dollar figure.

## POINT III

## ON THE MERITS, THE PLAINTIFFS' PRE-ENFORCEMENT CHALLENGE TO GENERAL BUSINESS LAW § 518 FAILS AS A MATTER OF LAW

Even if the plaintiffs could establish Article III standing and could show that their pre-enforcement challenge were ripe — and they cannot, as explained above — on the merits their claims fail as a matter of law.  General Business Law § 518, which prohibits "impos[ing] a surcharge" on credit card users, regulates conduct, not speech.  It thus does not implicate the First Amendment.  It is sufficiently clear to give sellers fair warning as to what conduct is prohibited.  And because it is pro-competitive, not anti-competitive, it is not preempted by the federal antitrust laws.  Thus, the plaintiffs' complaint should be dismissed under Rule 12(b)(6) and, because they are not likely to succeed on the merits, their motion for a preliminary injunction should be denied.

### A.    The Plaintiffs' First Amendment Claim Fails Because General Business Law § 518 Regulates Conduct — "Impos[ing] a Surcharge" — Not Speech

General Business Law § 518, properly interpreted, regulates <u>conduct</u>, not speech, and thus it does not violate the First Amendment.  It is directed at what sellers may not do — "impose a surcharge" — not what they may or may not say.[20]  *See, e.g.*, *Rumsfeld v. Forum for*

---

[20]    That fact distinguishes this case from the cases cited by the plaintiffs involving laws prohibiting speech about cost-shifting.  *See* PI Br. at 25; *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008) ("[T]his provision regulates speech, not conduct, as it prohibits providers from 'stat[ing]' the tax on the bill.") (emphasis added); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. Abrams*, 684 F. Supp. 804, 805 (S.D.N.Y. 1988) (statute "'prohibit[ed] . . . <u>identif[ying]</u> in the purchase agreement . . . any charge as being for the purpose of affording a customer his or her rights under the Lemon Law'") (quoting attorney general aff.) (some emphasis deleted); *Capital Leasing of Ohio, Inc. v. Columbus Mun. Airport Auth.*, 13 F. Supp. 2d 640, 648 (S.D. Ohio 1998) (contract prohibited lessee from "<u>using the following words</u> . . .") (emphasis added); *Bloom v. O'Brien*, 841 F. Supp. 277, 278 (D. Minn. 1993) (statute prohibited health care providers from "<u>stat[ing]</u>" tax on bill) (emphasis added).

36

*Academic & Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006) ("[T]he Solomon Amendment regulates conduct, not speech.  It affects what law schools must <u>do</u> — afford equal access to military recruiters — not what they may or may not <u>say</u>.").

It is true that if sellers want to use dual pricing, § 518 affects <u>how</u> they may communicate it: they must display the credit card price <u>at least as prominently as</u> the cash price.  But § 518 does not dictate the <u>content</u> of that communication at all; sellers are free to set the credit card price at whatever level they wish.  *See id.* at 62 (holding that law requiring universities to give military recruiters access to campus resources "'in a manner that is at least equal in quality and scope'" as access given to other recruiters did not violate First Amendment because, even though law occasionally had the effect of compelling universities to disseminate military recruiters' speech, law "does not dictate the content of the speech at all" and that compelled speech is "plainly incidental to the [law's] regulation of conduct"); *id.* at 62 ("'[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'") (citation omitted).

Moreover, the conduct regulated by § 518 is not "inherently expressive" such that it is protected by the First Amendment.  *See id.* at 65 (First Amendment extends only to conduct that is "inherently expressive").  The fact that the plaintiffs say they want to use their pricing schemes to convey a political message to their customers about credit card regulation does not make it symbolic speech.  *See id.* at 65–66 ("[W]e rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.") (internal quotation marks omitted).  Without additional speech explaining their aims, a customer who encounters the plaintiffs' surcharges would have no way of knowing whether the plaintiffs are

37

protesting credit card companies' political clout or trying to pull a fast one on inattentive customers.  *See id.* at 66 ("The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection [as symbolic speech].").

But even if § 518 were construed to be a content-based speech regulation, the plaintiffs' First Amendment claim would still fail.  A seller violates § 518 only if it fails to display its credit card price with equal prominence as its cash price.  So understood, the statute prohibits only misleading and deceptive commercial speech, is reasonably related to the State's interest in preventing consumer deception, and thus (to the extent the plaintiffs' proposed conduct would violate the statute) would not violate the plaintiffs' First Amendment rights.

