**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EXPRESSIONS HAIR DESIGN, LINDA
FIACCO, THE BROOKLYN FARMACY &
SODA FOUNTAIN, INC., PETER FREEMAN,
BUNDA STARR CORP., DONNA PABST, FIVE
POINTS ACADEMY, STEVE MILLES,
PATIO.COM LLC, and DAVID ROSS,

No. 13-CIV-3775 (JSR)

*Plaintiffs,*

**FIRST AMENDED
COMPLAINT**

v.

ERIC T. SCHNEIDERMAN, in his official
capacity as Attorney General of the State of New
York, CYRUS R. VANCE, JR., in his official
capacity as District Attorney of New York County,
CHARLES J. HYNES, in his official capacity as
District Attorney of Kings County, and GERALD
F. MOLLEN, in his official capacity as District
Attorney of Broome County,

*Defendants.*



### Introduction

Every time a consumer uses a credit card to make a purchase, the merchant
incurs a fee—known colloquially as a "swipe fee." These fees are typically passed on to all
consumers in the form of higher prices for goods and services. Both state and federal law,
however, permit merchants to pass swipe fees on to only those consumers who pay with
credit cards. Merchants may charge two different prices depending on which payment
method the consumer uses: a higher price for using a credit card, and a lower price for
using other payment methods (cash, a personal check, or a debit card). But, in New York,
merchants may engage in dual pricing only if they communicate the difference between
the cash price and the credit price using the right *language:* The state allows merchants to

offer "discounts" for using cash or a debit card, yet makes it a criminal offense to impose "surcharges" for using a credit card—even though the conduct in both cases (the use of dual pricing) is the same.

This New York no-surcharge law, N.Y. Gen. Bus. Law § 518, violates the First Amendment to the U.S. Constitution, is unconstitutionally vague, and is preempted by federal antitrust law. The plaintiffs are merchants who seek a declaration that the law is unconstitutional and an injunction preventing the State of New York from enforcing the law against them.

## Jurisdiction

1.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

## Parties

2.      Plaintiff Expressions Hair Design is a unisex hair salon in Vestal, New York, founded in 2006. For a small business like Expressions, credit-card swipe fees make an enormous difference. Expressions has found that most of its customers are not aware of the high cost of swipe fees or the ways in which they burden small businesses. But when they learn of the fees, customers are generally sympathetic. Expressions therefore seeks to do what it can to ensure that its customers learn about the cost of using credit cards and take that information into account in deciding how to pay for haircuts and other salon services. Ultimately, Expressions wants credit-card companies to reduce their swipe fees, either as a result of market forces or action by Congress, and is hopeful that educating its customers about swipe fees will cause them to act—both as consumers and as citizens.

3.      Until 2012, Expressions posted a sign at its counter informing all customers that, due to the high swipe fees charged by the credit-card industry, Expressions would charge customers 3% more for using a credit card. But Expressions

took down its sign and stopped communicating that policy to its customers when one customer (who is also a lawyer) informed the salon that New York law makes it illegal to impose a "surcharge" on customers for paying with a credit card (even though merchants are allowed to provide a "discount" for paying with cash, check, or debit card). Because of the New York no-surcharge law, the salon's current policy is to charge two different prices for haircuts and other services—a lower price for customers paying with cash, check, or debit card and a higher price for customers paying with a credit card. Expressions tries to be as careful as it can to avoid characterizing that price difference as a "surcharge" or an "extra" charge for paying with a credit card, even though its customers *do* effectively pay more for using a credit card.

4.      By engaging in dual pricing, Expressions increases its prices to account for the cost of credit cards (which New York permits) and does so only for those who use credit cards (which New York also permits). But Expressions cannot communicate its price difference in the way that it would like—by calling the difference a "surcharge" for using credit—because New York's no-surcharge law bars Expressions from using that word. Instead, Expressions is forced to describe the lower price as the "cash price" and the higher one as the "credit price," which Expressions believes is far less effective at conveying the costs of credit to its customers (and thus at reducing the amount Expressions pays in swipe fees) than having a "regular price" with a "surcharge" for credit. Indeed, Expressions knows from experience that customers who are presented with an extra charge for using a credit card are much more likely to respond by using a cheaper payment method.

