**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EXPRESSIONS HAIR DESIGN, *et al.*,

          *Plaintiffs*,

    v.

ERIC T. SCHNEIDERMAN, in his official
capacity as Attorney General of the State of
New York, *et al.*,

          *Defendants*.

No. 13-CIV-3775 (JSR)

**REPLY MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**
**AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

DEEPAK GUPTA (*pro hac vice*)
GREGORY A. BECK
BRIAN WOLFMAN
JONATHAN E. TAYLOR
**GUPTA BECK PLLC**
1625 Massachusetts Avenue, NW
Washington, DC 20036
(202) 470-3826

GARY B. FRIEDMAN
TRACEY KITZMAN
**FRIEDMAN LAW GROUP LLP**
270 Lafayette Street
New York, NY 10012
(212) 680 5150

MARK WENDORF
**REINHARDT, WENDORF &**
**BLANCHFIELD**
332 Minnesota Street
St. Paul, MN 55101
(651) 287-2100

July 29, 2013

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ii

Introduction ...................................................................................................................1

Argument .......................................................................................................................4

    I.    The Plaintiffs Have Standing to Challenge New York's No-Surcharge Law. ..............4

        A.   The state's newly devised interpretation cannot defeat standing,
            so long as the plaintiffs plausibly fear enforcement. ...........................................4

        B.   The plaintiffs' interpretation is the only reasonable interpretation. ...............6

            1.    The text ...............................................................................................7

            2.    The history of the temporary federal ban ...........................................8

            3.    State legislative history...................................................................10

            4.    The case law .....................................................................................11

            5.    The state's legal opinions and enforcement history .........................13

            6.    Banks and the credit-card industry ..................................................18

            7.    Merchants .........................................................................................19

            8.    The federal government ...................................................................20

    II.    The No-Surcharge Law Violates The First Amendment. ......................................21

    III.   The No-Surcharge Law Is Unconstitutionally Vague. .........................................22

    IV.   The Antitrust Preemption Claim Survives Dismissal. .........................................23

    V.    The Plaintiffs Will Be Irreparably Harmed Absent An Injunction. .......................24

Conclusion ...................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*BellSouth Telecommunications, Inc. v. Farris,*
    542 F.3d 499 (6th Cir. 2008) ............................................................................21

*Buckley v. Illinois Judicial Inquiry Board,*
    997 F.2d 224 (7th Cir. 1993) ..............................................................................8

*Capital Leasing of Ohio, Inc. v. Columbus Municipal Airport Authority,*
    13 F. Supp. 2d 640 (S.D. Ohio 1998)................................................................21

*Chatin v. Coombe,*
    186 F.3d 82 (2d Cir. 1999) ................................................................................22

*Citizens for Responsible Government State Political Action Committee v. Davidson,*
    236 F.3d 1174 (10th Cir. 2000) ..........................................................................8

*Edenfield v. Fane,*
    507 U.S. 761 (1993) ..........................................................................................21

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council,*
    485 U.S. 568 (1988) ............................................................................................6

*Eubanks v. Wilkinson,*
    937 F.2d 1118 (6th Cir. 1991) ............................................................................6

*Green Party of New York State v. New York State Board of Elections,*
    389 F.3d 411 (2d Cir. 2004) ..............................................................................24

*Hertz Corp. v. City of New York,*
    1 F.3d 121 (2d Cir. 1993) ..................................................................................23

*Hertz Corp. v. City of New York,*
    212 F. Supp. 2d 275 (S.D.N.Y. 2002)................................................................23

*Hill v. City of Houston,*
    789 F.2d 1103 (5th Cir. 1986) ............................................................................6

*In re R.M.J.,*
    455 U.S. 191 (1982) ......................................................................................3, 21

*International Dairy Foods Association v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996) ..................................................................................24

*Kucharek v. Hanaway,*
    902 F.2d 513 (7th Cir. 1990) ..............................................................................5

*Legal Aid Society of Hawaii v. Legal Services Corp.,*
    961 F. Supp. 1402 (D. Haw. 1997)....................................................................24

*NAACP Legal Defense & Education Fund, Inc. v. Campbell,*
    504 F. Supp. 1365 (D.D.C. 1981)...................................................................3, 22

*National Organization for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013) ...........................................................................4, 5

*Pacific Capital Bank, N.A. v. Connecticut,*
    542 F.3d 341 (2d Cir. 2008) ........................................................5

*People v. Fulvio,*
    514 N.Y.S.2d 594 (N.Y. Crim. Ct. 1987) ........................................12

*People v. Fulvio,*
    517 N.Y.S.2d 1008 (N.Y. Crim. Ct. 1987) ......................................12

*Sierra v. City of New York,*
    535 F. Supp. 2d 448 (S.D.N.Y. 2008)..............................................5

*Sorrell v. IMS Health Inc.,*
    131 S. Ct. 2653 (2011) ..............................................................21

*State by Abrams v. Camera Warehouse, Inc.,*
    496 N.Y.S.2d 659 (N.Y. Sup. Ct. 1985) ..........................................11

*Vermont Right to Life Committee, Inc. v. Sorrell,*
    221 F.3d 376 (2d Cir. 2000) ..........................................1, 4, 5, 6, 22

**Statutory Materials**

*Cash Discount Act, 1981: Hearings on S. 414 Before the Subcommittee On Consumer Affairs of the Senate
    Committee On Banking, Housing, & Urban Affairs,* 97th Cong., 1st Sess. (Feb. 18, 1981)........9, 10

Minn. Stat. § 325G.051..................................................................2, 8

N.Y. Gen. Bus. Law § 518 ........................................................*passim*

**Articles**

*Cuomo targets gasoline stations,*
    Journal News (Westchester), Aug. 29, 2008 ....................................17

Carter Dougherty, *Swipe-Fee Battle Moves to States as U.S. Banks Fight Surcharges,*
    Bloomberg, Jul. 9, 2013 ............................................................19

Gary Dymski, *State freezes illegal oil heat fees,*
    Newsday, Sept. 15, 2009 ..........................................................19

Peggy Spellman Hoey, *Local fuel companies slapped on the wrist,*
    North Shore Sun, Sept. 18, 2009 ................................................15

Richard Squire, *Antitrust and the Supremacy Clause,*
    59 Stan. L. Rev. 77 (2006)..........................................................23

**Other Sources**

New York Attorney General, 2006 Formal Opinion No. F2 (Jan. 25, 2006)................13

New York Attorney General, Press Release: *Attorney General Cuomo Issues Consumer
    Alert For Nyc Drivers After Investigation Reveals Nearly 25% Of Nyc Area Gas Stations
    Inspected Engaged In Deceptive Practices* (Aug. 28, 2008)............................18

New York Attorney General, Press Release: *Attorney General Cuomo Announces Investigation Revealing Nearly One-third Of Long Island Gas Stations Inspected Engaged In Deceptive Practices* (Aug. 21, 2008)....................................................................18

