UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
EXPRESSIONS HAIR DESIGN, LINDA      :
FIACCO, THE BROOKLYN FARMACY & SODA :      13 Civ. 3775 (JSR)
FOUNTAIN, INC., PETER FREEMAN, BUNDA :
STARR CORP., DONNA PABST, FIVE       :     PRELIMINARY INJUNCTION,
POINTS ACADEMY, STEVE MILLES,       :
PATIO.COM LLC, and DAVID ROSS,      :       OPINION, AND ORDER
                                    :
        Plaintiffs,                 :
                                    :
           -v-                      :
                                    :
ERIC T. SCHNEIDERMAN, in his        :
official capacity as Attorney       :
General of the State of New York,   :
CYRUS R. VANCE, JR., in his official :
Capacity as District Attorney of New :
York County, CHARLES J. HYNES, in   :
his official capacity as District   :
Attorney of Kings County, and GERALD :
F. MOLLEN, in his official capacity  :
as District Attorney for Broome     :
County,                             :
                                    :
        Defendants.                 :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

    Alice in Wonderland has nothing on section 518 of the New York

General Business Law.  Under the most plausible interpretation of

that section, if a vendor is willing to sell a product for $100 cash

but charges $102 when the purchaser pays with a credit card, the

vendor risks prosecution if it tells the purchaser that the vendor

is adding a 2% surcharge because the credit card companies charge

the vendor a 2% "swipe fee."  But if, instead, the vendor tells the

purchaser that its regular price for the product is $102, but that

it is willing to give the purchaser a $2 discount if the purchaser

1

pays cash, compliance with section 518 is achieved.  As discussed
below, this virtually incomprehensible distinction between what a
vendor can and cannot tell its customers offends the First Amendment
and renders section 518 unconstitutional.

The instant action is brought by five retailers and their
principals against the Attorney General of the State of New York and
the District Attorneys of New York, Kings, and Broome Counties
challenging the constitutionality of section 518 of the New York
General Business Law.  That statute prohibits a seller from imposing
a "surcharge" on customers who elect to pay with a credit card,
rather than by cash, check, or other similar means, see N.Y. Gen.
Bus. Law § 518, and has been applied so as to prohibit retailers
from informing their customers that the fees they pay to credit card
companies and then pass on to their customers are in the nature of
surcharges above the price they would otherwise charge.  Plaintiffs
wish to impose surcharges on credit-card transactions and to so
inform their customers, but are constrained from doing so by section
518, which they assert violates the First Amendment, is
unconstitutionally vague, and also is preempted by the Sherman
Antitrust Act.  Pending before the Court are plaintiffs' motion for
a preliminary injunction based on the First Amendment and vagueness
challenges and defendants' cross-motion to dismiss the complaint in
its entirety.  For the reasons that follow, plaintiffs' motion is
granted, and defendants' motion is denied.

2

Section 518 provides: "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." Id. Violations of this prohibition carry criminal penalties: "any seller who violates [section 518] shall be guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars or a term of imprisonment up to one year, or both." Id. Criminal prosecutions under section 518 are brought by the appropriate county District Attorney. See N.Y. County Law §§ 700, 927. In addition, the New York Attorney General is authorized to bring civil enforcement actions to enjoin "continuous" violations of the statute, N.Y. Gen. Bus. Law § 513, and to seek restitution, damages, and cancellation of business licenses against "repeat[]" or "persistent" offenders, N.Y. Exec. Law § 63(12).

Section 518 by its terms only prohibits credit-card "surcharge[s]," and all parties here agree that the statute does not bar sellers from offering an equivalent "discount" to consumers who use cash.[1] In terms of their immediate economic consequences, surcharges and discounts are merely different labels for the same thing -- a price difference between cash and credit. A number of studies have indicated, however, that consumers perceive credit-card surcharges negatively as a kind of loss or penalty, while cash discounts are perceived positively as a kind of gain or bonus. See

---

[1] For convenience, and following the parties' usage, the Court hereinafter refers to all non-credit forms of payment as "cash."

3

generally Daniel Kahneman, Jack L. Knetch & Richard H. Thaler,
Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias,
5 J. Econ. Persp. 193, 199 (1991); Adam Levitan, The Antitrust Super
Bowl: America's Payment Systems, No-Surcharge rules, and the Hidden
Costs of Credit, 3 Berkeley Bus. L.J. 265, 280-81 (2006); see also
S. Rep. No. 97-23, at 3 ("The [U.S. Senate Banking] Committee
recognizes that while discounts for cash and surcharges on credit
cards may be mathematically the same, their practical effect and the
impact they may have on consumers is very different.").

        The parties draw very different conclusions about the impact
these varying consumer reactions have on the financial relations
between buyers, sellers, and third-party credit providers.
Plaintiffs claim that framing the incremental cost of credit-card
usage as a "surcharge" is an accurate and effective way to convey to
consumers that paying with credit is actually more expensive than
paying with cash. Absent surcharges, consumers may be unaware that
when they use a credit card, the relevant credit card company
charges the retailer a fee, usually around two to three percent of
the sales price. See, e.g., Decl. of Linda Fiacco ("Fiacco Decl.")
¶ 3; FAC ¶ 7. Such fees, known as "swipe fees," are among greatest
and fastest growing operating expenses for merchants in some
industries. See Adam J. Levitin, Priceless? The Economic Costs of
Credit Card Merchant Restraints, 55 UCLA L. Rev. 1321, 1345 (2008);
FAC ¶ 28. Plaintiffs accordingly want to impose credit card
surcharges, rather than give cash discounts, and to so inform their

                                   4

customers, precisely because consumers are more likely then to notice the fees, dislike them, and switch to cash in order to avoid them. Over time, this behavior will place downward pressure on swipe fees, which credit card companies will be forced to reduce in order to prevent more and more consumers from switching to cash. See Levitan, The Antitrust Super Bowl, supra, at 313 (noting that after surcharges were permitted in Australia and customers were notified of same, swipe fees there declined significantly); FAC ¶ 27.