The plaintiffs concede that their proposed use of the word "surcharge" is commercial speech[21] — that is, "'speech proposing a commercial transaction.'"  PI Br. at 27; *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 637 (1985) (citation omitted). As a general matter, laws restricting commercial speech that concerns lawful activity and that is not misleading or deceptive must "directly advance[]" a "substantial governmental interest" and must not be "more extensive than is necessary to serve that interest."  *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 566 (1980).  But the First Amendment allows states "to prevent the dissemination of commercial speech that is false, deceptive, or

---

[21]     The plaintiffs argue that their proposed speech also has a political element, aiming to influence consumers' views about appropriate credit card regulation, and thus that any restriction of that speech should be subject to strict scrutiny. PI Br. at 26–28.  But the Supreme Court has rejected that argument, explaining that "'advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech.  A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions.'"  *Zauderer*, 471 U.S. at 637 n.7 (citations omitted).

misleading." *Zauderer*, 471 U.S. at 638.  A state may therefore require that businesses disclose certain information "'to dissipate the possibility of consumer confusion or deception' . . . as long as [those] disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.* at 651 (citation omitted); *see also id.* (emphasizing that "disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech"); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010) (rejecting argument that *Central Hudson* standard applied and holding instead that "the less exacting scrutiny described in *Zauderer* governs" because the challenged statute "is directed at misleading commercial speech" and "impose[s] a disclosure requirement rather than an affirmative limitation on speech") (emphasis deleted).

Here, General Business Law § 518 is directed at misleading commercial speech.  A low advertised price with no mention of a credit card fee would lead most consumers to believe that that price applied to credit card purchases.  It is not hard to imagine that such an advertised price could induce a driver with no cash in her wallet to pull off the highway into a gas station, or a shopper with no cash in his wallet to stand in a long line at a retail store — only to learn at the pump or register about a credit card surcharge that, had it been displayed prominently, they would have been willing and able to avoid, either by stopping at an ATM or by choosing a competitor.  And § 518 imposes a disclosure requirement — requiring that if sellers use dual pricing, they must display the credit card price at least as prominently as the cash price — not an affirmative limitation on speech.  Finally, § 518's disclosure requirement is "reasonably related to the State's interest in preventing [consumer] deception" because it provides potential customers with relevant information about the seller's prices.  *See Zauderer*, 471 U.S. at 651; *Milavetz*, 559 U.S. at 251–53.

39

Thus, because the plaintiffs' First Amendment claim fails as a matter of law, it should be dismissed and their motion for a preliminary injunction should be denied.

**B.**     **The Plaintiffs' Void-For-Vagueness Claim Fails Once Their Untenable Interpretation of § 518 Is Discarded**

Like the plaintiffs' First Amendment claim, their void-for-vagueness claim is premised on the same untenable interpretation of General Business Law § 518.  And like their First Amendment claim, their void-for-vagueness claim fails when the statute is reasonably construed using the normal tools of statutory construction.

A void-for-vagueness challenge fails when the challenged statute "'provide[s] a person of ordinary intelligence fair notice of what is prohibited'" and is not "'so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *FCC v. Fox TV Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012) (citation omitted).  Courts do not restrict their analysis to the challenged statutory text in a vacuum, but rather examine the statute using traditional tools of statutory interpretation and in light of prior case law.  *See, e.g.*, *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 576–80 (1973) (holding that statute was not unconstitutionally vague in light of related statutory provisions, statutory history and structure, corresponding regulations, and prior adjudications interpreting the statute and regulations); *Arnett v. Kennedy*, 416 U.S. 134, 160–62 (1974) (plurality op.) (holding that statute was not unconstitutionally vague in light of its purpose and canon of constitutional avoidance; observing that statute "was not written upon a clean slate in 1912, and it does not appear on a clean slate now").

Here, General Business Law § 518 — interpreted in light of its plain meaning, federal precursor, legislative history, statutory objectives, case law, and canons of construction, *see supra* pp. 20–30 — is not unconstitutionally vague.  The statute provides sellers of ordinary

40

intelligence fair notice that they may not impose a hidden fee on credit card users over and above their normal cash price.  For the same reason, the statute provides sufficient standards for enforcement.

Indeed, *Fulvio I* considered and rejected a void-for-vagueness challenge to § 518 as applied to a defendant alleged to have "impose[d] a five cents per gallon charge over the cash price when the complainant attempted to use his credit card to purchase gasoline," holding that the statute gave him fair warning that that alleged conduct was prohibited.  514 N.Y.S.2d at 596–97.