5.      Expressions is also concerned that even this less effective way of labeling its pricing could violate the no-surcharge law, depending on how Expressions' staff describe

the price difference to customers. If even one staff member inadvertently refers to the difference as a "surcharge" for credit, or says that credit is "extra" or "more," Expressions is afraid that its truthful speech could subject the business to criminal sanctions. This fear is not merely hypothetical: New York has arrested and criminally prosecuted a gas station owner that maintained a similar dual-pricing policy solely because the gas station's cashier used the word "extra" to describe the price difference in a conversation with a customer. *See People v. Fulvio*, 517 N.Y.S.2d 1008 (Crim. Ct. N.Y. 1987). Expressions must therefore be exceedingly vigilant in instructing its staff on how to characterize the price difference, and in monitoring what they say to ensure compliance. Even then, Expressions is unsure what constitutes a surcharge and what constitutes a discount. "If a customer asks us whether we charge more for paying with a credit card," wonders one of the salon's owners, "should we ignore or dodge the question? Are we required to answer falsely? Or should we say something like the following? 'State law does not allow us to tell you that you are paying more for using a credit card, but we can tell you that you are paying less for not using a credit card.'"

6.      Plaintiff Linda Fiacco is one of three co-owners of Expressions Hair Design and is responsible for its day-to-day management.

7.      Plaintiff The Brooklyn Farmacy & Soda Fountain, Inc. is an ice-cream parlor and soda fountain in Brooklyn, New York, founded in 2010. It is in a competitive industry with low profit margins, and swipe fees significantly cut into these margins. Brooklyn Farmacy pays an average of 2% to 3% per credit transaction in swipe fees and has paid thousands of dollars in fees since starting the business. Swipe fees are Brooklyn Farmacy's largest non-payroll-related expense besides rent. Although the company tries to reduce credit-card use by requiring a $10-minimum purchase amount to pay with

credit, it currently does not have a dual-pricing system. This means that swipe fees get passed on to *all* of Brooklyn Farmacy's customers, cash and credit users alike, in the form of higher prices. And because these fees are kept hidden, customers who meet the minimum purchase amount have no disincentive to use credit—just the opposite, in fact, because of the benefits that most credit cards offer—which raises fees even higher.

8.     The reason Brooklyn Farmacy does not offer dual pricing is because of the law's prohibition on speech and also because of its vagueness. As to the former: Brooklyn Farmacy would like to communicate the price difference as a "surcharge" for credit—not a "discount" for cash, which would make prices look higher than they are—because the company believes that this would most effectively convey the costs of credit to its customers. New York's no-surcharge law blocks it from doing so. As to the latter: The law is so vague about what it prohibits that Brooklyn Farmacy is afraid to have any dual pricing at all, lest it accidentally subject itself to criminal prosecution. The company would have to instruct its employees on the difference between a "surcharge" and a "discount," which even its owners do not fully understand, and then constantly monitor the employees to make sure that each one is sticking to the script. Rather than risk criminal prosecution to say something that it believes is only marginally effective at communicating its message, Brooklyn Farmacy stays away from dual pricing altogether.

9.     Plaintiff Peter Freeman is the co-founder of Brooklyn Farmacy and is responsible for its day-to-day management.

10.     Plaintiff Bunda Starr Corp. owns Brite Buy Wine & Spirits, a liquor store in lower Manhattan founded in 1980. Brite Buy has accepted credit cards since the mid-1980s, when the New York State Liquor Authority changed its laws to allow liquor to be purchased with credit. Between 60% and 70% of Brite Buy's sales are now made with

some form of payment card (usually a credit card), which means that the company incurs swipe fees for most of its sales transactions. Each year, Brite Buy pays tens of thousands of dollars in swipe fees. To cut down on these fees, the company had previously required a minimum purchase amount to pay with a credit card, but that strategy proved ineffective. Brite Buy would like to communicate the cost of credit to customers by calling it a "surcharge," which the company believes would be effective at getting them to reduce credit use, but New York's no-surcharge law makes using that label a crime.