New York Attorney General, Press Release: *Attorney General Cuomo Announces Nationwide Investigation Into Debt Settlement Industry* (May 8, 2009)................................................18

New York Attorney General, Press Release: *Attorney General Cuomo Stops Oneida County Used Card Dealer From Overcharging For DMV Registration Fees And Implementing Surcharges On Credit Card Purchases* (June 1, 2009) ....................................................18

New York Attorney General, Press Release: *Attorney General Cuomo's Investigation Prompts 14 Suffolk County-Based Home Heating Oil/propane Companies To Agree To Stop Charging Surcharges For Credit Card Purchases* (Sept. 14, 2009)............................18

New York Insurance Department, Office of General Counsel Opinion (Feb. 25, 2008)...........13

New York Insurance Department, Office of General Counsel Opinion (June 19, 2007) ...........13

New York Insurance Department, Office of General Counsel Opinion (Dec. 28, 2001) ...........13

## INTRODUCTION

The plaintiffs are merchants who want to let their customers know about the high transaction costs of credit cards. In their view, the most effective way to do that is to tell their customers the truth: "You're paying *more* for using credit, not just *less* for using cash."

But they do not say what they want to say because they fear that the New York Attorney General's Office will come after them—just as it has come after like-minded merchants across New York in recent years—for violating the state's no-surcharge law. That law enacts the credit-card industry's speech code: It prohibits merchants from "impos[ing] a surcharge" for payment by credit card, but allows an equivalent "discount" for payment by cash. Liability turns solely on the merchants' speech—a "3% cash discount" is okay, a "3% credit-card surcharge" is verboten. Because the First Amendment outlaws this sort of content-based speech restriction, and because the Due Process Clause outlaws the vagueness inherent in this blurry semantic distinction, the Court should enjoin the law's enforcement.

Rather than defend its statute as written, the state proposes a new one. Its only defense is that the no-surcharge law does not mean what it says—that it does not prohibit "impos[ing] a surcharge," but rather *authorizes* merchants to label the price difference as a "surcharge" so long as the surcharge is (in the state's words) "disclosed at least as prominently as the cash price."

In light of this new false-advertising-only theory, the state argues, the plaintiffs' standing cannot rest on the conventional interpretation—that the surcharge ban is a surcharge ban—because that is neither "the *most reasonable* interpretation" nor "the *attorney general's* interpretation." AG's Mem. 21. This gets the Article III jurisprudence backwards. First, the Attorney General cannot defeat standing simply by conjuring up a new interpretation; he could change his mind at any time, and his litigation position here isn't binding on anyone. *See Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000). Second, the test is not whether a plaintiff's

interpretation is "the most reasonable," but whether it is plausible—that is, "reasonable enough that [a plaintiff] may legitimately fear that it will face enforcement." *Id.*

Here, the plaintiffs' interpretation is not just plausible or "reasonable enough." It is the *only* reasonable interpretation. The state's false-advertising-only theory inverts the statute's text. Surely New York's law ("*[n]o* seller … may impose a surcharge") cannot mean the same thing as Minnesota's, which says just the opposite (a seller "*may* impose a surcharge," if disclosed). Nor can the state's theory be reconciled with the history of the short-lived federal ban, which the Federal Reserve proposed replacing with a disclosure-only law like Minnesota's. That proposal was rejected under pressure from the credit-card lobby—which described surcharges as "negative statement[s] about the card[s]" that "talk against the credit industry." For its part, the New York legislative history shows that the state adopted the broad speech ban, not the rejected disclosure-only proposal. How else to understand the state's concern, divulged openly at the time, with the "psychological" effect of the surcharge label on "desired behavior"? (Hidden surcharges could not have such an effect.) The false-advertising-only view is likewise at odds with every court decision and agency opinion interpreting the New York law—including a formal opinion of the Attorney General. In the end, the state's theory is more invention than "interpretation."

Any doubt about the law's meaning is dispelled by the Attorney General's enforcement history. Although the Attorney General confidently asserts (at 19) that the false-advertising-only theory has been "the attorney general's consistent view for more than 25 years," his office acknowledged to us that it filed its memorandum without reviewing the records of its own most recently publicized settlements. Those records—and firsthand accounts in declarations accompanying this reply memorandum—show that the plaintiffs have good reason to fear enforcement. The Attorney General enforced the law in a series of sweeps against gas stations and mom-and-pop heating-oil companies in 2008 and 2009. In several cases, those companies

had made the mistake of truthfully telling their customers just what the plaintiffs here would like to tell their customers—that they impose a credit-card "surcharge" on top of the cash price (*e.g.*, "We impose a 3% surcharge for all credit card purchases."). They were targeted even though they *clearly disclosed* the surcharge at the same time, and as prominently, as they disclosed the cash prices. The resulting settlements included fines, penalties, restitution, and orders barring the companies from characterizing the added cost as a surcharge rather than a discount. The Attorney General's office did not say: "In the future, you may impose surcharges if you disclose them prominently." Instead, it gave the merchants scripts, with specific language, so they could reframe the same price information as "discounts" rather than "surcharges." Some did so. Others abandoned the effort, finding the distinction "too convoluted."

Once its false-advertising-only theory is discarded, the state has no remaining defenses.[1] Under the First Amendment, "States may not place an absolute prohibition" on information that is only "potentially misleading" if it "also may be presented in a way that is not deceptive." *In re R.M.J.*, 455 U.S. 191, 203 (1982). And because "it is clear from the evidence" that the state's interpretation is "nothing more than a post hoc rationalization … constructed especially for this litigation," it "does not provide the guidance required to overcome the inherent vagueness." *NAACP v. Campbell*, 504 F. Supp. 1365, 1368 (D.D.C. 1981). In fact, it just makes things worse. Our opening memorandum (at 38) asked what the legal difference is between two signs. The first: "We offer a 3% cash discount on all items." The second: "We impose a 3% credit-card surcharge on all items." Is the second sign illegal in New York? The Attorney General (at 35 n.19) punts on that question—even though that is just what the plaintiffs here want to say.

---

[1] Given the state's decision to decline to defend the statute as conventionally interpreted, this Court may wish to consolidate the decision on the preliminary-injunction motion with the merits. *See* Fed. R. Civ. P. 65(a)(2). Because the only contested issue is how to read the statute—a purely legal issue that has been fully briefed—the record is sufficient for a merits decision.

### ARGUMENT

**I.   THE PLAINTIFFS HAVE STANDING TO CHALLENGE NEW YORK'S NO SURCHARGE LAW.**

> **A.   The State's Newly Devised Interpretation Cannot Defeat Standing, So Long as The Plaintiffs Plausibly Fear Enforcement.**

As the Second Circuit has recently explained, federal courts "assess pre-enforcement First Amendment claims . . . under somewhat relaxed standing and ripeness rules." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013). Plaintiffs must have something more than a purely subjective fear that their rights will be chilled, but "a real and imminent fear of such chilling is enough." *Id.* A plaintiff "need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it." *Id.* (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000)). Each plaintiff here has such a fear; each wants to be able to communicate the price difference between cash and credit as a "surcharge" rather than a "discount," but refrains from doing so because of New York's no-surcharge law.