Plaintiffs also argue that, in the absence of being able to impose surcharges and label them as such, some retailers cannot effectively call consumers' attention to the price differences between cash and credit, and therefore must charge higher headline prices for everyone. Surcharge bans like section 518 thus in effect force cash users (who are said to be disproportionately poor and minority persons), to subsidize the retail purchases of credit card users. See Adam J. Levitin, Priceless? The Social Costs of Credit Card Merchant Restraints, 45 Harv. J. on Legis. 1, 35 (2008); FAC ¶¶ 28-29. This hidden, regressive subsidy for credit card usage is not insubstantial. See Scott Schuh, Oz Shy, & Joanna Stavins, Who Gains and Who Loses from Credit Card Payments? at 21 (Fed. Reserve Bank of Boston, Public Policy Discussion Paper No. 10-03, 2010) ("The average cash-paying household transfers $149 . . . annually to card users," each of whom on average "receives a subsidy of $1,333 . . . annually from cash users.").

Defendants, however, contend that, in enacting section 518, the New York legislature effectively concluded that a surcharge ban would actually protect consumers from unfair surprise and deception. Defendants note that consumers tend to plan and anchor their expectations around the advertised sticker price of a given item they intend to purchase. If a consumer later learns that she can earn a discount from that price for using cash, she is not harmed. But if the consumer later learns that there is an additional charge, above the sticker price, if she chooses to pay by credit card, her expectations may be frustrated.

Whatever its purported purpose, section 518 is the product of a decades-long battle between credit card companies on the one hand and retailers and consumer advocates on the other. In the early days of credit cards, credit card companies included clauses in their contracts with retailers that strictly forbade those retailers from charging different prices for cash and credit transactions. See Edmund W. Kitch, The Framing Hypothesis: Is It Supported by Credit Card Issuer Opposition to a Surcharge on a Cash Price?, 6 J.L. Econ. & Org. 217, 219-20 & n.4 (1990); FAC ¶ 32. That practice ended in 1974 when Congress amended the Truth in Lending Act to provide that a "card issuer may not, by contract or otherwise, prohibit any . . . seller from offering a discount to a cardholder to induce the cardholder to pay by cash, check, or similar means rather than use a credit card." Fair Credit Billing Act, Pub. L.

6

No. 93-495, tit. III, § 306, 88 Stat. 1500, 1515 (1974) (codified at
15 U.S.C. § 1666f(a)).

Thereafter, the battleground moved from whether merchants could
charge different prices for cash and credit to how merchants could
communicate those different prices to consumers. In 1976, at the
urging of the credit card industry, Congress passed another
amendment to the Truth in Lending Act, providing, as section 518 now
provides, that "[n]o seller in any sales transaction may impose a
surcharge on a cardholder who elects to use a credit card in lieu of
payment by cash, check, or similar means." Act of Feb. 27, 1976,
Pub. L. No. 94-222, § 3(c), 90 Stat. 197, 197 (codified at 15 U.S.C.
§ 1666f(a) (1980)). In this 1976 amendment, Congress defined the
terms "discount" (as used in the preexisting version of the Act) and
"surcharge" (as used in the amendment) as follows:

> The term "discount" . . . means a reduction made from the
> regular price. The term "discount" . . . shall not mean a
> surcharge.
>
> . . . The term "surcharge" . . . means any means of
> increasing the regular price to a cardholder which is not
> imposed upon customers paying by cash, check, or similar
> means.

Id. § 3(a) (codified at 15 U.S.C. § 1602 (1980)).

The 1976 amendment placed a three-year time limit on the no-
surcharge provision, but in 1978, Congress extended the provision
for an additional two years. See Financial Institutions Regulatory
and Interest Rate Control Act of 1978, Pub. L. No. 95-630, § 1501,
92 Stat. 3641, 3713. In 1981, with the support of the credit card

industry and over the opposition of federal regulators, Congress
again extended the sunset for another three years.  See Cash
Discount Act, Pub. L. No. 97-25, § 201, 95 Stat. 144, 144; S. Rep.
No. 97-23, at 8-10 (additional views of Sen. Proxmire) (describing
the positions of credit card companies and federal regulators).  In
addition, supplementing the provisions that had defined "discount"
and "surcharge" in terms of the retailer's "regular price," the 1981
renewal added a provision defining "regular price" as follows:

> the term "regular price" means the tag or posted price
> charged for the property or service if a single price is
> tagged or posted, or the price charged for the property or
> service when payment is made by use of . . . a credit card
> if either (1) no price is tagged or posted, or (2) two
> prices are tagged or posted, one of which is charged when
> payment is made by use of . . . a credit card and the
> other when payment is made by use of cash, check, or
> similar means.

Cash Discount Act § 102.  This definition was intended to clarify
that the no-surcharge provision "permits merchants to have two-tier
pricing systems and to offer a differential between the credit price
and the cash price" as long as merchants ensure that "when prices
are tagged or posted, the consumers will be exposed to the highest
price when they see a tagged or posted price."  S. Rep. No. 97-23,
at 4.

In 1984, however, Congress allowed the no-surcharge provision
to lapse.  In response, the credit card industry began lobbying for
state-level no-surcharge laws, which were eventually enacted in ten

8

states, including New York.   See N.Y. Bus. Law § 518.[2]   New York's no-surcharge provision, section 518, copied the operative text of the then-lapsed federal provision prohibiting surcharges, but did not include the federal definitions, or any other definitions, of "discount," "surcharge," or "regular price."