As a result, the plaintiffs' void-for-vagueness claim fails on the merits.

## C.     The Plaintiffs' Antitrust Preemption Claim Fails As a Matter of Law Because § 518 Is Pro-Competitive

The plaintiffs' antitrust preemption claim — on the ground that that General Business Law § 518 "insulates credit-card companies from competition" — is likewise based on their untenable interpretation of the statute.  Compl. ¶ 52.  But under the more sensible interpretation explained above, § 518 is pro-competitive, requiring sellers with dual pricing schemes to disclose the additional credit card fee prominently and thus exposing credit card companies to competition.  The plaintiffs' antitrust preemption claim thus fails as a matter of law.

The plaintiffs do not claim that the Sherman Act expressly preempts § 518.  Rather, they claim that the Sherman Act impliedly preempts § 518 because § 518 conflicts with the Sherman Act's purposes.  *See* Compl. ¶ 52 (alleging that § 518 "frustrates the purposes of federal antitrust law").

Courts facing an implied preemption claim begin with a presumption against preemption. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("Congress does not exercise lightly" its "extraordinary power" to "legislate in areas traditionally regulated by the States."); *see also Rice*

41

*v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress").

A state law is not preempted unless "'compliance with both federal and state regulations is a physical impossibility'"[22] or the state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (citations omitted).

The plaintiffs' preemption theory is that § 518, by supposedly outlawing any dual pricing scheme that uses the credit card "surcharge" label, insulates credit card companies from competition and frustrates the pro-competitive purposes of federal antitrust law.  Compl. ¶¶ 41–42, 52.

But § 518 does not prohibit a dual pricing scheme solely because of the "label" the seller uses to describe it.  Rather, a seller violates § 518 only if its credit card price is not displayed at least as prominently as its cash price. *See supra* pp. 20–30.  So understood, § 518 is pro-competitive:  By requiring sellers to prominently disclose the credit card price, § 518 consumers to make an informed decision whether the higher credit card price is worth paying at an early moment in the transaction when they can feasibly switch to cash.  Accordingly, § 518 does not interfere with the Sherman Act's purposes and is not preempted.

In any event, even under the plaintiffs' untenable interpretation of § 518, the statute is not preempted.  The federal surcharge ban from which § 518 was copied word-for-word — and which was enacted <u>after</u> the Sherman Act — expressly stated that it did <u>not</u> preempt state credit

---

[22]  The plaintiffs do not contend that it is physically impossible for them to comply with both the Sherman Act and § 518.

card surcharge bans. *See Texaco, Inc. v. Hughes*, 572 F. Supp. 1, 6–7 (D. Md. 1982) ("The stated intent of Congress in enacting TILA, later amended by the Cash Discount Act, was as follows: this subchapter does not otherwise annul, alter or affect in any manner the meaning, scope or applicability of the laws of any state, including but not limited to, laws relating to the types, amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit . . . .") (quoting 15 U.S.C. § 1610(b)). That federal statute sunsetted in 1984. Act of July 27, 1981, Pub. L. 97-25, 95 Stat. 144. For the plaintiffs' preemption theory to work, then: (1) the Sherman Act as originally enacted must have preempted state surcharge bans; (2) Congress, in enacting the federal surcharge ban, must have abrogated the Sherman Act; (3) and then Congress, in allowing the federal surcharge ban to sunset, must have passively and *sub silentio* re-expanded the Sherman Act to again preempt state surcharge bans. That theory strains credibility.

The plaintiffs' preemption claim thus fails as a matter of law and should be dismissed under Rule 12(b)(6).

## POINT IV

### EVEN IF THE PLAINTIFFS' CLAIMS DID NOT FAIL ON THE MERITS, THEIR PRELIMINARY INJUNCTION MOTION SHOULD STILL BE DENIED

Even if the plaintiffs could establish Article III standing, and even if their claims were likely to succeed on the merits, their motion for a preliminary injunction should still be denied. The plaintiffs are not likely to suffer irreparable harm absent a preliminary injunction, and the other preliminary injunction factors weigh against granting one here.

A.      **Absent a Preliminary Injunction, the Plaintiffs Are Unlikely To Suffer Irreparable Harm**

The plaintiffs' sole claimed irreparable injury is that the possibility of a General Business Law § 518 prosecution chills their supposed constitutional right to use the word "surcharge" to describe their dual pricing schemes.  *See* PI Br. at 42–44.  But for three reasons, that alleged chill is insufficient to constitute the irreparable harm necessary for a preliminary injunction.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20–22, 24 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction" because "a preliminary injunction is an extraordinary remedy never awarded as of right.").