11.     Because of New York's law, Brite Buy does not currently engage in dual pricing, even though it would like to (and even though that conduct is permitted). The company does not do so for the same reasons as Brooklyn Farmacy: (1) because the law imposes criminal punishment on the company's most effective way of conveying to its customers the true costs of credit, and (2) because the law's vagueness leaves the company uncertain as to whether it could implement a dual-pricing system in a lawful way.

12.     Plaintiff Donna Pabst is president of Bunda Starr Corp. and is responsible for Brite Buy's day-to-day management.

13.     Plaintiff Five Points Academy is a martial arts and fitness studio in lower Manhattan founded in 2003. It pays on average between 2.4% and 3.3% per credit transaction in swipe fees. Over the years, an increasing percentage of Five Points' members have chosen to pay their monthly dues and other expenses by credit card. This has caused a sharp increase in the amount the company pays each year in fees, to the point where it paid more than $50,000 in fees in 2012 alone. Five Points wants to offer a dual pricing system, but it will do so only if it can communicate the price difference as a "surcharge" for using credit (which the company believes is the best way to convey the

costs of credit) and only if the law is clear about what it permits (and what it criminalizes). New York's no-surcharge law prevents both of these conditions from being satisfied.

14.     Plaintiff Steve Milles is Vice President of Five Points Academy and is responsible for its day-to-day management.

15.     Plaintiff Patio.com LLC is an outdoor furniture and billiards company founded in 1984. It has stores in Mount Kisco, Scarsdale, South Hampton, and Westbury, New York, as well as in six other states and online. Credit cards have become an increasingly popular payment method among Patio.com's customers. About 80% of the company's storefront sales are now made with a credit card. Patio.com pays on average between 2% and 3% per credit transaction in swipe fees. It paid more than $200,000 in swipe fees in 2012.

16.     New York's no-surcharge law harms Patio.com in at least two ways. The law prevents the company from informing its customers of swipe fees by imposing a "surcharge" for credit, which it would like to do. And the law effectively prevents the company from having a dual-pricing system by (1) outlawing the most effective way of conveying that system and (2) being so unclear about how such a system can be lawfully described.

17.     Plaintiff David Ross is the founder and president of Patio.com LLC, and is responsible for its day-to-day management.

18.     Defendant Eric T. Schneiderman is the Attorney General of New York and is responsible for enforcing the laws of the state, including the state's no-surcharge law. Defendant Cyrus R. Vance, Jr. is the District Attorney of New York County and is responsible for representing the People of the State of New York in criminal proceedings in New York County. Defendant Charles J. Hynes is the District Attorney of Kings

County and is responsible for representing the People of the State of New York in criminal proceedings in Kings County. Defendant Gerald F. Mollen is the District Attorney of Broome County and is responsible for representing the People of the State of New York in criminal proceedings in Broome County. Each defendant is sued in his official capacity.

### Factual Background

19.   Americans pay some of the highest swipe fees in the world—seven or eight times those paid by Europeans, according to estimates by the Merchants Payments Coalition. The main reason swipe fees are so high is that they are kept hidden from consumers, who decide which payment method to use and thus determine whether a fee will be incurred in the first place. According to one survey, about 41% of American credit-card users are completely unaware that merchants are charged fees to process credit-card transactions. Although merchants are allowed to charge consumers more for using credit than for using cash, merchants cannot effectively communicate that added cost because New York and other states force them to call it a "discount" for cash rather than a "surcharge" for credit.

20.   New York's no-surcharge law makes it a criminal offense—punishable by a fine of $500 and up to one year of imprisonment—for any "seller in any sales transaction [to] impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." N.Y. Gen. Bus. Law § 518. New York's no-surcharge law does *not*, however, outlaw dual pricing. This is clear from (1) the state's own interpretation of the law, (2) the law's legislative history, (3) the only court decision to have addressed the question, and (4) federal law.

21.    As the state itself has recognized, the no-surcharge law "'prohibits a vendor from charging a surcharge for credit card usage, but would not interfere with that same vendor establishing the higher price for credit card sales and then allowing a comparable discount for cash purchases.'" *Fulvio*, 517 N.Y.S.2d at 1011 (ellipsis omitted) (quoting prosecutor's memorandum). That is, "'[c]ash discounts are allowed, credit surcharges are impermissible.'" *Id.* at 1014. Moreover, the state has applied that distinction to cover speech uttered by employees, having prosecuted a gas-station owner because the station's cashier told a customer that using a credit card would cost "extra"—even though the station's pricing system was otherwise lawful. *Id.* at 1010.