In the state's view, however, the plaintiffs lack standing because their interpretation of the law "is not *the most reasonable* interpretation, and—more importantly for Article III injury purposes—it is not *the attorney general's* interpretation." AG's Mem. 21 (emphasis added). That argument makes two critical mistakes about the law of standing.

*First*, the state cannot defeat standing by asserting that the plaintiffs' interpretation is "not the attorney general's interpretation." To the contrary, it does not "make a difference" if the Attorney General denies that the plaintiffs will be prosecuted. *Nat'l Org. for Marriage*, 714 F.3d at 690. As discussed in detail below, the previous Attorney General, Andrew Cuomo, interpreted the no-surcharge law in the same way the plaintiffs do, and sought fines, civil penalties, and restitution from merchants throughout the state on that basis. The current Attorney General,

Eric Schneiderman, claims here that he will not take the same position. But "he may be replaced in office," *Kucharek v. Hanaway*, 902 F.2d 513, 519 (7th Cir. 1990), and "there is nothing that prevents the State from changing its mind," *Vt. Right to Life*, 221 F.3d at 383. His view binds nobody, not even local prosecutors. *Id.* "In light of this uncertainty, the State's representation cannot remove [the plaintiffs'] reasonable fear" of prosecution. *Id.* If the law were otherwise, the plaintiffs' First Amendment rights would be placed "at the sufferance of" the Attorney General. *Id.* (internal quotation marks omitted).[2]

*Second*, Article III does not require a plaintiff to prove that it has "the most reasonable interpretation" to establish standing. To the contrary, standing and ripeness are satisfied so long as the plaintiff "plausibly contends" that its intended expression would violate the statute. *Nat'l Org. for Marriage*, 714 F.3d at 690. "[W]hile there may be other, *perhaps even better*" interpretations of the statute, the question is whether the plaintiff's interpretation "is *reasonable enough* that it may legitimately fear that it will face enforcement of the statute by the State." *Vt. Right to Life*, 221 F.3d at 383 (emphasis added); *see also Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350-51 (2d Cir. 2008) ("reasonable enough" standard met even though the state had never enforced the statute against anyone and it was "unknown how the State will apply that section in any future

---

[2] The Attorney General (at 11-16) makes much of the fact that his office may pursue only civil enforcement. But the "fear of civil penalties can be as inhibiting of speech as can trepidation in the face of threatened criminal prosecution," *Vt. Right to Life*, 221 F.3d at 382, and although he denies (at 18) that his office has the authority "to seek fines or other penalties" in civil actions to enforce the no-surcharge law, it has done just that in many cases in recent years. *See, e.g.,* Second Gupta Decl., Ex. C (settlement of "$4,000 in penalties, fees and costs"). The law also carries stiff criminal penalties—up to one year in prison—which may be sought by local district attorneys. Even though the Attorney General is a sufficient defendant, we have added the relevant district attorneys in an effort to avoid unnecessary litigation over standing. The state further argues (at 17-19) that this case is not ripe because postponing review would cause no hardship—the plaintiffs could simply break the law and wait for the Attorney General to come after them. But "no theory of standing requires a plaintiff actually to violate a law" before challenging a statute. *Sierra v. City of New York*, 535 F. Supp. 2d 448, 450 n.1 (S.D.N.Y. 2008) (Rakoff, J.).

enforcement action"). As we demonstrate below, the plaintiffs' interpretation of New York's surcharge ban is not just "reasonable enough"—it is the *only* reasonable interpretation.

Seeking to flip the standard on its head, the state (at 29) invokes constitutional-avoidance principles, suggesting that this Court has a duty to rescue New York's statute from unconstitutionality by adopting any available reading not plainly contrary to the legislature's intent. AG's Mem. 29 (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). Not so. First, narrowing constructions are for the merits, not standing. *Vt. Right to Life*, 221 F.3d at 386, 390-91. Second, even on the merits, that interpretive approach is appropriate only for *federal* statutes. When "interpreting a *state* statute, by sharp contrast," federal courts lack the authority to "rewrite a state law to conform it to constitutional requirements" and may instead give it only its "readily apparent" meaning. *Id.* (internal quotation marks omitted); *see Eubanks v. Wilkinson*, 937 F.2d 1118, 1125 (6th Cir. 1991) ("Federal courts lack authority and power to give a limiting, narrowing construction to a state statute."); *Hill v. City of Houston*, 789 F.2d 1103, 1112 (5th Cir. 1986) ("Federal courts . . . may not impose [their] own narrowing construction" on state law).

## B.    The Plaintiffs' Interpretation Is The Only Reasonable Interpretation.

New York's no-surcharge law prohibits merchants from imposing surcharges on credit-card transactions. That is what the law says, and it is what just about everyone (except for the Attorney General, according to his briefing here) thinks the law means. On this common understanding, the law allows the plaintiffs to charge different prices for cash and credit, but prevents them from expressing the difference as a separate percentage fee for credit—even if they prominently disclose that fee, as plaintiff Expressions Hair Design did when it put up a sign telling customers that it charged "3% more for using a credit card," and as the plaintiffs here all seek to do. Fiacco Decl. ¶ 6; *see* Supp. Fiacco Decl.; Supp. Milles Decl.

The Attorney General now takes the position that the no-surcharge law does *not* prohibit merchants from imposing a surcharge on credit-card purchases. "Rather, [it] is an anti-fraud statute" that bars only the imposition of "additional hidden fee[s]," just like New York's consumer-protection and false-advertising laws. AG's Mem. 21. On this false-advertising-only theory, the law actually *authorizes* merchants to say that they are imposing surcharges on credit-card use, as long as the surcharges are prominently disclosed. So Expressions Hair Design's decision to take down its "3% more" sign was mistaken—that speech, under the state's new interpretation, is apparently permitted. (Unless it is not. The state's brief does not answer that question directly. *See* AG's Mem. 35 n.19.)

But there is a problem with the state's interpretation: It is entirely made up. The state, perhaps adopting the strategy that the best defense is a good offense, attempts to conceal that fact by repeatedly calling the common understanding of the law "untenable" and "illogical." AG's Mem. 2, 3, 19, 21 n.6, 32, 40, 41, 42, 45. It confidently asserts that *its* interpretation—not everyone else's—is the one that is more faithful to the law's "plain meaning, the meaning of the federal precursor on which it is based, the legislative history, the statute's policy objectives, the case law, established canons of construction, and the attorney general's consistent view for more than 25 years." *Id.* at 19, 21. As we now show, that sweeping assertion is wrong on every point.