Contemporaneously, credit card companies also began including contractual no-surcharge provisions in their agreements with retailers.   See Amos Tversky & Daniel Kahneman, Rational Choice and the Framing of Decisions, 59 J. Bus. S251, S261 (1986); FAC ¶¶ 34, 43.   In January 2013, however, two major credit card issuers, Visa and MasterCard, agreed to drop their contractual prohibitions against surcharges as part of a larger antitrust settlement.   See Jessica Silver-Greenberg, Visa and MasterCard Settle Claims of Antitrust, N.Y. Times, July 14, 2012, at B1; FAC ¶ 48.   As a result, state no-surcharge laws, previously redundant of retailers' contractual obligations, have now taken on renewed importance.

The ten plaintiffs in this case consist of five New York retail businesses and their principals.   All of these businesses pay swipe fees of around two-to-three percent per credit transaction, and accordingly would like to charge higher prices for credit transactions than for cash.   They do not want to frame this price difference as a cash discount, however, because, inter alia,

---

[2] See also Cal. Civ. Code § 1748.1(a); Colo. Rev. Stat. § 5-2-212(1); Conn. Gen. Stat. § 42-133ff(a); Fla. Stat. § 501.0117; Kan Stat. Ann. § 16a-2-403; Me. Rev. Stat. 9-A, § 8-303(2) (repealed Sept. 27, 2011); Mass Gen. Laws ch. 140D, § 28A(a); Okla. Stat. tit. 14a, § 2-211(A); Tex. Fin. Code § 339.001.

discounts "would make advertised prices look higher than they are, without making it transparent that the higher price would be due solely to credit card transaction costs -- precisely the information [they] wish to convey to [their] consumers." Decl. of Peter Freeman Decl. ("Freeman Decl.") ¶ 8; Decl. of Donna Pabst ("Pabst Decl.") ¶ 5 (similar); Decl. of David Ross ("Ross Decl.") ¶¶ 8-9 (similar); Fiacco Decl. ¶¶ 5-8; Decl. of Stephen Milles ("Milles Decl.") ¶¶ 5-6; FAC ¶¶ 2-4, 7, 10, 13, 16. Given section 518, however, plaintiffs fear that they may be sued or even prosecuted if they frame any price difference as imposing a "surcharge" or otherwise convey to their customers that they will be charged more for paying with credit rather than less for paying with cash. See Freeman Decl. ¶ 9; Pabst Decl. ¶ 6; Ross Decl. ¶ 10; Fiacco Decl. ¶¶ 8-9; Milles Decl. ¶¶ 6-7; FAC ¶¶ 4-5, 8, 11, 13, 16.

Because of these fears, moreover, four of the five plaintiff businesses simply charge the same price for all transactions, even though they would like to charge more for credit. See Freeman Decl. ¶ 6; Pabst Decl. ¶ 5; Ross Decl. ¶ 7; Milles Decl. ¶ 4; FAC ¶¶ 7, 11, 13, 16. The remaining business, Expressions Hair Design ("Expressions"), a unisex hair salon in Vestal, New York, does charge different prices for cash and credit, but section 518 effectively restricts how it describes those prices to its customers. According to the salon's co-owner plaintiff Linda Fiacco, "[u]ntil 2012, Expressions posted a sign at our counter informing all customers that, due to the high swipe fees charged by

10

the credit-card industry, we would charge them 3% more for using a credit card to purchase services."  Fiacco Decl. ¶ 6; see FAC ¶ 3. However, after a customer who is a lawyer informed the salon of New York's no-surcharge law, Expressions removed the sign.  Fiacco Decl. ¶ 6; FAC ¶ 3.  Expressions still charges a higher price for credit, but because of section 518, the salon's managers and employees "try to be as careful as we can to avoid characterizing that price difference as a 'surcharge' or an 'extra' charge for paying with a credit card," as opposed to a discount for cash.  Fiacco Decl. ¶ 7; see FAC ¶ 5.  Fiacco states that Expressions would like to return to its former policy of prominently advertising a surcharge on all credit transactions, but cannot because of fears of being prosecuted or sued for violation of section 518.  Fiacco Decl. ¶ 8; FAC ¶ 4.

Against this background, the Court turns to plaintiffs' motion for a preliminary injunction on its First Amendment and void-for-vagueness claims and defendants' cross-motion to dismiss the complaint in its entirety.[3]

---

[3] In their initial complaint, plaintiffs named only the Attorney General as a defendant, but later amended their complaint to name the three District Attorneys as well.  See generally Compl.; FAC. Before plaintiffs filed their amended complaint, however, the Attorney General moved to dismiss the initial complaint.  On consent of the parties, the Court later deemed the motion to dismiss to be directed against the First Amended Complaint.  See Order of July 31, 2013.  Also on consent of the parties, the Court deemed plaintiffs' motion for a preliminary injunction to be directed not only against the Attorney General, but also against the District Attorneys.  See Order of August 14, 2013.  The District Attorneys joined in the Attorney General's motion to dismiss, as well as his opposition to the motion for a preliminary injunction.

11

Regarding plaintiffs' motion, a plaintiff seeking a preliminary injunction must ordinarily show "1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest weighs in favor of granting an injunction." Metro. Taxicab Bd. of Trade v. City of New York, 615 F.3d 152, 156 (2d Cir. 2010) (internal quotation marks and citations omitted). However, "[w]hen, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." Id.

As for defendants' motion, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A court considering a motion to dismiss must "accept[] as true all factual claims in the complaint and draw[] all reasonable inferences in the plaintiff's favor." Fink v. Time Warner Cable, 714 F.3d 739, 740-41 (2d Cir. 2013).

Before applying these standards to the motions at hand, the Court must first address defendants' threshold argument that certain plaintiffs lack Article III standing and that plaintiffs' entire pre-enforcement challenge to section 518 is not ripe for

12

adjudication.  As to standing, Article III of the Constitution

limits federal courts' jurisdiction to "Cases" and "Controversies,"

and "[o]ne element of the case-or-controversy requirement is that

plaintiffs must establish that they have standing to sue."  Clapper

v. Amnesty Int'l USA, 133 S. Ct. 1138, 1146 (2013) (internal

quotation marks omitted).  This constitutional requirement demands

that

>     (1) the plaintiff have suffered an injury in fact -- an
>     invasion of a legally protected interest which is (a)
>     concrete and particularized and (b) actual or imminent,
>     not conjectural or hypothetical, (2) the injury be fairly
>     traceable to the challenged action of the defendant, and
>     (3) it be likely, as opposed to merely speculative, that
>     the injury will be redressed by a favorable decision.