First and most importantly, the plaintiffs' argument obscures the substance of their claim. Although as a general matter the deprivation of a constitutional right constitutes irreparable injury, "'the mere allegation of a constitutional infringement in and of itself does not constitute irreparable harm.'"  *Air Transp. Int'l LLC v. Aerolease Fin. Grp.*, 993 F. Supp. 118, 124 (D. Conn. 1998) (citation omitted) (citing cases).  Rather, courts consider "the nature of the constitutional injury."  *Id.*; *see also Savage v. Gorski*, 850 F.2d 64, 67–68 (2d Cir. 1988) (vacating preliminary injunction despite alleged chill of plaintiffs' First Amendment rights because "reinstatement and money damages could make [plaintiffs] whole for any loss suffered during this period" and thus "their injury is plainly reparable").  Here, the real injury that the plaintiffs complain of is monetary — that they are paying swipe fees to credit card companies and (allegedly) cannot recoup them effectively from their customers.  *See* PI Br. at 1 ("The plaintiffs are five New York merchants who want to pass on the cost of swipe fees to only those customers who pay with credit cards.").  That type of easily quantifiable monetary injury is the

44

paradigmatic "reparable" harm and is thus insufficient to justify a preliminary injunction.  *See Savage*, 850 F.2d at 68.

Second, the plaintiffs' delay in bringing this action and in seeking injunctive relief belies their claim of irreparable harm.  *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").  According to the plaintiffs, Visa and MasterCard dropped their contractual ban on credit card surcharges in January 2013, *see* PI Br. at 15, yet the plaintiffs did not file this action until five months later.  *See* Compl. (filed June 4, 2013).  Even then, they did not seek a temporary restraining order.  And they agreed to a briefing schedule on their preliminary injunction motion that does not make the motion returnable until two months after they filed it.  *See* Notice of Mot. for Prelim. Inj., June 14, 2013, ECF No. 11.  That delay undermines their claim of irreparable harm.

Third, absent the plaintiffs' requested preliminary injunction, the attorney general is not "likely" to criminally prosecute them under § 518 on the basis of their proposed conduct.  *See Winter*, 555 U.S. at 22.  The attorney general cannot criminally prosecute § 518 violations.  *See supra* pp. 11–16; *Savage v. Gorski*, 850 F.2d 64, 67–68 (2d Cir. 1988) ("Since the source of the 'chill' is the permanent loss of [the plaintiffs'] jobs, retaining those positions pending resolution of the case will do nothing to abate that effect.").  Even if he could, the plaintiffs' proposed conduct would violate § 518 only under their untenable interpretation of the statute, and thus their fear of being prosecuted for that conduct is fictional.  *See supra* pp. 19–33; *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999) ("[T]his kind of conjectural chill is not sufficient to establish real and imminent irreparable harm.").

45

**B.      The Balance of Equities Tips in Favor of the Attorney General, Not the Plaintiffs, and the Plaintiffs' Requested Injunction Is Not in the Public Interest**

The plaintiffs ask the Court to enjoin the attorney general from discharging his duty to enforce state law.  Their requested injunction would deprive the attorney general of his discretion to decide whether to enforce § 518 as more facts about the plaintiffs' pricing schemes emerge.  It would apply regardless of whether the attorney general enforced § 518 in a way so as to avoid constitutional problems.  It would confer no corresponding benefit on the plaintiffs because their respective district attorneys could still prosecute them under § 518.  And it would deprive the public of the effect of a law validly enacted by their representatives.  It would, in short, be inequitable as to the parties here and against the public interest.  *See Maryland v. King*, 133 S.Ct. 1, 3 (2012) (Roberts, C.J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'") (citation omitted).

## CONCLUSION

For these reasons, the complaint should be dismissed and the plaintiffs' preliminary injunction motion should be denied.

Dated: New York, New York            Eric T. Schneiderman
       July 12, 2013                   Attorney General of the State of New York

                                       By:

                                        /s/ Garrett Coyle
                                       Garrett Coyle
                                       Assistant Attorney General
                                       120 Broadway, 24th Floor
                                       New York, New York 10271
                                       Tel:  (212) 416-6696
                                       Fax:  (212) 416-6009

46