22.    The no-surcharge law's differential treatment of "surcharges" and "discounts" is also reflected in the law's legislative history, which makes clear that, under the law, a "merchant would be able to offer a discount for cash if they so desire." And the only court to address the line between "surcharges" and "discounts" interpreted the no-surcharge law as prohibiting the former but permitting the latter, in part because the purpose of the law was "to fill the gap created by expiration of the federal ban on surcharges" (which is discussed below), with the understanding that the federal "provision permitting a merchant to offer a discount for cash would still be permitted." *Id.* at 1012.

23.    Until January 2013, New York's no-surcharge law was effectively redundant because credit-card companies imposed similar speech prohibitions in their contracts with merchants. But after federal antitrust litigation caused the two dominant credit-card companies (Visa and MasterCard) to change their contracts to remove their no-surcharge rules, New York's law took on added importance. It is now the only thing keeping the plaintiffs from saying what they would like: that they impose a "surcharge" for using credit because credit costs more.

I.    **Why labels matter: the communicative difference between "surcharges" and "discounts"**

24.    A "surcharge" on credit and a "discount" for cash "are different frames for presenting the same price information—a price difference between two things." Adam J. Levitin, *Priceless? The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1351-52 (2008). They are identical in every way except one: the *label* that the merchant uses to communicate that price difference.

25.    But labels can matter. "[T]he frame within which information is presented can significantly alter one's perception of that information, especially when one can perceive the information as a gain or a loss," as with the price difference between using cash and using credit. Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence Of Market Manipulation*, 112 Harv. L. Rev. 1420, 1441 (1999). This is largely because of a well-known cognitive phenomenon called "loss aversion," which refers to people's tendency to let "changes that make things worse (losses) loom larger than improvements or gains" of an equivalent amount. Daniel Kahneman, Jack L. Knetsch, & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persp. 193, 199 (1991). Put more simply: "people have stronger reactions to losses and penalties than to gains." Adam J. Levitin, *The Antitrust Super Bowl: America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 Berkeley Bus. L.J. 265, 280 (2006).

26.    Because of this, "[c]onsumers react very differently to surcharges and discounts," even though they present the exact same pricing information. *Id.* Consumers are more likely to respond to surcharges (which are perceived as *losses* for using credit) than to discounts (which are perceived as *gains* for not using credit). *Id.* Research shows

just how wide this gap is. In one study, 74% of consumers had a negative or strongly negative reaction to credit surcharges, while fewer than half had a negative or strongly negative reaction to cash discounts. That difference—the difference in how the same pricing information is understood by consumers—influences their behavior, making "surcharges" a much more effective way to communicate the costs of credit to consumers.

27.     The effectiveness of surcharges is why the plaintiffs in this case seek to impose them: surcharges inform consumers of the costs of credit, letting consumers decide for themselves whether credit's benefits outweigh its costs. That exchange of information creates meaningful competition, which in turn drives down costs—as demonstrated by price-transparency reforms in Europe and Australia. If consumers are made aware of swipe fees and determine that they are too high, consumers will use a different payment method, and banks and credit-card companies will have to lower their fees to attract more business. Indeed, in Australia, where regulators in 2003 allowed complete transparency of price information and merchants have responded with surcharges, swipe fees have greatly declined.

28.     But when the government criminalizes framing the added cost of credit as a "surcharge," as New York has done, merchants lose their most effective means of informing consumers of the high costs of credit. Moreover, because the dividing line between what constitutes a "surcharge" and what constitutes a "discount" is so blurry, many merchants (including many of the plaintiffs in this case) do not even attempt to offer dual pricing, even though the law allows it, to avoid accidentally subjecting themselves to criminal punishment. And many other merchants falsely believe that they may not offer any dual pricing at all. The upshot, then, is that merchants end up passing on swipe fees to *all* consumers by raising the prices of goods and services across the board. This means

that consumers are unaware of how much they pay for credit and have no incentive to reduce their credit-card use because they will pay the same price regardless. As a result, swipe fees have soared.