**1. The Text.** Start with the text: "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." N.Y. Gen. Bus. Law § 518. A "surcharge" is "an additional tax, cost or impost." AG's Mem. 22. The statute's plain meaning, in turn, is that it bans the imposition of an additional cost for using credit. Thus, a merchant who charges more for credit, and expresses the price difference as a percentage (2% or 3%, say) on top of the posted price, is imposing a "surcharge"

even if the fee is prominently disclosed. Put differently, the no-surcharge law focuses on whether a surcharge is imposed, not whether it is disclosed.

The text says nothing at all about disclosure, but it could have: Minnesota's law provides that a merchant "may impose a surcharge on a purchaser who elects to use a credit card," provided the merchant "informs the purchaser of the surcharge both orally at the time of sale and by a sign conspicuously posted on the seller's premises." Minn. Stat. § 325G.051(1)(a). But instead of enacting this statute (merchants "*may* impose a surcharge" if disclosed), New York enacted an entirely different one ("*[n]o* seller . . . may impose a surcharge"). To read these two statutes as having the same meaning would be absurd. "To rewrite the [state] statutes in this manner would exceed the power and function of the [federal] court, and would fail to bind state prosecutors, leaving the citizens of [the state] vulnerable to prosecutions under the actual language of the statute." *Citizens for Responsible Gov't State PAC v. Davidson*, 236 F.3d 1174, 1194-95 (10th Cir. 2000). "It is not [the federal courts'] proper business to patch up [a state statute]—and it would be a patchwork job indeed, with the [statute] itself saying one thing and the judicial gloss on it another." *Buckley v. Ill. Judicial Inquiry Bd.*, 997 F.2d 224, 230 (7th Cir. 1993).

**2. The History of the Temporary Federal Ban.** The state's real textual argument is based not on its own statute, but on the definitions in the short-lived federal surcharge ban, on which the New York law "was modeled." AG's Mem. 21. The argument goes like this: (1) the term "surcharge" was defined in relation to the "regular price," *i.e.* the "tagged or posted" price; (2) if a merchant tagged or "posted only one price, that posted price was the regular price," but if a merchant "posted two prices, the credit card price was the regular price"; (3) "[t]he only way a seller could violate the federal surcharge ban, therefore, is if it charged credit holders a higher price without having 'posted' that price," (4) so only "an additional hidden fee" can be a "surcharge." *Id.* at 21-22 & n.7.

8

The argument's flaws are most apparent in its conclusion. To see why, imagine a merchant who lists only one price for every item in her store and puts up signs saying that she charges "3% more" (or a "3% surcharge") for credit-card purchases—just as Expressions did. Can the merchant be said to have two "tagged or posted" prices? Doubtful. The merchant posts one price and expresses the cost of credit as a 3% charge on top of that price (which is what makes the "surcharge" label so effective in the first place). That fee is thus a "surcharge" under the federal definition and New York law. But is it hidden? No. It clearly notifies consumers of the added cost.

**The Federal Reserve's rejected disclosure-only proposal**. The legislative history confirms that the federal surcharge ban was not limited to hidden surcharges. A Federal Reserve Board member—presenting the Board's unanimous opposition to the surcharge ban's 1981 extension—pointed out "the obvious difficulty in drawing a clear economic distinction between a permitted discount and a prohibited surcharge."[3] "If you just change the wording a little bit, one becomes the other." *Id.* at 22. The Board thus proposed "a very simple rule": that both surcharges and discounts be allowed, and "that the availability of the discount or surcharge be *disclosed* to consumers." *Id.* at 10 (emphasis added). But Congress rejected this disclosure-only proposal and kept the surcharge ban in place. The state's theory cannot explain away that fact.

**Consumer groups' opposition to the surcharge ban**. Every major consumer advocacy organization urged Congress to let the ban lapse and allow surcharges—an exceedingly strange position if the ban were really just an "anti-fraud statute." One consumer advocate testified that the difference between surcharges and discounts "is merely one of semantics, and

---

[3] *Cash Discount Act, 1981: Hearings on S. 414 Before the Subcomm. On Consumer Affairs of the Senate Comm. On Banking, Housing, & Urban Affairs*, 97th Cong., 1st Sess. 9 (Feb. 18, 1981) (Nancy Teeters, Federal Reserve Board).

not of substance."[4] But "the semantic differences are significant," she explained, because "the term 'surcharge' makes credit card customers particularly aware that they are paying an extra charge," whereas "the discount system suggests that consumers are getting a bargain, and downplays the truth." *Id.* Another advocate put it more pithily: "one person's cash discount may be another person's surcharge."[5] "Removing the ban on surcharges," he explained, "is an important first step" to "*disclos[ing]* to consumers the full" cost of credit so that they can "make informed judgments." *Id.* at 92. (emphasis added).

 ***Credit-card industry and banks' support for the ban****.* On the other side of the debate, American Express and MasterCard "wholeheartedly" and "strongly" supported the ban, even though, from a "mathematical viewpoint," "there is really no difference between a discount for cash and a surcharge for credit card use."[6] And the big banks, like the credit-card giants, supported treating "surcharges" and "discounts" differently because a surcharge "makes a negative statement about the card to the consumer."[7] Surcharges, a banking lobbyist openly explained, "talk against the credit industry." *Id.* at 60.

 The notion that this debate was all about a false-advertising law—with consumer groups, the Federal Reserve Board, and the Federal Trade Commission *against* the law, and bankers and credit-card companies *for* it—is, to put it mildly, fanciful.

 **3. State Legislative History.** The state further claims (at 23) that the New York legislative history supports its false-advertising-only theory, based on a memo speculating that surcharges might lead to "unannounced price increases." But nothing in the history suggests New York's law was *limited* to preventing "unannounced price increases." Quite the contrary, the

---

 [4] *Id.* at 98 (Ellen Broadman, Consumers Union).

 [5] *Id.* at 90 (Jim Boyle, Consumer Federation of America).

 [6] *Id.* at 43 (Hugh H. Smith, American Express); *id.* at 55 (Amy Topiel, MasterCard).

 [7] *Id.* at 32 (Peter Hood, American Bankers Association).

history shows that the law prohibits "a surcharge for credit in keeping with the provisions of the Federal ban that recently expired," which (as just discussed) was a speech ban, not an anti-fraud statute. Gupta Decl., Ex. B at 5 & 6; *see also id.* at 8 & 13. And the memo on which the state relies shows why the state is wrong: "Surcharges, even if only psychologically, impose penalties on purchasers and may actually dampen retail sales. A cash discount, on the other hand, operates as an incentive and encourages desired behavior." *Id.* at 10. How could a surcharge "psychologically" impose a penalty if it is, by definition, hidden from consumers? The state does not say.[8]

**4. The Case Law.** The state says (at 26) that the case law "accords" with its false-advertising theory, not the conventional understanding of the law. That's wrong too.