Hedges v. Obama, No. 12-3176, -- F.3d --, 2013 WL 3717774, at *11

(2d Cir. July 17, 2013) (internal quotation marks omitted).

The closely related doctrine of ripeness has both

constitutional and prudential aspects.  "To the extent that issues

of ripeness involve, at least in part, the existence of a live 'Case

or Controversy,' a conclusion that the complaining party will

sustain immediate injury and that such injury would be redressed by

the relief requested would appear to satisfy this constitutional

requirement."  Simmonds v. I.N.S., 326 F.3d 351, 358 (2d Cir. 2003)

(internal quotation marks and alterations omitted).  As a prudential

matter, courts also consider "(1) whether an issue is fit for

judicial decision and (2) whether and to what extent the parties

will endure hardship if decision is withheld."  Id. at 359.

13

That said, courts "assess pre-enforcement First Amendment claims . . . under somewhat relaxed standing and ripeness rules." Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 689 (2d Cir. 2013). Void-for-vagueness claims grounded in First Amendment concerns receive similar treatment. See Dickerson v. Napolitano, 604 F.3d 732, 742 (2d Cir. 2010). As the Second Circuit has explained, "plaintiffs contesting statutes or regulations on First Amendment grounds face an unattractive set of options if they are barred from bringing a facial challenge: refrain[] from activity they believe the First Amendment protects, or risk civil or criminal penalties for violating the challenged law." Nat'l Org. for Marriage, 714 F.3d at 689 (internal quotation marks omitted). Accordingly, in order to satisfy the requirements of standing and ripeness, "[a] plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it." Id. (internal quotation marks omitted).

Taking the issue of ripeness first, this well-settled standard disposes of defendants' contention that plaintiffs' claims are unripe. Defendants argue that this suit is premature because no plaintiff has yet been the subject of civil or criminal enforcement for violating section 518, and plaintiffs supposedly would suffer no hardship from postponing review. But that argument simply ignores the gravamen of this suit, which claims that section 518 presently

14

burdens and chills plaintiffs' fundamental right of free speech. That is an cognizable injury plaintiffs would continue to suffer on an ongoing basis if review were withheld.  This suit is clearly ripe.

As to standing, defendants recognize the governing principles and concede that four of the ten plaintiffs in this action legitimately fear enforcement and therefore have standing.  See Defs.' Reply Mem. of Law in Further Supp. of Mot. To Dismiss at 8-9. While this concession alone is sufficient to allow this suit to continue, the Court must resolve each plaintiff's standing in order to determine the scope of any injunction in this case -- i.e., precisely which parties the defendants would be formally prevented from suing or prosecuting under section 518.  In addition, it is useful to discuss defendants' challenge to the remaining six plaintiffs' standing because it casts light on the proper interpretation of section 518.

As an initial matter, plaintiffs argue that they all have standing because, as they read it, section 518 draws the line between permissible discounts and impermissible surcharges based solely on the words and labels a seller uses to describe its prices. Here, each plaintiff avers that but for section 518, they would charge different prices for cash and credit and would frame that price difference as a credit-card surcharge.  Plaintiffs therefore claim that they all legitimately fear enforcement and therefore have standing.

Defendants, however, contend that section 518 "is an anti-fraud statute prohibiting sellers from charging credit card users an additional hidden fee not displayed as prominently as the cash price." Mem. of Law in Supp. of Defs.' Mot. To Dismiss and in Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Mem.") at 21. On defendants' reading, a "surcharge" is any increase over a seller's regular price, and a seller's "regular" price, in turn, is the price, in dollars and cents, that is most prominently displayed or communicated to consumers. Hence, if a seller's credit-card price is displayed, in dollars and cents, at least as conspicuously as the cash price, then the credit-card price is the "regular price," and there can be no impermissible surcharge.

According to defendants, six of the plaintiffs here -- The Brooklyn Farmacy & Soda Fountain, Inc., its co-owner Peter Freeman, Bunda Starr Corp., its president Donna Pabst, Patio.com LLC, and its founder and president David Ross -- do not propose to advertise their credit-card prices any less prominently than their cash prices. See generally Freeman Decl.; Pabst Decl.; Ross Decl.[4] Defendants thus argue that these plaintiffs have not proposed to do

---

[4] To be precise, defendants contend that it is unclear whether Patio.com intends to display the credit card surcharge prominently or only as a line item on the customer's receipt. See Defs.' Mem. at 34-35. Fairly read, however, the Ross Declaration indicates that Patio.com wants to include a line item on its receipt in addition to other means of prominently advertising the surcharge. The Ross Declaration states that Patio.com wants "to charge a different price for credit card usage" and "call that price a 'surcharge'" in order to "provide a meaningful incentive to many customers to switch to paying with a debit card, cash or check." Ross Decl. ¶ 8.

16

anything that would violate section 518, and therefore lack standing. The remaining four plaintiffs, however -- Expressions, Fiacco, Five Points Academy, and its vice-president Stephen Milles - - assertedly want to advertise and their credit-card surcharges only as a percentage fee added on top of their cash prices. See Suppl. Decl. of Linda Fiacco; Suppl. Decl. of Stephen Milles. Because these plaintiffs propose not to disclose their credit-card prices in dollars and cents at all (i.e., not as a "sticker price"), their proposals would violate defendants' reading of the statute. Defendants accordingly concede that these four plaintiffs have standing.