29.     Swipe fees thus function as an invisible tax, channeling vast amounts of money from consumers to some of the nation's largest banks and credit-card companies. Because cash and credit purchasers both pay this tax, swipe fees are also highly regressive: low-income cash purchasers subsidize the cost of credit cards, while enjoying none of their benefits or convenience. According to Federal Reserve economists, "[b]y far, the bulk of [this subsidy] is enjoyed by high-income credit card buyers," who receive an average of $2,188 every year, paid disproportionately by poor and minority households.

30.     For these reasons, numerous prominent economists and consumer advocates—from Joseph Stiglitz to Elizabeth Warren—have opined that no-surcharge policies are bad for consumers and hurt competition.

## II.     The credit-card industry's concerted efforts to prevent merchants from communicating the costs of credit as "surcharges"

31.     The invisibility of swipe fees is no accident. It is the product of concerted efforts by the credit-card industry over many decades to ensure that merchants cannot communicate to consumers the added price they pay for using credit. Over the years, the industry has succeeded, both through contractual provisions and legislative measures, to silence merchants' attempts to call consumers' attention to the true costs of credit.

### The industry's early ban on differential pricing ends

32.     In the early days of credit cards, any attempt at differential pricing between credit and non-credit transactions was strictly forbidden by rules imposed on merchants in their contracts with credit-card companies. That changed in 1974 after two

important developments. *First*, Consumers Union sued American Express on the ground that its contractual ban on differential pricing was an illegal restraint on trade. Rather than face the prospect that federal courts would mandate full price transparency, American Express almost immediately settled the suit by agreeing to allow merchants to provide consumers with differential price information.

33.     *Second*, Congress then enacted legislation protecting the right of merchants to have dual-pricing systems. Congress amended the Truth in Lending Act to provide that "a card issuer may not, by contract, or otherwise, prohibit any such seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Pub. L. No. 93, § 495, 88 Stat. 1500 (1974).

### The credit-card industry shifts its strategy to labeling

34.     The 1974 amendments were initially considered a victory for consumers. But the credit-card industry, seizing on Congress's use of the word "discount," soon shifted its focus to the way merchants could *label* and *describe* such pricing to consumers. Aware that how information is presented to consumers can have a huge impact on their behavior—and that many merchants would avoid dual pricing altogether if "surcharges" were outlawed—the credit-card lobby "insist[ed] that any price difference between cash and credit purchases should be labeled a cash discount rather than a credit card surcharge." Amos Tversky & Daniel Kahneman, *Rational Choice and the Framing of Decisions*, 59 J. Bus. S251, S261 (1986).

### The credit-card industry's labeling strategy achieves
### short-lived success at the national level

35.     In 1976, after two years of lobbying Congress to impose the credit-card industry's preferred speech code, the industry succeeded in getting Congress to enact a

temporary ban on "surcharges," despite the authorization for "discounts." *See* Pub. L. No. 94–222, 90 Stat. 197 ("No seller in any sales transaction may impose a surcharge on a cardholder who elects to use a credit card in lieu of payment by cash, check, or similar means."). This controversial measure set the stage for a series of battles over renewal of the ban, culminating in an intense political debate in the mid-1980s that pitted both the Reagan Administration and consumer groups against the credit-card industry.

36.     With the "surcharge" ban set to expire in 1981, the federal government and consumer advocates registered the impact that it had on consumers' and merchants' behavior. The Chairman of the Federal Trade Commission, writing in opposition to extending the law, recognized that the "surcharge" label drives home the true marginal cost of a credit transaction to the consumer. S. Rep. 97-23, at 11-12. Although "a discount and a surcharge are equivalent concepts," he remarked, "one is hidden in the cash price and the other is not," meaning that a ban on "surcharges" prohibited merchants from disclosing to their customers the true cost of credit. *Id.* at 10. Despite the opposition, Congress gave in to industry lobbying and renewed the law for an additional three years. Pub. L. 97–25, 95 Stat. 144 (1981).