***Camera Warehouse***. For starters, the state omits the first case brought under the law, *State by Abrams v. Camera Warehouse, Inc.*, 496 N.Y.S.2d 659 (N.Y. Sup. Ct. 1985), in which Attorney General Robert Abrams sought restitution and an injunction against a company that imposed a credit-card surcharge. The court observed that "[t]he statute's language is plain and unequivocal"—it "outlaws credit card surcharges"—and the defendant had "charged its customers a surcharge when they elected to use a credit card." *Id.* at 659-60. Nobody hinted that there was any deception or that the law was limited to disclosure; to the contrary, the defendant was permanently enjoined "from charging its customers *any* surcharge" for credit. *Id.* at 660 (emphasis added).

***Fulvio I.*** The two other judicial opinions interpreting New York's law arose out of the criminal prosecution of a gas station owner charged with violating the law because his employee

---

[8] In addition, the legislative history reveals that a "surcharge" was broadly defined as "*any means* of increasing the regular price" for those who pay with credit. Gupta Decl., Ex. B at 8 (emphasis added). As explained above, that definition includes a percentage assessed on top of the posted price—however disclosed.

characterized the price difference between cash and credit as "five cents more" for credit. *See People v. Fulvio*, 514 N.Y.S.2d 594 (N.Y. Crim. Ct. 1987) (*Fulvio I*); *People v. Fulvio* 517 N.Y.S.2d 1008 (N.Y. Crim. Ct. 1987) (*Fulvio II*). Amazingly, the state claims that these opinions *bolster*, rather than undermine, its false-advertising theory. But *Fulvio I* focused on the "everyday, commonsense meaning" of "surcharge"—"an extra or additional fee, usually for some special service"—and held that Mr. Fulvio's argument that he was offering "a cash discount and not a surcharge" was an issue for trial. 514 N.Y.S.2d at 595-96 & n.*. If the no-surcharge law were just a false-advertising law—if "surcharge" meant "hidden surcharge"—one might have expected the court to mention that while discussing the word's "everyday, commonsense meaning." It did not.

*Fulvio II*. Mr. Fulvio was later convicted at trial—even though the extra fee he charged was clearly posted on signs. (He was also arrested right in front of those signs, which would be quite odd if the law were only about false advertising.) But the court set aside the verdict because the no-surcharge law, at least as applied to Mr. Fulvio, was unconstitutionally vague. *Fulvio II*, 517 N.Y.S.2d at 1012. Based on the law's "legislative history," "the position of the People" in the case, and the facts, the court determined "that precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the *label* the individual affixes to his economic behavior, without substantive difference." *Id.* at 1011.

The court also expressly rejected a false-advertising-only interpretation of the statute, pointing out that "it is clear that conviction may be had under the literal terms of GBL § 518 *regardless of sign displays*." *Id.* (emphasis added). Those displays may be relevant to "issues such as misrepresentation, fraud, consumer affairs, or other issues," but they are simply "not determinative" of whether the no-surcharge law was violated. *Id.* at 1012. That "clear" view of the statue's "literal terms" refutes the state's position here.

12

**5. The State's Legal Opinions and Enforcement History.** The state represents to this Court that the false-advertising-only interpretation has been "the attorney general's consistent view for more than 25 years," and that the conventional interpretation on which the plaintiffs rely is "not and ha[s] never been" the Attorney General's. AG's Mem. 19 & 27 n.13. It appears to be true that the Attorney General's office has had a consistent view (at least, until the filing of this case). But that view, like almost everything else, conflicts with the state's position in this litigation.

***The Attorney General's formal opinion***. The state does not mention the only formal Attorney General opinion interpreting the no-surcharge law. That opinion—cited in our opening brief and filed as an exhibit—was issued by Attorney General Elliot Spitzer in 2006 in response to a request from the Insurance Department about the lawfulness of imposing fees on credit-card purchases. Gupta Decl., Ex. F. The Attorney General concluded that these fees "are prohibited credit card surcharges within the meaning of General Business Law § 518"—again, with no mention that they would be lawful if only they were disclosed. In fact, the Attorney General concluded that "the plain meaning of the statute," "broadly worded to prohibit credit card surcharges," makes clear that "it was intended to apply broadly"—a remarkable statement if the law were limited to false advertising or disclosure. *Id.*[9]

---

[9] ***State Insurance Department Opinions:*** In 2007 and 2008, the State Insurance Department, in consultation with the Attorney General, issued two additional opinions interpreting the law as an across-the-board prohibition on surcharges. Neither said anything about disclosure. The first concluded that the fee at issue was "a surcharge because it [was] a charge on top of the premiums paid by policyholders" and companies "may not charge . . . an additional fee to cover credit card" expenses. Gupta Decl., Ex. G. The second concluded that the fee was *not* a surcharge because it was "not an extra charge levied by the insurance provider itself or its agent for the privilege of paying by credit card." Gupta Decl., Ex. C. Earlier, the Department had concluded that "[i]t is impermissible" for an insurer "to pass such credit card transaction fees on to an insured pursuant to N.Y. Gen. Bus. Law § 518." N.Y. Ins. Dept. Opinion (Dec. 28, 2001), *available at* http://www.dfs.ny.gov/insurance/ogco2001/rg112281.htm. There, too, there was no mention of false advertising or disclosure.

***Enforcement history generally***. Most telling, however—and most relevant to the reasonableness of the plaintiffs' fear of prosecution—is the state's enforcement history. Attorney General Andrew Cuomo enforced the law in a series of sweeps against gas stations and small heating-oil companies in 2008 and 2009—including investigations of at least 43 gas stations on Long Island, dozens of gas stations statewide, 14 heating-oil companies in Suffolk County, and 4 heating-oil companies in upstate New York. Many of these companies were targeted *even though they disclosed the surcharge with equal prominence as the cash price*. And the Attorney General's office gave them specific instructions on how to describe—that is, how to speak about—their pricing schemes so as to comply with the no-surcharge law. A few examples illustrate how the law is enforced.