But defendants' rather convoluted interpretation of the statute runs into several difficulties. The most obvious is the plain text of section 518 itself, which, as previously stated, reads: "No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means." N.Y. Bus. Law § 518. The statute simply bans "surcharge[s]." This, on its face, chills any retailer from characterizing its prices as including a surcharge; conversely it says nothing, and provides no warning or guidance, about how prominently prices must be displayed or whether swipe fees must be disclosed in dollars and cents or as a percentage.

Defendants' interpretation also produces absurd results. Consider, for example, a seller who advertises two prices with equal prominence: "$100 per widget" and "$103 per widget with 3% credit-

17

card surcharge." It strains credulity to suggest that a seller using the latter language could not legitimately fear prosecution under section 518.

The actual history of prosecution under section 518 also belies defendants' interpretation. In 1987, just a few years after section 518 was enacted, the District Attorney for Bronx County prosecuted and convicted a gas-station owner, Eugene Fulvio, for imposing an unlawful credit-card fee of five cents per gallon, which was advertised as such. After trial, the Bronx County Criminal Court granted Fulvio's motion to dismiss the charge under section 518 on the ground that, as applied, section 518 was impermissibly vague. See People v. Fulvio ("Fulvio II"), 517 N.Y.S.2d 1008, 1009-10 (N.Y. Crim. Ct. 1987).[5] In the course of its ruling, the court concluded that, based on "the facts developed in this case," "the pertinent legislative history," and "the position of the People," "precisely the same conduct by an individual may be treated either as a criminal offense or as lawfully permissible behavior depending only upon the label the individual affixes to his economic behavior, without substantive difference." Id. at 1011 (emphasis original). Although Fulvio had testified that "the signs in his station clearly stated the 'cash price' and the 'credit price' for his gasoline," id. at 1010, the court found it "clear that conviction may be had

---

[5] In an earlier decision in the same case, the court rejected Fulvio's argument that section 518 was impermissibly vague on its face. See People v. Fulvio ("Fulvio I"), 514 N.Y.S.2d 594, 596-97 (N.Y. Crim. Ct. 1987).

18

under the literal terms of GBL § 518 regardless of sign displays,"
id. at 1011.  In the court's view, "§ 518 creates a distinction
without a difference; it is not the act which is outlawed, but the
word given that act."  Id. at 1015 (emphasis original).

     Although Fulvio is one of the few reported cases involving
prosecution under section 518, defendants attempt to dismiss it as a
kind of aberration and to find support for their interpretation of
section 518 in the definitions of the terms "surcharge," "discount,"
and "regular price" that existed under the now-lapsed federal
statute.  But in enacting section 518 the New York legislature chose
not to enact those definitional provisions.  And even if it had, the
federal definitions, like section 518 itself, make no mention of how
prominently a seller's credit-card price must be disclosed or
whether it may be expressed in dollars and cents or a percentage.

     Nor can defendants point to any case law or official
pronouncement that would limit section 518's scope to match the
lapsed federal definitions.  To the contrary, the Attorney General's
most recent enforcement actions under section 518 are inconsistent
with the federal definitions.  As the federal legislative history
shows, the federal definitions were designed to "permit[] merchants
to have two-tier pricing systems," provided that "when prices are
tagged or posted, the consumers will be exposed to the highest price
when they see a tagged or posted price."  S. Rep. No. 97-23, at 4

(emphasis added).[6]  In a series of sweeps in 2008 and 2009, however,

then-Attorney General Andrew Cuomo enforced section 518 against

sellers that had no tagged or posted prices, but had only announced

their prices orally.[7]  These recent enforcement actions are fatal to

defendants' reliance on the federal definitions.  Contrary to

defendants' contention, sellers have every reason to fear, based on

recent history, that section 518 will be enforced beyond the bounds

of its federal precursor.

     For all of these reasons, the Court rejects defendants' reading

of the statute, and concludes that all of the plaintiffs here

legitimately fear that section 518 may be enforced against them.

All of the plaintiffs accordingly have standing.

     The Court therefore turns to the merits of plaintiffs' First

Amendment claim.  It is axiomatic that "[t]he First Amendment

---

[6] See also Cash Discount Act § 102 (defining "regular price" as (1)
the "tag or posted price" for an item if a single price is tagged or
posted, or (2) the credit-card price if (a) no price is tagged or
posted, or (b) two different prices are tagged or posted, one for
cash and one for credit).

[7] In a representative case, an investigator called a small home
heating oil company "pretending to be a customer ordering oil," and
an employee "quoted the price of oil and said that [the company]
charge[s] a fee on top of that price for using a credit card."
Decl. of Michael Parisi ¶ 6.  The Attorney General took the position
that that constituted the imposition of an unlawful surcharge under
section 518.  The company ultimately entered into an Assurance of
Discontinuance, which included an agreement to refund "all
previously imposed surcharges" over a specified period.  Id., ex. A,
¶ 9.  The Attorney General took the same position in numerous other
cases around the same time.  See Decl. of John Conover ¶¶ 3-5; Decl.
of Donna Zasowski ¶¶ 3-6; Second Decl. of Deepak Gupta ("Second
Gupta Decl."), exs. F, H (press releases announcing settlements with
numerous other heating-oil companies).

20

protects against government regulation and suppression of speech on account of its content." United States v. Caronia, 703 F.3d 149, 162-63 (2d Cir. 2012). Content-based restrictions on speech "require[] heightened scrutiny" and are "presumptively invalid." Sorrell v. IMS Health Inc., 131 S. Ct. 2653, 2664, 2667 (2011). These general principles apply "whenever" the government restricts speech based on the message it conveys, and "[c]ommercial speech is no exception," id. at 2664. "Criminal regulatory schemes, moreover, warrant even more careful scrutiny." Caronia, 703 F.3d at 163.