37.     In 1984, the no-surcharge law was again set to expire. Senator William Proxmire of Wisconsin, one of the ban's chief opponents, cut to the chase: "Not one single consumer group supports the proposal to continue the ban on surcharges," he observed. "The nation's giant credit card companies want to perpetuate the myth that credit is free." Irvin Molotsky, *Extension of Credit Surcharge Ban*, N.Y. Times, Feb. 29, 1984, at D12. The credit-card industry, acutely conscious of the threat that merchants' disclosure of credit's true cost posed to its business model, responded by unleashing a massive lobbying campaign to oppose ending the ban. Stephen Engelberg, *Credit Card*

14

*Surcharge Ban Ends*, N.Y. Times, Feb. 27, 1984, at D1. One senior vice president of Shearson/American Express remarked in 1984 that his company had been opposing ending the ban for eight years. He observed that consumers do not write angry letters to credit-card companies about cash discounts, but do complain about surcharges. *Id.* He concluded that ending the ban "could potentially hurt the image of" credit cards, revealing that the industry viewed its legislative efforts as playing a key role in dictating the perception of credit cards among consumers. *Id.* The industry's efforts failed, and the ban lapsed in 1984. Levitin, *Priceless?*, 55 UCLA L. Rev. at 1381.

38.     A 1981 report of the Senate Banking Committee, prepared as part of the law's initial renewal, stressed the law's role in regulating how a merchant could frame a dual-pricing system. The Committee observed that "while discounts for cash and surcharges on credit cards may be mathematically the same, their practical effect and the impact they may have on consumers is very different." S. Rep. 97-23, at 3. The no-surcharge law thus effectively set forth a speech code, requiring that merchants label their prices in the way that best hid the costs of credit and most enabled the credit-card companies to take advantage of the framing effect: by advertising the credit price as the "regular" price, and the cash price as a "discount" from that price.

39.     Furthermore, the vague distinction between "discounts" and "surcharges," and the risk of inadvertently describing a dual-pricing system in an unlawful way, led merchants to steer clear of such systems. In an editorial in *The New York Times*, Senator Christopher Dodd of Connecticut, a proponent of allowing surcharges, noted that "many merchants are not sure what the difference between a discount and a surcharge is and thus do not offer different cash and credit prices for fear they will violate the ban on surcharges." Sen. Christopher J. Dodd, *Credit Card Surcharges: Let the Gouger Beware*, N.Y.

Times, Mar. 12, 1984, at A16. *See also* Carol Krucoff, *When Cash Pays Off*, Wash. Post, Sept. 22, 1981 (describing consumer activist who argued that merchants have not offered cash discounts because "the regulations have been so complicated. Smaller business people, who are most likely to offer them, may have been intimidated by the fear it could be viewed as an illegal surcharge."); Engelberg, *Credit Card Surcharge Ban Ends*, at D1 ("A House aide said that one explanation for the relative unpopularity of cash discounts is that retailers, aware that surcharges on credit purchases are illegal, have erroneously assumed that discounts are not permitted.").

### The credit-card industry lobbies the states to enact no-surcharge laws and adopts contractual no-surcharge rules

40.     After the controversial federal ban expired, the credit-card industry briefly turned to the states, convincing fewer than a dozen (including New York) to enact no-surcharge laws of their own. In an early instance of the phenomenon now known as "astroturfing," American Express and Visa went to great lengths to create the illusion of grassroots support for such laws, even going so far as to create and bankroll a fake consumer group called "Consumers Against Penalty Surcharges." But real consumer groups—including Consumers Union and Consumer Federation of America—opposed state no-surcharge laws because they discouraged merchants from making the costs of credit transparent, which resulted in an enormous hidden tax paid by all consumers whenever they made a purchase.

41.     New York's law took effect in June 1984, just after expiration of the temporary federal ban. N.Y. Gen. Bus. Law § 518. The law's legislative history does not hide the fact that it was intended to influence consumers' perceptions of credit cards by controlling the labels that merchants may use to describe mathematically equivalent

transactions. For example, one state official justified the law as follows: "Surcharges, even if only psychologically, impose penalties on purchasers and may actually dampen retail sales. A cash discount, on the other hand, operates as an incentive and encourages desired behavior." Memorandum from Mollie Lampi, Associate Counsel, State Consumer Protection Board, to Gerald C. Crotty, Counsel to the Governor (June 1, 1984).