***Parkside Fuel Oil Delivery & Service.*** Parkside used to impose a credit-card fee. It informed customers of the fee "on the phone, at the same time that [it] informed them of [its] prices." Parisi Decl. ¶ 5. In 2009, someone from the Attorney General's office called "pretending to be a customer ordering oil," and a Parkside employee "quoted the price of oil and said that [the company] charge[s] a fee on top of that price for using a credit card." *Id.* ¶ 6. To the Attorney General, that was an illegal "surcharge." *Id.* Parkside immediately "ceased imposing a credit surcharge," as the Attorney General demanded, and "agreed to provide a refund" for "*all* previously imposed surcharges" over a certain period of time. Parisi Decl., Ex. A ¶ 9. (settlement agreement) (emphasis added); *see also id.* ¶ 8 (agreement to "not charge consumers a surcharge for payment by credit card"). The settlement says nothing about disclosure. *See* Parisi Decl., Ex. A.[10]

An Assistant Attorney General told Parkside's owner that, to comply with the law, his employees had to "characteriz[e] the difference between paying with cash and paying with credit

_____

[10] Nor do the other agreements we were able to obtain from businesses targeted by the Attorney General, which are virtually identical to Parkside's. *See* Second Gupta Decl., Exs. B & C.

as a cash 'discount,' not a credit 'surcharge.'" Parisi Decl. ¶ 8. The Assistant Attorney General went so far as to give the owner "a script of what [he] could tell customers when talking to them over the phone"—saying that he "could quote the price as $3.50/gallon, for example, and then explain to customers that they would receive a $.05/gallon 'discount' for paying with cash," but he "could not quote the price as $3.45/gallon while explaining that they would have to pay a $.05/gallon 'surcharge' to use a credit card." *Id.* Parkside tried following the script for a bit, but customers found it "confusing," and it was "not the message that [Parkside] meant to convey." *Id.* ¶ 9. As a result, Parkside gave up on dual pricing altogether. *Id.*

The notion that New York's no-surcharge law (or the Attorney General's interpretation of it) is limited to false advertising simply "does not square with [Parkside's] experience" with the law, which was "all about semantics." *Id.* ¶¶ 10 & 11. Parkside was "targeted because [it] didn't realize that [it] had to tell [its] customers about the price difference between cash and credit in a specific way," *id.*, which is consistent with press accounts at the time.[11]

***Southville Petroleum.*** Parkside's experience was no outlier. Southville, another heating-oil company, also imposed "a small fee on credit-card transactions," which it "expressed . . . as a price per gallon." Conover Decl. ¶ 3. It too "always informed the customer what the charge would be." *Id.* It too received a call from the Attorney General's office pretending to be a customer and made the mistake of using the wrong words—saying that it was "three cents per gallon more" for credit instead of three cents less for cash. *Id.* ¶ 4. And it too was determined by the New York Attorney General to have violated the no-surcharge law. *Id.*

---

[11] *See* Peggy Spellman Hoey, *Local fuel companies slapped on the wrist*, North Shore Sun, Sept. 18, 2009, *available at* http://classified.timesreview.com/PrinterFriendly/S091809_fuel_psh (quoting Parkside owner as saying he was targeted for "'the wording' used with customers," and he "was never deceptive" and "told everyone the prices").

Like Parkside, Southville was targeted because of how employees characterized the charge over the phone. *Id.* ¶ 6. Southville was "never told" by anyone from the Attorney General's office that it "could impose a credit-card surcharge if only [it] told customers about this ahead of time" (which *is what Southville did*). *Id.* As a result of the Attorney General's actions, Southville refrains from differential pricing of any kind, even though it is legal, because "[t]he law is too convoluted." *Id.* ¶ 7.

**K Skee Oil.** K Skee had a similar run in with the New York Attorney General. Like Parkside and Southville, it imposed a credit-card surcharge and was "up front with [its] customers about this charge, telling them about it over the phone when informing them of [K Skee's] prices." Zasowski Decl. ¶ 2. "For example, if someone called asking about the price of oil," an employee "would tell them that it is $2/gallon, plus an additional $.05/gallon fee if paying with credit" (or "it's a nickel extra to use a credit card"). *Id.*

The Attorney General's office informed K Skee that it was imposing an illegal "surcharge" and demanded that it stop doing so. *Id.* ¶ 3. When K Skee's owner spoke with the Assistant Attorney General handling the case, he said to her: "You can charge more for a credit card all you want, but you have to say that this is the cash discount rate"—that is, "that the regular price is $4.25/gallon, for example, and the cash discount rate is $4/gallon." *Id.* ¶ 4. K Skee's employees "had been saying that 'it is a quarter more a gallon,'" to use the same example, and they "were not allowed to say that." *Id.* So K Skee "agreed to stop imposing a surcharge on customers who paid with a credit card," and "to pay a $1,100 fine and restitution to customers who had paid the surcharge." *Id.* ¶ 6. The Attorney General "never said anything about being able to impose a surcharge if only [K Skee] disclosed that fact to customers." *Id.* ¶ 7. Rather, he said that it "could not impose a 'surcharge' at all, but that [it] could give a cash 'discount.'" *Id.*

16

***Other accounts of the 2008 & 2009 enforcement actions.*** Other accounts further demonstrate that the Attorney General has enforced the law as a speech ban, not an anti-fraud statute. A lawyer for two New York heating-oil trade associations, as well as for a number of heating-oil companies (some of whom were nabbed in the Attorney General's sting), was not aware of any "consumer complaints" made to his clients about surcharges, and he "would have known if there had been any." Damadeo Decl. ¶¶ 1 & 2. "Based on [his] experience" representing clients during the investigations, "including conversations with representatives of the Attorney General's Office," he does not believe that the no-surcharge law is about false advertising; rather, it "turns on nothing but semantics." *Id.* ¶ 4. He therefore counsels his clients, some of whom offer cash discounts, on how to describe their pricing system consistent with the no-surcharge law, which "has everything to do with how you say it." *Id.* ¶ 5.[12]

***2011 cease-and-desist letter.*** The Attorney General's office sent a cease-and-desist letter in 2011 to a gas station that had "been posting gasoline prices which, in small print, are limited to cash sales only." Second Gupta Decl., Ex. I. The letter explains that "[t]he roadside listing of a price without equally prominent disclosure of the higher standard price for credit purchases violates" two *false-advertising* statutes. *Id.* But the letter does not mention the no-surcharge law—even though, on the state's interpretation, the law is designed specifically for (and only for) this exact situation.

***Attorney General press releases.*** Finally, the Attorney General's own press releases are consistent with the law's common understanding—and at odds with the state's new theory. One press release announced an investigation finding that many gas stations were "wrongfully

---

[12] Other accounts are similar. *See* Pls.' P.I. Mem. 38 n.8 (press accounts of heating-oil cases); *see also Cuomo targets gasoline stations*, Journal News (Westchester), Aug. 29, 2008 (gas station accused by Attorney General of imposing illegal surcharges even though it "doesn't charge credit card users more," but "just lowers the price for cash customers" and "clearly displays the prices").

surcharging credit card customers."[13] It explains that "retailers are not allowed to impose a surcharge on customers for using a credit card." *Id.* Drawing a distinction, it then says: "*In addition*, Cuomo's investigation also identified *instances* where gas stations . . . engaged in *false advertising* by only listing the lower cash prices on their street-view signage in order to lure patrons to the pump. In *several cases*, the stations *failed to disclose* that the price was only for cash transactions." *Id.* (emphasis added).[14] The investigation found that gas stations were violating the law "by *either* charging customers more for using a credit card, *or* by posting only the lower cash prices." *Id.* (emphasis added). The position that the state now takes—that the statute reaches only false advertising—cuts against its own statements just five years ago.[15]

**6. Banks and the Credit-Card Industry.** The state claims that its false-advertising-only interpretation is "more reasonable" because "requiring sellers to prominently disclose the credit card price *exposes* credit card companies to competition." AG's Mem. 21 & 25. True, allowing disclosed surcharges is good for consumers and competition and threatens the revenues of banks and credit-card companies. But if the state's false-advertising theory were right, then

---

[13] Second Gupta Decl., Ex. D.