Plaintiffs claim that section 518 is unconstitutional under these principles because it is an unsupportable content-based restriction on disfavored speech -- specifically, speech that describes an extra charge for credit-card usage as a credit-card "surcharge." Defendants, however, contend that section 518 on its face regulates non-expressive conduct -- "impos[ing] a surcharge" -- not speech. In the alternative, to the extent the statute can be read to regulate speech, defendants contend that it merely imposes a disclosure requirement, a type of regulation subject only to rational basis review. See Connecticut Bar Ass'n v. United States, 620 F.3d 81, 95 (2d Cir. 2010).

Defendants' arguments are unpersuasive. For all the reasons already stated, section 518 draws the line between prohibited "surcharges" and permissible "discounts" based on words and labels, rather than economic realities. So read, the statute clearly

regulates speech, not conduct, and does so by banning disfavored expression.

It bears noting, however, that even if section 518 somehow could be construed as defendants propose, it would still violate the First Amendment. To begin with, even as defendants read it, section 518 plainly regulates speech. Indeed, defendants' suggestion to the contrary turns the speech-conduct distinction on its head. Defendants argue that while "[i]t is true that if sellers want to use dual pricing, § 518 affects how they may communicate it," the statute "does not dictate the content of that communication at all," because "sellers are free to set the credit card price at whatever level they wish." Defs.' Mem. at 37. Thus, in defendants' view, setting prices (which section 518 does not regulate) is speech, but communicating those prices to customers (which the statute, on defendants' own analysis, does regulate) is conduct. That is precisely backwards. Pricing is a routine subject of economic regulation, but the manner in which price information is conveyed to buyers is quintessentially expressive, and therefore protected by the First Amendment.

Defendants' argument that their reading of section 518 does nothing more than impose a disclosure requirement fares no better. To be sure, the Supreme Court has held that the government may constitutionally require commercial speakers to disclose truthful factual information as long as it is "reasonably related to the State's interest in preventing deception of consumers." Zauderer v.

22

Office of Disciplinary Counsel of Sup. Ct. of Ohio, 471 U.S. 626, 651 (1985). But section 518 on defendants' reading does not merely impose a disclosure requirement, because disclosure alone is not sufficient for compliance. Rather, on defendants' reading, the statute also prohibits sellers from advertising their cash price in a way that causes consumers to perceive it as the regular, baseline price against which all other prices are measured.

It is instructive in this regard to compare defendants' interpretation of section 518 with Minnesota's surcharge law. Minnesota's law provides:

> A seller of goods or services may impose a surcharge on a purchaser who elects to use a credit card in lieu of payment by cash, check, or similar means, provided (1) the seller informs the purchaser of the surcharge both orally at the time of sale and by a sign conspicuously posted on the seller's premises . . . .

Minn. Stat. § 325G.051(1)(a) (emphasis added). A seller who fully complied with Minnesota's disclosure requirement would still violate defendants' reading of section 518 if it displayed its cash price one iota more prominently than the credit card price. In this sense, defendants interpret section 518 as an anti-disclosure statute, as they read the statute to bar a seller from disclosing its cash price even marginally more conspicuously than its credit-card price.

Because even on defendants' interpretation, section 518 contains not just a disclosure requirement but also an "outright prohibition[] on speech," id. at 650, Zauderer's lenient standard of

23

review is inapplicable, and the statute must be subjected to "heightened judicial scrutiny." Sorrell, 131 S. Ct. at 2664. In particular, commercial speech has traditionally been subject to intermediate scrutiny, which directs courts to consider (1) whether the regulated speech "concern[s] lawful activity and [is] not . . . misleading," (2) "whether the asserted governmental interest" justifying the regulation "is substantial," (3) "whether the regulation directly advances the governmental interest asserted," and (4) whether the regulation "is not more extensive than is necessary to serve the governmental interest." Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 566 (1980). Section 518, however it is interpreted, cannot pass muster under this standard, for three reasons.[8]

---

[8] Because the Court easily concludes that section 518 fails intermediate scrutiny, it need not resolve plaintiffs' argument that the statute sweeps up both commercial and noncommercial speech, subjecting the law to strict scrutiny. See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc., 487 U.S. 781, 796 (1988); Brown v. Entm't Merchants Ass'n, 131 S. Ct. 2729, 2738 (2011). The Court notes, however, that commercial speech generally includes speech that "does no more than propose a commercial transaction," United States v. United Foods, Inc., 533 U.S. 405, 409 (2001), or is "related solely to the economic interests of the speaker and its audience." Cent. Hudson, 447 U.S. at 561. In this case, while price information no doubt proposes a transaction and relates to economic interests, "what is going on here is more than just a debate about how best to sell toothpaste." BellSouth, 542 F.3d at 505. Plaintiffs want to convey not only the terms of a transaction, but also why prices are what they are and who is responsible. Given current debates over swipe fees and financial regulation more generally, those questions have a powerful noncommercial valence. See id. at 504-05 (discussing a regulation prohibiting a seller from including a line item on an invoice separately detailing the cost of a particular tax); Bloom v. O'Brien, 841 F. Supp. 277, 280-81 (D. Minn. 1993) (similar).

24

First, the speech restricted by section 518 concerns lawful conduct and is non-misleading. The regulated speech pertains solely to dual pricing, which all parties agree is lawful in itself. And while defendants make much of the fact that credit-card surcharges may be misleading if they are hidden or inadequately disclosed, "the States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not deceptive." In re R.M.J., 455 U.S. 191, 203 (1982). The Court finds nothing "inherently misleading" about a seller describing a price difference as a credit-card "surcharge" or displaying its credit-card price with marginally less prominence than the cash price. Id. Indeed, by truthfully and effectively conveying the true costs of using credit cards, surcharges can actually make consumers more informed rather than less, thus furthering rather than impeding the purposes of the First Amendment. See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 765 (1976).