42.    The only court to analyze the New York no-surcharge law concluded that, under the law, "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *Fulvio*, 517 N.Y.S.2d at 1011 (emphasis in original). The court explained: "[W]hat General Business Law § 518 *permits* is a price differential, in that so long as that differential is characterized as a discount for payment by cash, it is legally permissible; what General Business Law § 518 *prohibits* is a price differential, in that so long as that differential is characterized as an additional charge for payment by use of a credit card, it is legally impermissible. . . . General Business Law § 518 creates a distinction without a difference; it is not the *act* which is outlawed, but the *word* given that act." *Id.* at 1015 (emphasis in original).

43.    Around the same time that New York's no-surcharge law was enacted, the major credit-card companies changed their contracts with merchants to include no-surcharge rules. No-surcharge laws in New York and other states thus function as a legislative extension of the restrictions that credit-card issuers imposed more overtly by contract. For instance, American Express's contracts with merchants include an elaborate speech code. The contracts provide that merchants may not "indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card"; "try to dissuade Cardmembers from using the Card"; "criticize … the Card or any of our

services or programs"; or "try to persuade or prompt Cardmembers to use any Other
Payment Products or any other method of payment (e.g., payment by check)."

**The Durbin Amendment and the
recent political controversy over swipe fees**

44.     From the mid-1980s until the 2000s the issue of swipe fees remained
largely in the shadows. Even in the majority of states without anti-surcharge laws, the
contractual no-surcharge rules ensured that consumers were rarely informed of the true
costs of credit. Developments in the late 2000s, however, caused swipe fees to reemerge as
a volatile political issue.

45.     The global financial crisis of 2007-2008 and the ensuing push for financial-
regulation reform resulted in renewed focus on swipe fees. Senator Dick Durbin of Illinois
proposed an amendment to the Senate version of the Dodd-Frank Wall Street Reform
and Consumer Protection Act that aimed to reduce the fees associated with transactions
by both debit and credit cards. Although proposed legislation to regulate *credit-card* swipe
fees was defeated, the Durbin Amendment was enacted into law. As enacted, it establishes
a procedure by which the Federal Reserve Board now sets the maximum swipe fees for
*debit-card* transactions. 15 U.S.C. § 1693o-2(a). It also includes a provision protecting
merchants' rights to offer consumers incentives for using different payment methods: "A
payment card network shall not … by contract, requirement, condition, penalty, or
otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for
payment by the use of cash, checks, debit cards, or credit cards." *Id.* § 1693o-2(b)(2).

46.     The fight over the Durbin Amendment shone a spotlight on the amount of
revenue that banks generate from swipe fees, initiated a frenzy of lobbying by the credit-
card industry, and touched off a contentious national political debate. Many merchants

sought to convey their opposition to swipe fees directly to their customers—and voters—at the checkout counter. The national convenience store chain 7-Eleven, for example, put up signs asking customers to "STOP UNFAIR CREDIT CARD FEES" and gathered a total of 1.6 million signatures on a petition to support legislation on credit-card fees. 7-Eleven claimed that its petition represented the largest quantity of signatures ever presented to Congress—trumping even the 1.3 million signatures presented to Congress regarding national healthcare reform.

### Visa & MasterCard drop their no-surcharge rules

47.    In May 2005, Animal Land Inc., a pet-relocation company based in Atlanta, Georgia, sued Visa for a declaration that its no-surcharge rule violated antitrust laws by preventing Animal Land and other merchants from assessing a discrete, denominated charge upon customers using credit cards, as opposed to cash, checks, or debit cards. *Animal Land, Inc. v. Visa USA, Inc.*, No. 05-CV-1210 (N.D. Ga.). In the ensuing months, numerous U.S. merchants and trade associations brought claims against the dominant credit-card networks, alleging that they engaged in illegal price-fixing and impermissibly banned merchants from encouraging customers to use less expensive payment methods. The lead plaintiff in the lawsuit was Mitch Goldstone, the owner of a small photo-processing business. Troubled by consumers' ignorance about swipe fees and merchants' passive acceptance of them, Goldstone became an activist against the credit-card issuers, challenging their business practices in media interviews and blog postings in addition to his role as lead plaintiff in the lawsuit.