[14] *See also* Second Gupta Decl., Ex. E (same).

[15] Other press releases also do not read the statute as the Attorney General now claims:

- Second Gupta Decl., Ex. F (announcing "settlements with six New York-based home heating oil companies," some of which had "improperly add[ed] surcharges for credit card payments"—including one that had "improperly charged a 2 percent service charge on credit card payments," which was illegal because "[s]tate law prohibits a surcharge on the use of a credit card for purchases," and three who "were also illegally charging surcharges for credit card payments" and thus may "no longer charge surcharges for credit card payments");

- Second Gupta Decl., Ex G (announcing that car dealer was "improperly charging surcharges on purchases made with a credit card" and that the dealer "must stop imposing a surcharge for the use of credit cards, which is illegal");

- Second Gupta Dec., Ex. H (announcing "settlements with 14 Suffolk County-based home heating oil companies for improperly adding surcharge for credit card payments," under which the companies had agreed to "provide refunds" and "immediately stop charging" surcharges).

why would those industries fight so hard for no-surcharge laws like New York's? Why would the industry have maintained contractual surcharge bans for so long, dropping them only this year under a national antitrust settlement? As noted in our opening brief (at 35 n.7), that settlement requires extensive and prominent disclosure at multiple points. For example, merchants must post signs like this: "We impose a surcharge of ___% on credit-card transactions, which is not greater than the swipe fees we pay." Yet Visa and MasterCard say that the disclosed surcharges allowed under the new rules are prohibited by New York's no-surcharge law.[16] Are they wrong? And why is the credit-card industry now lobbying 20 state legislatures—asking for laws just like New York's, without much success thus far—given that merchants in all those states are, as of this year, already required under the national settlement to prominently disclose any surcharge?[17]

**7. Merchants.** Major retailers like Walgreens, Kroger, Safeway, Rite Aid, Food Lion, and Albertson's—all *amici* in this case—also share the conventional understanding. *See* Mem. of *Amici Curiae* Retailers. Are they all misguided? So do representatives of smaller businesses, like the CEO of the Oil Heat Institute of Long Island, whose members' experiences made him realize that the no-surcharge law "turns on a semantic distinction in how a company characterizes the added cost of using a credit card," Rooney Decl. ¶¶ 1-3—which he said several years ago as well. *See* Gary Dymski, *State freezes illegal oil heat fees*, Newsday, Sept. 15, 2009 ("It's semantics."). The notion that the no-surcharge law is something other than "an outright ban on surcharges" is "news to [him]" and his members. Rooney Decl. ¶ 4. He has "never heard the Attorney General

---

[16] *See* http://usa.visa.com/personal/using_visa/checkout_fees/index.html.

[17] *See* Carter Dougherty, *Swipe-Fee Battle Moves to States as U.S. Banks Fight Surcharges*, Bloomberg, Jul. 9, 2013, *available at* http://www.bloomberg.com/news/2013-07-09/swipe-fee-battle-moves-to-states-as-u-s-banks-fight-surcharges.html.

or anyone else claim that it is lawful for a merchant to impose a surcharge, as long as the charge is prominently disclosed." *Id.*[18]

**8. The Federal Government**. The federal government tells its employees that "[e]ven though VISA/MasterCard have eliminated the prohibition against credit card surcharges, merchants in [New York] are barred from imposing surcharges because it is illegal under state law."[19] It does not say the same thing about Minnesota—whose law the state claims has the same meaning as New York's.

*       *       *

In sum, the state is right only if everyone and everything else is wrong. Every relevant source—the statute's text, state and federal legislative history, case law, the state's own legal opinions, the enforcement history including settlements and press releases, and the common understanding of everyone from the credit-card companies to large and small retailers—all show that the plaintiffs' interpretation is the only reasonable interpretation. The state should not be allowed to evade constitutional scrutiny by making up a spurious new interpretation on the fly.

---

[18] In addition, New York's own Metropolitan Transportation Authority has said, in objections to the national antitrust settlement requiring Visa and MasterCard to drop their no-surcharge rules, that "MTA is precluded under New York State law from surcharging credit card transactions. Thus, the provisions of the Proposed Settlement that permit such surcharges have zero financial value for MTA." *In re Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation*, 1:05-md-01729-JG-JO, Doc. No. 2653 at 3. Thousands of merchants, in standard-form objections, have said the same thing—that because New York's law "prohibit[s] surcharging of credit card transactions," they are unable to take advantage of the settlement's "principal relief." *See, e.g., id.*, Docs. No. 2317 (Lawler's Grocery), 2268 (Tiffany & Co.), 4615 (Applebee's), 5065 (Saratoga Pharmacy).

[19] GSA SmartPay, *available at* https://smartpay.gsa.gov/program-coordinators/tax-information/NewYork; *see also* GSA SmartPay, *available at* https://smartpay.gsa.gov/about-gsa-smartpay/surcharges (listing New York as a state banning the imposing of a surcharge, which is usually expressed as "[a] percentage of the value of the sale").

## II.   THE NO-SURCHARGE LAW VIOLATES THE FIRST AMENDMENT.

The state's only defense to our First Amendment challenge is that the no-surcharge law, if "properly interpreted," regulates "conduct, not speech." AG's Mem. 36. But once the state's false-advertising-only interpretation fails, so does its defense. And even on its own terms, the state's position makes no sense: It denies that the law regulates *any* speech but then, paradoxically, defends the law as "directed at misleading commercial speech." *Id.* at 39. The law's effect "cannot simultaneously be non-communicative," as the state argues, "and yet pose the risk of communicating a misleading message." *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 510 (6th Cir. 2008). In any event, the state does not deny that the "practical effect" of the no-surcharge law—as conventionally interpreted—shows it to be a content-based speech restriction subject to heightened scrutiny. *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663 (2011). The state's failure to defend its law is fatal because the state has the burden to justify it—a burden "not satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).

Rather than attempt to meet its burden, the state does just the opposite: It points out that the statute, as the plaintiffs (and the rest of the world) interpret it, does "*not* serve the State's anti-deception interest, as liability . . . turn[s] solely on the label that a seller used to describe its dual pricing scheme." AG's Mem. 24 (emphasis added). "States may not place an absolute prohibition" on information that is merely "potentially misleading . . . if the information also may be presented in a way that is not deceptive." *In re R. M. J.*, 455 U.S. 191, 203 (1982). Here, "the prohibition against the use of words which could be used to present the information about the surcharge in an accurate and non-misleading manner [is] broader than necessary to prevent the description from being potentially misleading." *Capital Leasing of Ohio, Inc. v. Columbus Mun. Airport Auth.*, 13 F. Supp. 2d 640, 669 (S.D. Ohio 1998).