Second, section 518 does not "directly advance[]" any interest in protecting consumers from deception. Cent. Hudson, 447 U.S. at 566. To the contrary, insofar as it prohibits credit-card surcharges that are not misleadingly presented, the statute actually perpetuates consumer confusion by preventing sellers from using the most effective means at their disposal to educate consumers about the true costs of credit-card usage. It would be perverse to conclude that a statute that keeps consumers in the dark about

avoidable additional costs somehow "directly advances" the goal of preventing consumer deception.

Moreover, even to the extent it can be said to prevent misleading speech, section 518 is riddled with numerous "exemptions and inconsistencies [that] bring into question the purpose" of the statute. Rubin v. Coors Brewing Co., 514 U.S. 476, 489 (1995). While defendants express concern for consumers who may be lured into a transaction they cannot complete without incurring additional unannounced charges, section 518 applies to only one particular type of additional charge: credit-card surcharges. The statute thus does not actually ensure that the most prominently displayed price consumers encounter will reflect the highest price they will have to pay, since handling charges, shipping costs, service fees, processing fees, "suggested tips," and any number of other types of additional charges -- which consumers may or may not be able to take steps to avoid -- may still be added on top.

Furthermore, even with respect to credit-card surcharges, New York has created numerous exceptions to section 518 for the state itself and certain favored utilities.[9] Defendants offer no

_____

[9] See N.Y. Crim. Proc. Law § 420.05 (authorizing York courts to impose "a reasonable administrative fee" on individuals who pay court-imposed fines or fees "by credit card or similar device"); N.Y. Crim. Proc. Law § 520.10(1)(i) ("[A]ny person posting bail by credit card or similar device . . . may be required to pay a reasonable administrative fee."); N.Y. Pub. Auth. Law § 1045-j(4-a)(b) (allowing the Water Board to "accept credit cards as a means of payment of fees, rates, rent or other charges," and to impose "a reasonable administrative service fee not to exceed the costs incurred by the water board in connection with such credit card

explanation for why credit-card surcharges are somehow less deceptive when imposed by the Water Board, for example, than when imposed by ordinary commercial retailers like the plaintiffs. See Greater New Orleans Broad. Ass'n, Inc. v. United States, 527 U.S. 173, 191 (1999) ("[T]he Government presents no convincing reason for pegging its speech ban to the identity of the owners or operators of the [speaker].")[10]

Finally, section 518 is far broader than necessary to serve any asserted anti-fraud purpose. New York easily could have limited its regulation to surcharges that are deceptive or misleading. Alternatively, it could have passed a provision similar to Minnesota's surcharge law, which permits credit-card surcharges so long as the seller "informs the purchaser of the surcharge both orally at the time of sale and by a sign conspicuously posted on the seller's premises." Minn. Stat. § 325G.051(1)(a)(1). And even in the absence of any statute specifically regulating surcharges, New York already has laws on the books prohibiting false advertising and deceptive acts and practices. See N.Y. Gen. Bus. Law §§ 349-350-a. For all these reasons, section 518 is plainly overbroad.

---

transaction."); N.Y. Pub. Serv. Law § 92-c(9) (allowing telecommunications providers to collect a "premises or location surcharge" for calls originating in the state that are charged to a credit card).

[10] As one commentator has observed, these kinds of exceptions make little sense "unless one sees them as an implicit acknowledgement that when the government plays the role of a merchant, it too does not want to be stuck with any of the transaction costs of credit." Levitan, The Antitrust Super Bowl, supra, at 285 n.92.

The Court accordingly concludes that section 518, however interpreted, violates the First Amendment.

The Court now moves on to plaintiffs' claim that section 518 is impermissibly vague. "As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 186 (2d Cir. 2010) (internal quotation marks omitted). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000). "The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." VIP of Berlin, 593 F.3d at 186 (internal quotation marks omitted). Here, section 518 is subject to the strictest vagueness scrutiny, as it both chills First Amendment rights and imposes criminal penalties. In addition, the statute also contains no "scienter requirement," thus potentially setting "a trap for those who act in

good faith." Colautti v. Franklin, 439 U.S. 379, 390 (1979)

(internal quotation marks omitted).

With these standards in mind, the Court has little difficulty

concluding that, to the extent liability under section 518 turns on

the labels that sellers use to describe their prices, the statute is

impermissibly vague.   Indeed, defendants make no attempt to defend

the statute so interpreted, conceding that it is "untenable."

Defs.' Mem. at 32.   That concession is well taken. In the words of

the court in Fulvio II:

> [it] is intolerable . . . that the gasoline station
> operator careful enough or sophisticated enough to always
> characterize the lower of [his] prices as a "discount for
> cash" may enter his automobile at the end of his business
> day and drive home a free man; however, if the same
> individual, or his colleague operating the station down
> the street, or his employee is careless enough to describe
> the higher price in terms which amount to the "credit
> price" having been derived from adding a charge to the
> lower price, he faces the prospect of criminal conviction
> and possible imprisonment.

517 N.Y.S.2d at 1015 (emphases in original).

Defendants' reading of section 518, whereby the statute simply

requires sellers to display their credit-card prices at least as

prominently as their cash prices, would present a closer question

under the Due Process Clause.   But as explained above, defendants'

narrowing interpretation strays markedly from the ordinary plain

meaning of the statute's text, and therefore cannot save it.   See

Vt. Right to Life Comm., Inc. v. Sorrell, 221 F.3d 376, 386 (2d Cir.

2000) (holding that federal courts may narrowly construe a state

statute to avoid constitutional problems only if the statute is

29

"readily susceptible to the limitation" (internal quotation marks omitted)).

The Court accordingly concludes that section 518 is also void for vagueness.