48.    Under the terms of a national class-action settlement, Visa and MasterCard in January 2013 dropped their prohibitions against merchants imposing surcharges on credit-card transactions. As a result, state no-surcharge laws—previously

redundant because of contractual no-surcharge rules—have now gained added importance. And as they did in the 1980s, credit-card companies are once again seeking to discourage dual pricing by pushing state legislation that dictates the labels that merchants can use for such systems.

**Claims for Relief**

**Claim One: Violation of the First Amendment (under 42 U.S.C. § 1983)**

49.     New York's no-surcharge law regulates how the plaintiffs may characterize the price differences they may lawfully charge for credit and cash purchases. The law allows them to tell their customers that they are paying *less* for using cash or other means of payment (a "discount"), but not that they are paying *more* for using credit (a "surcharge"). This state-imposed speech code prevents the plaintiffs from effectively conveying to their customers—who absorb the costs of credit through higher prices for goods and services—that credit cards are a more expensive means of payment.

50.     By prohibiting certain disfavored speech by merchants—and enforcing that prohibition with criminal penalties—New York's no-surcharge law violates the plaintiffs' First Amendment rights, as applied to the states through the Fourteenth Amendment. Because the no-surcharge law is a content- and speaker-based restriction on speech, it is subject to heightened scrutiny under the First Amendment. *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011). Regardless of whether the law is analyzed under a special commercial speech inquiry, it cannot survive. The prohibited speech concerns lawful activity (engaging in dual pricing) and is not misleading; New York has no substantial interest in prohibiting the speech; and New York's no-surcharge law does not directly advance—and is far more extensive than necessary to serve—any interest the

state might have. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980).

### Claim Two: Void for vagueness (under 42 U.S.C. § 1983)

51.     New York's no-surcharge law does not provide guidance about what speech is permitted and invites arbitrary and discriminatory enforcement. Because the law makes criminal liability turn on the blurry difference between two ways of describing the same conduct, the law does not provide a person of ordinary intelligence reasonable opportunity to know what is prohibited. Additionally, the law lacks explicit standards for those charged with its enforcement. It is therefore unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.

### Claim Three: Sherman Act preemption (under 42 U.S.C. § 1983)

52.     New York's no-surcharge law allows credit-card companies to keep the costs of credit hidden from consumers by preventing merchants from communicating these costs in an effective manner. The prohibition on communication insulates credit-card companies from competition, causes the costs of credit to skyrocket, and frustrates the purposes of federal antitrust law—just as Visa and MasterCard's no-surcharge rules did. Because those rules constituted an antitrust violation, the no-surcharge law that now carries them out does so as well. *See Calif. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980); *Hertz Corp. v. City of New York*, 1 F.3d 121 (2d Cir. 1993). The New York law violates, and is preempted by, the Sherman Act. 15 U.S.C. § 1 *et seq*.

### Request for Relief

The plaintiffs request that the Court:

A.     Declare that New York's no-surcharge law is unconstitutional and preempted by the Sherman Act, and enjoin its enforcement;

B.      Award the plaintiffs their reasonable costs, expenses, and attorney's fees under 42 U.S.C. § 1988; and

C.      Grant the plaintiffs all other appropriate relief.

July 15, 2013                                                    Respectfully submitted,


                                                                */s/ Deepak Gupta*
                                                                DEEPAK GUPTA (*pro hac vice*)
                                                                GREGORY A. BECK
                                                                BRIAN WOLFMAN
                                                                JONATHAN E. TAYLOR
                                                                GUPTA BECK PLLC
                                                                1625 Massachusetts Avenue, NW
                                                                Suite 500
                                                                Washington, DC 20036
                                                                (202) 470-3826

                                                                GARY B. FRIEDMAN
                                                                TRACEY KITZMAN
                                                                FRIEDMAN LAW GROUP LLP
                                                                270 Lafayette Street
                                                                New York, NY 10012
                                                                (212) 680-5150

                                                                MARK WENDORF
                                                                REINHARDT, WENDORF &
                                                                 BLANCHFIELD
                                                                332 Minnesota Street
                                                                St. Paul, MN 55101
                                                                (651) 287-2100

                                                                *Counsel for Plaintiffs*