21

### III.    THE NO-SURCHARGE LAW IS UNCONSTITUTIONALLY VAGUE.

New York's no-surcharge law is unconstitutionally vague because it makes liability turn on the subtle semantic distinction between "surcharge" and "discount"—a distinction that fails to "give[] the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and does not "provide[] explicit standards for those who apply it." *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999). The state says its new false-advertising-only analysis provides fair notice, but just the opposite is true. Because "it is clear from the evidence that this analysis constitutes nothing more than a post hoc rationalization . . . constructed especially for this litigation," it "does not provide the guidance required to overcome the inherent vagueness." *NAACP Legal Def. & Educ. Fund, Inc. v. Campbell*, 504 F. Supp. 1365, 1368 (D.D.C. 1981). Which law should a law-abiding merchant follow—the law as portrayed in the state's brief to this Court? Or the law as enforced by the Attorney General in enforcement actions throughout the state? If she goes with the former, she may feel safe telling her customers that she imposes a 3% credit-card surcharge at the same time that she tells them her prices. But if she goes with the latter, she must avoid saying exactly that, lest she face fines, civil penalties, and restitution—as have other merchants in recent years—or even criminal prosecution. This uncertainty is intolerable.

Finally, to take up a question from our opening brief (at 38) to which the state has yet to respond: We understand that a merchant may advertise a "3% cash discount on all items." But may the same merchant prominently advertise an equivalent "3% credit-card surcharge on all items," as Expressions Hair Design did before it learned of the no-surcharge law and took down its sign? The State pointedly refuses to say. *See* AG's Mem. 35 n.19. Especially in light of the state's shifts and evasions, a merchant seeking to communicate the cost of credit to consumers "cannot know in advance whether the State will read the communication" as violating the no-surcharge law. *Vt. Right to Life*, 221 F.3d at 387.

## IV.     THE ANTITRUST PREEMPTION CLAIM SURVIVES DISMISSAL.

The state's effort to dismiss the antitrust preemption claim also assumes the correctness of its false-advertising-only theory. The state argues that a law *authorizing* merchants to impose surcharges is pro-competitive, not anti-competitive. We agree. But again, that is not the law that New York enacted.

The state further contends (at 42-43) that the preemption claim fails under generic conflict-preemption principles. "But in cases of conflict between state economic regulation and the Sherman Antitrust Act, the [Supreme] Court has eschewed its standard preemption approach" and instead asks whether state law "arises from or causes a 'violation' of the same federal antitrust rules that restrict the market conduct of private firms." Richard Squire, *Antitrust and the Supremacy Clause*, 59 Stan. L. Rev. 77, 78 (2006). Under Second Circuit precedent, the antitrust preemption claim here requires a potentially fact-intensive inquiry into whether the no-surcharge law is anticompetitive—an inquiry that cannot be resolved at the motion-to-dismiss stage. *See Hertz Corp. v. City of New York*, 1 F.3d 121, 130-31 (2d Cir. 1993) (remanding to the district court to consider whether a New York law that prohibited car-rental companies from imposing residence-based surcharges was anticompetitive and hence preempted by the Sherman Act); *Hertz Corp. v. City of New York*, 212 F. Supp. 2d 275, 280 (S.D.N.Y. 2002) (holding the surcharge prohibition preempted on remand).

The state concedes (at 25) that giving merchants the freedom to communicate the cost of credit as a surcharge "*exposes* credit card companies to competition by allowing consumers to make an informed decision about whether the higher credit card price is worth paying." Conversely, we will show that New York's adoption of the credit-card industry's speech code *shields* credit-card companies from competition.

## V.   THE PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION.

"[W]here a First Amendment right has been violated, the irreparable harm requirement for the issuance of a preliminary injunction has been satisfied." *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004). Undaunted, the state says that this rule doesn't apply because (1) the plaintiffs' "real injury" is monetary and (2) the plaintiffs "delay[ed]" filing. AG's Mem. 44-45. Both arguments fail. First, a "great deal of vital expression" has "an economic motive," *Sorrell*, 131 S. Ct. at 2665, and no "economic impact" can erase the irreparable harm to the plaintiffs' speech rights, *Int'l Dairy Foods v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996). Second, the state measures our "delay" from January 27, when the credit-card companies dropped their no-surcharge rules. True, merchants were no longer restrained by contractual speech codes as of that date, but the payment systems' information technology had not been adjusted to actually allow surcharges. Friedman Decl. ¶ 1. In late May, Visa and MasterCard agreed to begin eliminating that "bottleneck"—a process "expected to be completed shortly"—and *we filed suit 10 days later. Id.* ¶¶ 1, 4, 5. In addition, settlement notice was not completed until March 29,[20] and the deadline to respond was May 28—*seven days before* we filed suit. The plaintiffs, in other words, organized a full-bore constitutional challenge within the time that merchants had to read the notice and opt out. And the settlement still is not final; a hearing is set for September 12—*one month after* the hearing in this case. In any event, given the ongoing danger that the plaintiffs' speech will be chilled, the state's arguments cannot undermine their irreparable harm. *See Legal Aid Soc. of Hawaii v. Legal Servs. Corp.*, 961 F. Supp. 1402, 1418 (D. Haw. 1997) (even nine-month delay in filing suit could not undermine irreparable harm in First Amendment case).

---

[20]    https://www.paymentcardsettlement.com/Content/Documents/SettlementDocs/ Hamann_Nicole_Decl.pdf (describing settlement-notice program, including mailings completed by March 29 and subsequent mailings in April).

On the other side of the scale, the state has no legitimate interest in enforcing a law whose constitutionality it cannot even bring itself to defend.

## CONCLUSION

This Court should declare that N.Y. Gen. Bus. Law § 518 violates the plaintiffs' free-speech rights under the First Amendment and is unconstitutionally vague, and should enjoin the New York Attorney General and his agents, including all persons acting in the name of the State of New York, from enforcing the statute against the plaintiffs. Because the remaining issues are purely legal, the Court may wish to consolidate its decision with the merits under Rule 65(a)(2).

Respectfully submitted,

*/s / Deepak Gupta*
DEEPAK GUPTA (*pro hac vice*)
GREGORY A. BECK
BRIAN WOLFMAN
JONATHAN E. TAYLOR
GUPTA BECK PLLC
1625 Massachusetts Avenue, NW
Washington, DC 20036
(202) 470-3826

GARY B. FRIEDMAN
TRACEY KITZMAN
FRIEDMAN LAW GROUP LLP
270 Lafayette Street
New York, NY 10012
(212) 680-5150

MARK WENDORF
REINHARDT, WENDORF & BLANCHFIELD
332 Minnesota Street
St. Paul, MN 55101
(651) 287-2100

July 29, 2013                                              *Counsel for Plaintiffs*