The Court now addresses plaintiffs' claim that section 518 is preempted by the federal Sherman Antitrust Act.  While plaintiffs have not moved for a preliminary injunction on this claim, defendants have moved to dismiss it.  In general, federal law preempts state law if the federal law does so expressly, if the federal law occupies the entire regulatory field, or if the state law conflicts with federal law such that "compliance with both federal and state regulations is a physical impossibility" or the state law "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  Arizona v. United States, 132 S. Ct. 2492, 2500-01 (2012) (internal quotation marks omitted).  In the antitrust context, the Supreme Court has held that the Sherman Act preempts state law only if the state law necessarily mandates, authorizes, or causes an antitrust violation.  See Fisher v. City of Berkeley, Cal., 475 U.S. 260, 265 (1986).  Applying that standard, the Second Circuit has held that a state or local law can be preempted if it has unreasonable "anticompetitive effects."  Hertz Corp. v. City of New York, 1 F.3d 121, 127 (2d Cir. 1993).

Here, the complaint alleges that by preventing retailers from effectively communicating the costs of credit-card usage to consumers, section 518 "insulates credit card companies from

30

competition, causes the costs of credit to skyrocket, and frustrates the purposes of federal antitrust law -- just as Visa and MasterCard's no-surcharge rules did." FAC ¶ 52. According to plaintiffs, because those contractual rules "constituted an antitrust violation, the no-surcharge law that now carries them out does so as well." Id. Defendants, however, argue that plaintiffs' preemption claim fails, because, properly interpreted, the statute "is pro-competitive: By requiring sellers to prominently disclose the credit card price, § 518 [enables] consumers to make an informed decision whether the higher credit card price is worth paying at an early moment in the transaction when they can feasibly switch cash." Defs.' Mem. at 42 (emphasis original).

Defendants' argument that section 518 fosters rather than impedes competition presents a factual question that cannot be resolved on a motion to dismiss. Because plaintiffs do not allege or argue that section 518 constitutes a per se unlawful restraint of trade, the statute must be subjected to a fact-intensive analysis under "rule of reason." That standard directs "the factfinder [to] weigh[] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) (internal quotation marks omitted).

Plaintiffs have more than plausibly alleged that section 518 violates the rule of reason. To begin with, the statute imposes a

31

surcharge ban indistinguishable from the bans that Visa and

MasterCard recently dropped from their retailer contracts as part of

an antitrust settlement.  In addition, state and federal no-

surcharge laws like section 518 were enacted in the name of consumer

protection at the behest of the credit-card industry over the

objection of consumer advocates.  And furthermore, as explained

above with respect to plaintiffs' First Amendment claim, the "fit"

between the statute's asserted purpose of protecting consumers and

its actual scope and effect is dubious at best.  Defendants may be

able to produce evidence to undercut or rebut these considerations

when this claim is fully adjudicated, but the claim cannot be

dismissed at this stage of the case.

Having addressed the merits of each of plaintiffs' three claims

for relief, the Court turns finally to the remaining factors

relevant to the issuance of a preliminary injunction.

First, it is plain that plaintiffs will suffer irreparable harm

in the absence of an injunction.  "The loss of First Amendment

freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373

(1976).  The Court has already explained why all plaintiffs

reasonably fear that section 518 will be enforced against them, and

the plaintiffs' sworn declarations detail how that fear burdens and

chills the exercise of their right to free speech.

Defendants assert that plaintiffs' injury is actually monetary

in nature, since plaintiffs desire to impose surcharges in order to

recoup and reduce the costs of swipe fees. Monetary harms are usually not irreparable. See, e.g., Dexter 345 Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir. 2011). But free expression is no less protected merely because it has an economic impact or motive. See Sorrell, 131 S. Ct. at 2665. And section 518 does not merely cause a monetary injury that then incidentally burdens plaintiffs' free speech rights; instead, it directly prohibits and penalizes free expression. See Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 72 (2d Cir. 1996) (drawing this distinction). That injury is cognizable and irreparable.

Defendants also argue that plaintiffs' delay in bringing this action belies their claim of irreparable harm. To be sure, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights," and delay thus "tends to indicate at least a reduced need for such drastic, speedy action." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985). But any delay in this case was not unreasonable. As noted, the controversy over section 518 only became "live" after Visa and MasterCard dropped their contractual bans on surcharges in January of this year as part of an antitrust settlement. In May, Visa and MasterCard were still working to give retailers the technical ability to impose surcharges over the relevant networks. See Decl. of Gary B. Friedman ¶¶ 1-5. This suit was then filed on June 4, 2013. Furthermore, as of the date of this Opinion, the antitrust settlement still has not been

33

finally approved. See In re Payment Card Interchange Fee Merchant Discount Antitrust Litig., No. 05-MD-01720 (JG)(JO) (E.D.N.Y. fairness hearing held Sept. 12, 2013). Plaintiffs have not sat on their rights, and have more than adequately shown irreparable harm.

As to the public interest, the public has an undeniable interest in having access to full and accurate information. As the Supreme Court has explained, even in the context of purely commercial information, "[t]he listener's interest is substantial: the consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue." Bates v. State Bar of Arizona, 433 U.S. 350, 364 (1977). "Advertising," moreover, "though entirely commercial, may often carry information of import to significant issues of the day." Id. These values are well exemplified by plaintiffs' desired speech. Consumers make decisions about methods of payment millions of times every day, and credit-card surcharges convey information that is critical to those decisions. The information conveyed by surcharges also is relevant to current debates over swipe fee regulation, as well as financial regulation more broadly. And even beyond the informational content of surcharges, sellers' inability to effectively inform consumers of the true costs of credit has the effect of artificially subsidizing credit at the expense of cash, increasing overall credit-card usage and consumer debt.

Accordingly, for the foregoing reasons, the Court hereby preliminarily enjoins the defendants from enforcing section 518 of

34

the New York General Business Law during the pendency of this case, and denies defendants' motion to dismiss in full. In addition, the stay of proceedings imposed on August 14, 2013 is hereby lifted. The parties are directed, within one week of the date of this Order, to jointly telephone Chambers to schedule further proceedings in this case. The Clerk of the Court is directed to close documents numbered 26 and 49 on the docket of this case.

SO ORDERED.

Dated: New York, NY
October 3, 2013

JED S. RAKOFF, U.S.D.J.